## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

LORRAINE M. RAMOS, CONSTANCE
R. WILLIAMSON, KAREN F.
MCLEOD, ROBERT MOFFITT,
CHERLENE M. GOODALE, LINDA
ANN HEYRMAN, and DELRI
HANSON, individually and as
representatives of a class of plan
participants, on behalf of the Banner
Health Employees 401(k) Plan,

       *Plaintiffs*,

v.

BANNER HEALTH, BANNER
HEALTH BOARD OF DIRECTORS,
LAREN BATES, WILFORD A.
CARDON, RONALD J. CREASMAN,
GILBERT DAVILA, WILLIAM M.
DWYER, PETER S. FINE, SUSAN B.
FOOTE, MICHAEL J. FRICK,
MICHAEL GARNREITER, RICHARD
N. HALL, BARRY A. HENDIN, DAVID
KIKUMOTO, LARRY S. LAZARUS,
STEVEN W. LYNN, ANNE
MARIUCCI, MARTIN L. SHULTZ,
MARK N. SKLAR, QUENTIN P.
SMITH, JR., CHRISTOPHER VOLK,
CHERYL WENZINGER, BANNER
HEALTH RETIREMENT PLANS
ADVISORY COMMITTEE, BRENDA
SCHAEFER, BRUCE E. PEARSON,
CHARLES P. LEHN, COLLEEN
HALLBERG, DAN WEINMAN,
DENNIS DAHLEN, ED NIEMANN,
JR., ED OXFORD, JEFF BUEHRLE,
JENNIFER SHERWOOD, JULIE
NUNLEY, MARGARET DEHAAN,
PATRICIA K. BLOCK, PAULETTE

Case No. 1:15-cv-02556-WJM-MJW

AMENDED COMPLAINT—CLASS
ACTION

JURY TRIAL DEMANDED

Exhibit 1

FRIDAY, RICHARD O. SUTTON,
ROBERT LUND, MICHAEL GILLEN,
STEVEN L. SEILER, THOMAS R.
KOELBL, and JEFFREY SLOCUM &
ASSOCIATES, INC.,

                *Defendants.*

## AMENDED COMPLAINT

1.     This case arises from breaches of fiduciary duties by Defendants

Banner Health, the Banner Health Board of Directors, including individual

directors Laren Bates, Wilford A. Cardon, Ronald J. Creasman, Gilbert Davila,

William M. Dwyer, Peter S. Fine, Susan B. Foote, Michael J. Frick, Michael

Garnreiter, Richard N. Hall, Barry A. Hendin, David Kikumoto, Larry S. Lazarus,

Steven W. Lynn, Anne Mariucci, Martin L. Shultz, Mark N. Sklar, Quentin P.

Smith, Jr., Christopher Volk, and Cheryl Wenzinger; the Banner Health Retirement

Plans Advisory Committee, including individual members Brenda Schaefer, Bruce

E. Pearson, Charles P. Lehn, Colleen Hallberg, Dan Weinman, Dennis Dahlen, Ed

Niemann, Jr., Ed Oxford, Jeff Buehrle, Jennifer Sherwood, Julie Nunley, Margaret

DeHaan, Patricia K. Block, Paulette Friday, Richard O. Sutton, Robert Lund,

Michael Gillen, Steven L. Seiler, and Thomas R. Koelbl; and Jeffrey Slocum &

Associates, Inc., related to their imprudent and disloyal administration, operation

and management of Banner Health's employees' 401(k) plan (the Banner Health

Exhibit 1

Employees 401(k) Plan, "the Plan").[1]

2.    The marketplace for retirement plan services is established and competitive. Billion-dollar 401(k) plans, like this Plan, wield tremendous bargaining leverage and can obtain high-quality investment management and administrative services at very low costs. Defendants, as fiduciaries to the Plan, are obligated to act for the exclusive benefit of participants and without self-interest. Defendants failed these obligations in their imprudent and disloyal management and operation of the Plan. For instance, instead of using the Plan's bargaining power in the marketplace to provide selected core investment options, the Banner Health Defendants, who were advised by Slocum, maintained over 400 investment options in the Plan, despite almost one-third of these funds ranking in the bottom half of their investment category causing substantial Plan losses. The average number of investment options in jumbo-sized 401(k) plans, like this Plan, is 13–15 (excluding target-date funds). These Defendants further caused the Plan to pay unreasonable recordkeeping and administrative fees to Fidelity through excessive asset-based compensation, and direct payments to Banner Health, that are multiples of the market rate for the same services. Rather than fully recapturing these excessive fees for the exclusive benefit of Plan participants, the Banner Health Defendants

---

[1] Banner Health, the Banner Health Board of Directors, the individual directors, the Banner Health Retirement Plans Advisory Committee, and the individual committee members, are collectively referred to as the "Banner Health Defendants". Jeffrey Slocum & Associates, Inc. is referred to as "Slocum".

Exhibit 1

allowed the excessive fees to benefit not only themselves but other Banner Health-sponsored retirement plans and corporate plans. By failing to act solely in the interest of Plan participants and failing to adequately monitor the Plan's investment options and service providers, Defendants breached their fiduciary duties of loyalty and prudence, and the Banner Health Defendants engaged in transactions expressly prohibited by ERISA.[2] The Banner Health Defendants prevented participants in the Plan from discovering their breaches through a series of false and misleading communications to Plan participants.

3.     To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants in the Plan, bring this action on behalf of the Plan under 29 U.S.C. §§1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan any profits made through Defendants' use of the Plan's assets. In addition, Plaintiffs seek to reform the Plan to comply with ERISA and to prevent further breaches of ERISA's fiduciary duties and other such equitable or remedial relief for the Plan as the Court may deem appropriate.

---

[2] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

Exhibit 1

## JURISDICTION AND VENUE

4.     This Court has federal question subject matter jurisdiction under 28 U.S.C. §1331 because this is an action under 29 U.S.C. §1132(a)(2) and (3), for which federal district courts have exclusive jurisdiction under 29 U.S.C. §1132(e)(1).

5.     This district is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district where at least one Defendant may be found. All Defendants are subject to nationwide service of process under 29 U.S.C. §1132(e)(2).

## PARTIES

### Banner Health Employees 401(k) Plan

6.     Banner Health is a non-profit corporation that established and maintains the Plan for its eligible employees. Banner Health is the Plan sponsor under 29 U.S.C. §1002(16)(B). Banner Health maintains its business and has employed individuals (including Plaintiffs) in Brush, Fort Collins, Loveland, Sterling, and Greeley, Colorado, and thus may be found in this district.

7.     As required by 29 U.S.C. §1102(a)(1), the Plan is established and maintained by a written plan document titled "Banner Health Employees 401(k) Plan." The Plan was originally created as a profit-sharing retirement plan and was also named the Banner Health System Employees 401(k) Plan. Effective January 1, 2004, the name of the Plan was changed to the Banner Health Employees 401(k) Plan. The Plan document has been amended and restated repeatedly, most recently

Exhibit 1

on January 1, 2008. In 2000, 2001, and 2002, the Plan was restated as a nonstandardized prototype plan derived from a Fidelity FITSCO Defined Contribution Plan Basic Plan Document.

8.     With the possible exception of certain employees covered by collective bargaining agreements, all employees of Banner Health and certain of its affiliates are eligible to participate in the Plan.

9.     The Plan is an "employee pension benefit plan" under 29 U.S.C. §1002(2)(A), and an "individual account plan" or "defined contribution plan" under 29 U.S.C. §1002(34).

10.     As of December 31, 2014, the Plan held $2,010,435,718 in assets and had 33,026 participants with account balances.

11.     The Plan document identifies Banner Health as the named fiduciary of the Plan under 29 U.S.C. §1102(a) and the Plan administrator under 29 U.S.C. §1002(16)(A).

12.     In accordance with 29 U.S.C. §1103(c), the Plan document provides for all Plan assets to be held in trust by a trustee appointed by Banner Health under such terms as Banner Health determines, consistent with ERISA and the Plan document. As of December 24, 2007, Banner Health entered into a Trust Agreement with Fidelity Management Trust Company, which superseded and combined a 1999 Recordkeeping Agreement and a 2004 Trust Agreement.

Exhibit 1

13.     Fidelity Management Trust Company, Inc. provides recordkeeping and administrative services to the Plan as described in the 2007 Trust Agreement. In addition to providing recordkeeping services to the Plan, Fidelity has provided recordkeeping and administrative services to other Banner Health-sponsored plans, including the Banner Health 403(b) Plan, the Banner Health Retirement Income Plan, the Sun Health Pension Plan, the Sun Health 401(k) Plan, and other Banner Health non-qualified supplemental executive compensation plans, among others. Previously, Fidelity Investments Institutional Operations Company, Inc. (another Fidelity entity) provided recordkeeping and administrative services to the Plan. Both companies are wholly owned subsidiaries of FMR LLC, a privately owned limited liability company that presents itself as Fidelity Investments. Several Fidelity entities provide or have provided services to the Plan, including Fidelity Management & Research Company, which is the investment adviser for Fidelity mutual funds. All of these Fidelity entities, along with their affiliates, subsidiaries, parents, and otherwise will be referred herein as "Fidelity."

14.     Section 5(b) of the Trust Agreement provides that Banner Health as the named fiduciary shall direct the Trustee as to the investment options that will be offered in the Plan and limits those options to "(1) Mutual Funds, (2) Notes evidencing loans to Participants in accordance with the terms of Plan, and (3) Collective investment funds managed by the Trustee." Banner Health also represents to Plan participants in the Plan's summary plan description that the

Exhibit 1

designated investment options under the Plan include "Fidelity Investments mutual funds, Fidelity FundsNet funds, and Non-Fidelity mutual funds", which were purportedly selected by the Plan fiduciaries.

15.    The investment options provided in the Plan are listed on Schedule C of the Trust Agreement. The Trust Agreement requires all additions or deletions to Schedule C be reflected in an amendment. The Banner Health Defendants, however, have allowed Plan investment options to change without amending Schedule C of the Trust Agreement.

16.    Schedule C to the 2007 Trust Agreement indicates that the Plan investment options shall be all mutual funds advised by one mutual fund company—Fidelity Management & Research Company—or any of its affiliates, currently in existence or available in the future (*i.e.*, all Fidelity mutual funds), as well as 185 specified non-Fidelity mutual funds. On Plaintiffs' information and belief, the 185 mutual funds are included only because they pay to Fidelity a share of the fees they collect from investments in those funds. The Banner Health Defendants, who were provided ongoing investment advice from Slocum, selected and maintained these mutual fund investments, including *hundreds* of Fidelity proprietary mutual funds, which provided unreasonable compensation to Fidelity for recordkeeping and administrative services. In exchange for the substantial revenue and profits derived from Plan assets, Banner Health received preferential pricing on Banner Health's other plans that were also serviced by Fidelity,

Exhibit 1

including other defined contribution plans, defined benefit plans, and non-qualified plans offered to Banner Health executives.

17.     Mutual funds have different share classes, which are identical in all respects, including securities held, asset allocation, and investment managers. The only difference between share classes is expense, which is significantly higher for retail share class funds compared to institutional share classes. Large asset holders are able to purchase institutional share classes. In at least eight instances, the Banner Health Defendants, as advised by Slocum, provided mutual funds in multiple share classes as Plan investment options. In other instances, they provided mutual funds in a share class that was more expensive than other classes available to the Plan.

18.     The Banner Health Defendants also previously designated Fidelity's Freedom Fund target date retirement funds as the Plan's default investment option until May 29, 2015.

19.     The Fourth Amendment to the Trust Agreement, dated June 15, 2012, made the "Portfolio Advisory Service®" available to Plan participants. Portfolio Advisory Service® is represented to be an independent discretionary investment management service provided by Strategic Advisers, which is owned by the Fidelity parent entity FMR, LLC. It is represented to participants as independent advice on how to invest their retirement savings among the Plan's investment options. In fact, Portfolio Advisory Service® is merely a device that Fidelity employs to push

Exhibit 1

participants into its own Fidelity investments or other investments that share fees with Fidelity. The accounts of participants who enroll in the service are charged an annual asset-based fee that varies depending on the percentage of Plan participants who enroll. When fewer than 20% of participants enroll, the fee is 86 basis points ("bps") of the first $100,000, 76 bps of the next $150,000, and 61 bps of the average daily plan assets over $250,000 of total participant balances enrolled in the service.[3] If more than 20% enroll, the percentages decrease to 76 bps, 66 bps, and 56 bps. Strategic Advisers receives revenue sharing payments from the mutual funds into which it directed participants and claims to have credited those payments against the fees it charged. Participants pay the revenue sharing payments received by Fidelity's Strategic Advisers. On information and belief, Strategic Advisers does not credit all revenue sharing it receives.

### Plaintiffs

20.     Plaintiff Lorraine M. Ramos resides in Greeley, Colorado. She retired from her career as a respiratory therapist at Banner Health, but remains a participant in the Plan under 29 U.S.C. §1002(7) because she or her beneficiaries are eligible to receive benefits under the Plan.

21.     Plaintiff Constance R. Williamson resides in Greeley, Colorado. She is a surgical nurse for Banner Health and is a participant in the Plan under 29 U.S.C.

---

[3] One basis point is equal to 1/100th of one percent (or 0.01%).

Exhibit 1

§1002(7) because she or her beneficiaries are eligible to receive benefits under the Plan.

22.    Plaintiff Karen F. McLeod resides in Fort Collins, Colorado. She is a registered nurse for Banner Health and is a participant in the Plan under 29 U.S.C. §1002(7) because she or her beneficiaries are eligible to receive benefits under the Plan.

23.    Plaintiff Robert Moffitt resides in Loveland, Colorado. He is a registered nurse for Banner Health and is a participant in the Plan under 29 U.S.C. §1002(7) because he or his beneficiaries are eligible to receive benefits under the Plan.

24.    Plaintiff Cherlene M. Goodale resides in Loveland, Colorado. She was a director for medical imaging at Banner Health and a participant in the Plan until 2014, when her account balance was distributed from the Plan. Ms. Goodale nonetheless is entitled to receive benefits from the Plan in the amount by which her account would have increased in value as of the time of the account distribution had Defendants not breached their duties as alleged herein or had Defendants performed their duties under 29 U.S.C. §1109(a) before that date.

25.    Plaintiff Linda Ann Heyrman resides in Loveland, Colorado. She was a registered nurse for Banner Health and a participant in the Plan until 2011, when her account balance was distributed from the Plan. Ms. Heyrman nonetheless is entitled to receive benefits from the Plan in the amount by which her account would

Exhibit 1

have increased in value as of the time of the account distribution had Defendants not breached their duties as alleged herein or had Defendants performed their duties under 29 U.S.C. §1109(a) before that date.

26.    Plaintiff Delri Hanson resides in Loveland, Colorado. She was a medical assistant for Banner Health and a participant in the Plan until 2013, when her account balance was distributed from the Plan. Ms. Hanson nonetheless is entitled to receive benefits from the Plan in the amount by which her account would have increased in value as of the time of the account distribution had Defendants not breached their duties as alleged herein or had Defendants performed their duties under 29 U.S.C. §1109(a) before that date.

## Defendants

27.    Banner Health is the named fiduciary of the Plan under 29 U.S.C. §1102(a) and the Plan administrator. It also is a functional fiduciary under 29 U.S.C. §1102(21)(A) because it has discretionary authority and control over the investment options made available to Plan participants; over the hiring, monitoring, and removal of Plan service providers such as the trustee and recordkeeper; and all decisions and determinations over operation and administration of the Plan. Banner Health also exercises authority and control over Plan assets.

28.    The Plan document allows Banner Health's Board of Directors, or any committee of the Board authorized by the Board to act on its behalf, to act for Banner Health regarding its fiduciary duties to the Plan. The Plan document,

Exhibit 1

however, directs the Board to delegate its responsibilities with respect to all administrative actions under the Plan to Banner Health's Chief Executive Officer (CEO). Defendant Peter Fine has served as Banner Health's CEO since 2000. The Board has sole authority and responsibility under the Plan with respect to the delegation of authority and fiduciary responsibility to the CEO, reviewing and monitoring the performance of the CEO with respect to the duties that are delegated to him or her under the Plan, and taking any corrective action that is prudent or appropriate with respect to the performance of the CEO's duties under the Plan.[4] In this way, the CEO and the Board act on behalf of Banner Health as to the Plan in the same manner that they act on behalf of Banner Health as to Banner Health's other corporate activities.

29.     The Plan document provides for a Banner Health Defined Contribution Plan Committee to advise Banner Health with respect to Plan investment and administrative functions.[5] The First Amendment to the Plan document changed the name of the Committee, effective May 15, 2008, to "The Banner Health Retirement Plans Advisory Committee" (hereinafter, the "Committee"). Banner Health's CEO has authority to appoint the members of the Committee, to review and evaluate the Committee's performance, and to take any corrective action that is prudent and appropriate, including the removal of members of the Committee.

_____

[4] Plan §11.1.
[5] Plan §§2.10, 11.1(b).

Exhibit 1

30.     The Plan document and the Plan's "Statement of Fiduciary Duties and Procedures and Investment Objectives and Policies" ("IPS") provide that the Committee is responsible for all investment and administrative functions related to the Plan, including selecting, monitoring, evaluating, retaining, and making recommendations regarding the selection and removal of Plan investment options and appointing, monitoring, and removing an independent investment consultant to act as a fiduciary of the Plan to evaluate the investment options and make recommendations regarding appropriate investment options. The Plan document provides that the Committee is responsible for appointing, monitoring, removing investment managers, and appointing, monitoring, and removing the Trustee, custodian, and recordkeeper of the Plan with respect to investment functions and reviewing the reasonableness of investment-related fees paid by the Plan.

31.     In addition to its stringent fiduciary duties owed to the Plan, the Committee is responsible for all investment and administrative functions related to other Banner Health-sponsored retirement plans, including the Banner Health Employees 403(b) Plan, the Banner Health Retirement Income Plan, the Sun Health Pension Plan, and the Sun Health 401(k) Plan, among others. The Committee performed its fiduciary functions on behalf of the Plan in conjunction with its duties owed to other Banner Health-sponsored retirement plans, such as during the same fiduciary committee meeting.

Exhibit 1

32.    The Committee also acts as Plan Administrator, or it may appoint another committee or individual to perform any or all of the following Plan administrative functions:

a.  appoint and monitor the trustee, custodian, and recordkeeper with respect to administrative functions under the Plan and taking prudent and appropriate actions, including the removal of any such parties;

b.  monitor the reasonableness of Plan administrative fees;

c.  determine the construction and interpretation of the Plan, including benefits eligibility and Plan administration;

d.  provide Participants with information regarding their rights, benefits, and accounts under the Plan, as required by ERISA;

e.  adopt rules and regulations necessary for the proper and efficient Plan administration;

f.   direct the trustee, custodian, and recordkeeper regarding eligibility for, contributions to, account balances under, and distributions from the Plan;

g.  comply with all reporting and disclosure requirements;

h.  approve all amendments to the Plan, which must be executed by the CEO or Vice President—Total Compensation;

i.  appoint, employ, and oversee agents and delegate to them any of the administrative or ministerial powers or duties of the Plan Administrator; and

Exhibit 1

j.    take prudent and appropriate corrective action, including the removal

of any such agents or delegates.

33.    The actions taken by Peter Fine and other Banner Health officers,

directors, employees, agents, affiliates, subsidiaries, and committees, as to the Plan

were actions on behalf of, and thus the actions of, Banner Health.

34.    The following individuals are current or former members of the Banner

Health Board of Directors: Laren Bates, Wilford A. Cardon, Ronald J. Creasman,

Gilbert Davila, William M. Dwyer, Peter S. Fine, Susan B. Foote, Michael J. Frick,

Michael Garnreiter, Richard N. Hall, Barry A. Hendin, David Kikumoto, Larry S.

Lazarus, Steven W. Lynn, Anne Mariucci, Martin L. Shultz, Mark N. Sklar,

Quentin P. Smith, Jr., Christopher Volk, and Cheryl Wenzinger. By virtue of their

membership and activities on the Board, each of these individuals had and

exercised discretionary authority and responsibility in the administration of the

Plan, exercised discretionary authority or control respecting management of the

Plan, exercised authority or control respecting management or disposition of Plan

assets, and directly facilitated and participated in the Board's breaches of fiduciary

duties. Thus, each of these individuals is a fiduciary with respect to the Plan under

29 U.S.C. §1002(21)(A).

35.    Defendant CEO Peter Fine and the other current or former members of

the Committee are fiduciaries of the Plan under 29 U.S.C. §1002(21)(A) because

they exercised discretionary authority or discretionary control respecting

16

Exhibit 1

management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, or had discretionary authority or discretionary responsibility in the administration of the Plan.

36.     The following individuals are current or former members of the Committee: Brenda Schaefer, Bruce E. Pearson, Charles P. Lehn, Colleen Hallberg, Dan Weinman, Dennis Dahlen, Ed Niemann, Jr., Ed Oxford, Jeff Buehrle, Jennifer Sherwood, Julie Nunley, Margaret DeHaan, Patricia K. Block, Paulette Friday, Richard O. Sutton, Robert Lund, Michael Gillen, Steven L. Seiler, and Thomas R. Koelbl. By virtue of their membership and activities on the Committee, each of these individuals had and exercised discretionary authority and responsibility in the administration of the Plan, exercised discretionary authority or control respecting management of the Plan, exercised authority or control respecting management or disposition of Plan assets, and directly facilitated and participated in the Committee's breaches of fiduciary duties. Thus, each of these individuals is a fiduciary with respect to the Plan under 29 U.S.C. §1002(21)(A).

37.     Defendant Jeffrey Slocum & Associates, Inc. serves as an independent third-party investment consultant hired by Banner Health to function as a fiduciary with respect to the investment and administration of the assets of the Plan and other Banner Health corporate assets and sponsored retirement plans.  In this role, Slocum conducted an ongoing review of the applicable investment policy statement that governed the investment of assets held in Banner Health's 401(k) plans,

Exhibit 1

defined benefit plans, supplemental executive plans, as well as Banner Health's other corporate assets. Under the applicable IPS, Slocum was charged with the ongoing review of the investment options in the Banner Health-sponsored retirement plans, including the Plan. Slocum was also responsible for performing investment manager evaluations and searches when an investment manager was added to the Banner Health plans. During the transition to the selected investment manager, Slocum also assisted in the Committee in negotiating fees, among other duties. Slocum performed ongoing investment consulting services, such as providing written investment performance evaluations on a quarterly basis to the Committee, and performed asset liability and allocation evaluations. In performing investment services on behalf of the Plan, Slocum received a fee paid directly from Plan assets.

38.     Under the agreement between Slocum and Banner Health dated June 28, 2010, and as confirmed by the Plan's IPS, Slocum acknowledges that it is a "fiduciary within the meaning of section 3(21)(A)(ii) of ERISA [29 U.S.C. §1002(21)(A)(ii)] with respect to the Defined Benefit and 401(k) Plans." During all relevant time periods applicable to Plaintiffs' claims, Slocum has functioned as a fiduciary to the Plan. Based on the services performed on behalf of the Plan, Slocum is a fiduciary to the Plan because it rendered investment advice for a fee with respect to Plan assets, or had responsibility to do so. 29 U.S.C. §1002(21)(A)(ii).

Exhibit 1

39.     The fiduciary functions are allocated to the Board, the CEO, and the Committee in contradictory ways. Therefore, all Banner Health Defendants are collectively referred to in the paragraphs below.

**ERISA'S FIDUCIARY STANDARDS AND PROHIBITED TRANSACTIONS**

40.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a) states, in relevant part, that, "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and] (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims." The standard for the level of expertise that fiduciaries are held is that of a prudent expert in financial matters. *See, e.g., Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984).

41.     Under 29 U.S.C. 1103(c)(1), with certain exceptions not relevant here, "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

42.     Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must

Exhibit 1

act prudently and solely in the interest of participants in the plan. "[A] fiduciary of a defined contribution, participant-driven, 401(k) plan created to provide retirement income for employees who is given discretion to select and maintain specific investment options for participants—must exercise prudence in selecting and retaining available investment options." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007). In determining whether a fiduciary has selected investments prudently, courts "examine the totality of the circumstances[.]" *Id.*

43.     ERISA fiduciaries selecting plan investments and service providers "must also scrupulously adhere to a duty of loyalty, and make any decisions in a fiduciary capacity with 'an eye single to the interests of the participants and beneficiaries.'" *Id.* at 418–19. "Corporate officers must 'avoid placing themselves in a position where their acts [or interests] as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan.'" *Id.* at 419 (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)). As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

44.     An investment policy statement or IPS is a governing plan document within the meaning of 29 U.S.C. §1104(a)(1)(D). *See* 29 C.F.R. §2509.94-2 (1994), replaced by 29 C.F.R. §2509.08-2(2)(2008)("Statements of investment policy issued by a named fiduciary authorized to appoint investment managers would be part of

Exhibit 1

the 'documents and instruments governing the plan' within the meaning of ERISA

Sec. 404(a)(1)(D)."). "Fiduciaries who are responsible for plan investments governed

by ERISA must comply with the plan's written statements of investment policy,

insofar as those written statements are consistent with the provisions of ERISA."

*Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1042

(9th Cir. 2001). "[F]ailure to follow written statements of investment policy

constitutes a breach of fiduciary duty." *Id.* (citing *Dardaganis v. Grace Capital, Inc.*,

889 F.2d 1237, 1241–42 (2d Cir. 1989)). A violation of investment guidelines is an

independent breach of fiduciary duty, regardless of whether the action was

otherwise prudent. *See* 29 U.S.C. §1104(a)(1)(D).

45.   ERISA also imposes co-fiduciary liability on plan fiduciaries. Under 29

U.S.C. §1105(a), in addition to any liability for its own breach, a fiduciary "shall be

liable for a breach of fiduciary responsibility of another fiduciary with respect to the

same plan in the following circumstances: (1) if he participants knowingly in, or

knowingly undertakes to conceal, an act or omission of such other fiduciary,

knowing such act or omission is a breach; or (2) if, by his failure to comply with

section 404(a)(1) in the administration of his specific responsibilities which give rise

to his status as a fiduciary, he has enabled such other fiduciary to commit a breach;

or (3) if he has knowledge of a breach by such other fiduciary, unless he makes

reasonable efforts under the circumstances to remedy the breach."

Exhibit 1

46.     The general duties of loyalty and prudence imposed by 29 U.S.C. §1104 are supplemented by a list of transactions that are expressly prohibited by 29 U.S.C. §1106, and are considered *per se* violations because they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent part, that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect (A) sale or exchange, or leasing, of any property between the plan and a party in interest; ... (C) furnishing of goods, services, or facilities between the plan and party in interest; [or] (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan…" Section 1106(b) provides, in pertinent part, that "a fiduciary with respect to the plan shall not (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interest of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

47.     Under 29 U.S.C. §1109(a), "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such

Exhibit 1

plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary." 29 U.S.C. §1132(a)(2) empowers any plan participant to bring a civil action for appropriate relief under 29 U.S.C. §1109 on behalf of the plan.

48.     29 U.S.C. §1132(a)(3) provides a cause of action against a non-fiduciary "party in interest" who knowingly participates in prohibited transactions or knowingly receives payments made in breach of a fiduciary's duty, and authorizes "appropriate equitable relief" such as restitution or disgorgement to recover ill-gotten proceeds from the non-fiduciary.

## FACTS APPLICABLE TO ALL COUNTS

### The Banner Health Defendants and Slocum had no prudent or loyal process for selecting and retaining Plan investment options.

49.     In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts, which is determined solely by employee and employer contributions plus the amount gained through investment in the options that plan fiduciaries provide, less expenses. *See* 29 U.S.C. §1002(34); *Tibble,* 135 S. Ct. at 1826. Poor investment performance and excessive fees can significantly impair the value of a participant's retirement account. Over time, even seemingly small differences in fees and performance can result in vast differences in the amount of savings available at retirement. *See*, *e.g.*, U.S. Dep't of Labor, *A Look*

Exhibit 1

*at 401(k) Plan Fees* 1–2 (Aug. 2013)(1% difference in fees over 35 years reduces a participant's account balance at retirement by 28%).

50.     Here, the Banner Health Defendants, as advised by Slocum, controlled the investments in which Plan participants could place their retirement assets. Prudent and loyal fiduciaries evaluate each plan investment option to ensure it is and remains a prudent investment for participants' retirement savings. A prudent fiduciary process involves an analysis of investment style, historical performance, fees and expenses, manager skill and tenure, and appropriate investment vehicle (mutual fund, collective trust, and separate account), among others. That analysis must continue throughout the time investment options remain in the Plan, since fiduciaries have an ongoing duty to monitor the prudence of plan investment options. *Tibble*, 135 S. Ct. at 1828–29.

51.     Despite the fact that 401(k) plan fiduciaries are held to the standard of prudent financial experts and must act for the exclusive benefit of participants by screening and selecting a menu of investment options, the Banner Health Defendants and Slocum elected to provide and maintain over 400 investment options in the Plan until late 2014.[6] Many in this list of hundreds of options were imprudent for Plan participants to invest their retirement savings, consistently underperformed their designated benchmarks, consistently underperformed the

---

[6] In addition to the stunningly large number of investment options, the Plan also offered a self-directed brokerage option, although it is unclear what is offered through the brokerage window that was not already in the Plan.

Exhibit 1

majority of other funds of the same investment style, charged excessive fees, and paid revenue sharing to Fidelity far beyond a reasonable rate for the services provided.

52.     Providing such a massive number of investment options in the Plan, the Banner Health Defendants, as advised by Slocum, ensured that fewer employees would participate in the Plan and those that did would suffer. Professor Mercer Bullard, securities law specialist at the University of Mississippi School of Law, concluded that large investment menus in 401(k) plans result in inferior, expensive options that discourage employees from investing and confuse those that do participate, who in turn make more conservative, less informed choices. Mercer Bullard, *The Social Costs of Choice, Free Market Ideology and the Empirical Consequences of the 401(k) Plan Large Menu Defense*, 20 CONN. INS. L.J. 335 (Spring 2014); *see also* Donald B. Keim and Olivia S. Mitchell, *Simplifying Choices in Defined Contribution Retirement Plan Design,* at 3 (Nov. 30, 2015)(recognizing that "too many choices can create confusion and distraction");[7] Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments,* T. ROWE PRICE RETIREMENT RESEARCH, at 2 (Apr. 2009)("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions.").[8]

---

[7] Available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2697680.
[8] Available at http://www.behavioralresearch.com/Publications/Choice_in_Retirement_Plans_April

Exhibit 1

53.     In contrast to over 400 investment options in the Plan, defined contribution plans usually provide only 14 investment options, excluding target date funds.[9] This provides choice of investment style to participants while maintaining a larger pool of assets in each investment style and avoiding participant confusion.

54.     The Banner Health Defendants and Slocum, as 401(k) plan fiduciaries, are required to individually analyze for prudence each investment option made available to participants. *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423–24 (4th Cir. 2007). As evidenced by providing every Fidelity mutual fund (presently existing or created in the future) and 185 non-Fidelity mutual funds—over 400 investment options—the Banner Health Defendants and Slocum failed to engage in any prudent and loyal fiduciary process to select and maintain only prudent and reasonably priced investments as Plan investment options.

55.     In fact, a Plan participant could invest in a new Fidelity mutual fund, which was automatically added to the Plan *without prior fiduciary review or approval*. Between 2009 and 2013, when over 25 mutual funds were added to the Plan without any fiduciary oversight, approximately 23 of those fund additions were Fidelity proprietary mutual funds. The selection and retention of *hundreds* of

_2009.pdf.
   [9] Callan Investments Institute, *2014 Defined Contribution Trends*, at 28 (2015), available at https://www.callan.com/research/files/753.pdf (last visited Nov. 20, 2015).

Exhibit 1

Fidelity proprietary mutual funds directly benefitted Fidelity through the receipt of unreasonable investment management and recordkeeping fees.

56.     The imprudent and disloyal fiduciary process is further confirmed by the fact that the Banner Health Defendants and Slocum inexplicably provided and maintained at least eight mutual funds in two different share classes charging different expenses. They also provided and maintained mutual funds in shares classes that were more expensive than other share classes available to the Plan, and retained investment options that had a long history of underperformance—all to the detriment of Plan participants.

57.     A larger pool of assets in each investment style significantly reduces fees paid by Plan participants. By consolidating duplicative investments of the same investment style into a single investment option, the Plan would then have the ability to command lower-cost investments, such as collective trusts, separately managed accounts, and low-cost institutional share classes of the selected mutual fund options. Overall, the investment lineup should provide participants with the ability to diversify their portfolio appropriately while benefiting from the size of the pooled assets of other employees and retirees.

58.     Within each asset class and investment style deemed appropriate for the participant-directed retirement plan, prudent fiduciaries must make a reasoned determination and select a prudent investment option. Unlike the Banner Health Defendants and Slocum, prudent fiduciaries do not select and retain numerous

Exhibit 1

investment options for a single asset class and investment style. When many investment options in a single investment style were included and maintained as Plan investment options, the Plan's bargaining power is diminished, thereby impairing its ability to obtain lower investment management expenses for that investment style for the benefit of Plan participants.

59.     Until late 2014, the Banner Health Defendants, in concert with Slocum, provided and maintained duplicative investments in virtually every major asset class and investment style, including approximately 92 large capitalization stock funds, 61 mid-cap stock funds, 40 small-cap stock funds, 68 international stock funds, 62 fixed income (bond) funds, 35 asset allocation funds, and 47 specialty funds. There is no prudent or loyal reason to include such a massive number of investment options in each such category. Doing so harms participants by causing confusion, undermining the Plan's economies of scale and bargaining power to demand lower-cost investment management services, as well as foisting upon participants the responsibility for finding the prudent investments from this mass of available investment options. Moreover, numerous actively managed investment options within the same investment style produce an index return but charge higher active management fees, thereby lowering the plan participants' investment returns.

60.     In addition, the Banner Health Defendants and Slocum failed to prudently consider and investigate the use of separate accounts and collective trusts

Exhibit 1

that were available to the Plan in the same investment classes, but at far lower expenses paid by Plan participants. As fiduciary best practices, Slocum admits in fiduciary committee materials that investment share class must be reviewed and the use of collective trusts and separately managed account must be considered, if available, for the Plan. In contrast, for the investment of Banner Health's corporate assets, the Banner Health Defendants and Slocum selected lower-cost separate accounts and collective trusts.

61.     These failures firmly demonstrate, among other things, a failure by the Banner Health Defendants and Slocum to prudently and loyally manage, operate, and administer the Plan.

### The Banner Health Defendants and Slocum caused the Plan to pay excessive recordkeeping and administrative fees.

62.     Recordkeeping is a service necessary for every defined contribution plan. The market for recordkeeping is highly competitive. There are numerous vendors in the marketplace who are capable of providing a high level of service to a jumbo 401(k) plan like this Plan. These vendors primarily differentiate themselves based on price and vigorously compete for business by offering the best price. Recordkeeping vendors will readily bid for servicing a jumbo plan, such as Banner Health's Plan, on a flat, low, per-participant fee basis, if plan fiduciaries put plan recordkeeping services out for competitive bidding.

Exhibit 1

63.     Numerous recordkeepers provide recordkeeping services only and do not sell investment products. These vendors do not link proprietary investment products in a plan to provide recordkeeping services.

64.     Fidelity has been the recordkeeper for the Plan since at least 1999, and the Banner Health Defendants have never put the Plan's recordkeeping services out for competitive bidding in over 16 years.

65.     Prudent fiduciaries engage in a competitive bidding process for plan recordkeeping and administrative services about every three years. In fact, Slocum admits in fiduciary committee materials that it is a fiduciary best practice for Plan fiduciaries to seek competitive bids from service providers every three to five years, yet no such process was ever undertaken for the benefit of Plan participants. A competitive bidding process results in a negotiated recordkeeping contract that provides the desired services at the lowest cost available in the market. The Banner Health Defendants failed to engage in such a process since Fidelity was engaged as the Plan's recordkeeper. Had they done so, they would have entered into a recordkeeping arrangement for the Plan that provided the same recordkeeping services at a substantially lower, reasonable cost.

66.     The cost of providing recordkeeping services depends on the number of participants, not on the amount of money in participants' accounts. The cost of providing recordkeeping services to a participant with $100,000 in her retirement account is the same as for a participant with $1,000 in her retirement account.

Exhibit 1

Plans with large numbers of participants can also take advantage of economies of scale: for example, a plan with 30,000 participants can negotiate a much lower per participant fee for recordkeeping services than a plan with 300 participants. For these reasons, prudent fiduciaries negotiate recordkeeping fees on the basis of a fixed dollar amount for each participant in the plan, instead of a percentage of plan assets. Slocum expressly recognized that a fixed per-participant fee to limit the recordkeeper's compensation for services provided aligns closest with the recordkeeping cost structure, as noted above, and represents a fiduciary best practice. Setting recordkeeping fees on the basis of a percentage of plan asset values can result in excessive recordkeeping fees because, as plan assets increase (such as through participant contributions and gains on investments), recordkeeping compensation increases without any change in recordkeeping services.

67.     In its fiduciary capacity, Slocum recommended investment options to be included in the Plan based, in part, on the asset-based fees these options provided to compensate Fidelity for recordkeeping and administrative services. The Banner Health Defendants and Slocum caused the Plan to pay Fidelity with uncapped asset-based fees, and the Banner Health Defendants have not negotiated a reasonable, fixed fee per participant for the Plan's recordkeeping and administrative services, which has further caused the Plan to incur unreasonable expenses of administration.

Exhibit 1

68.    Some mutual funds engage in a practice known as revenue sharing. In a revenue sharing arrangement, a mutual fund pays part of the mutual fund's asset-based fees to certain recordkeepers. All but a handful of the funds in this Plan make or have made undisclosed revenue sharing payments to Fidelity ranging from 3 to 75 basis points (bps)(0.03%–0.75%). As much as 50% of the asset-based expense ratio of Fidelity equity mutual funds and 90% of the asset-based expense ratio of Fidelity money-market funds are allocated to the Fidelity entity that provides Plan recordkeeping or other administrative services.

69.    While revenue sharing payments are ostensibly provided as compensation to the recordkeeper for providing administrative services a mutual fund otherwise would have provided, the payments can effectively be kickbacks for including the fund in a plan's investment lineup because the amount of revenue sharing paid due to large plan investments in mutual funds can exceed reasonable compensation for the services provided. This excess over a reasonable fee is particularly likely since revenue sharing is asset-based and thus prone to increase as plan assets increase, even though recordkeeping services do not. Some recordkeepers, such as Fidelity, also sell investment products and recommend that plan fiduciaries use such affiliated funds or other funds offering revenue sharing arrangements that provide substantial revenue sharing to the Fidelity recordkeeper.

Exhibit 1

70.     In a plan that has a revenue-sharing mutual fund as a plan investment option, a prudent and loyal fiduciary monitors that revenue sharing to ensure that the recordkeeper does not receive total compensation from the plan exceeding a reasonable, per-participant recordkeeping fee and compels the recordkeeper to refund to the plan all revenue sharing it receives that exceeds the reasonable, negotiated recordkeeping fee. This also applies to all other sources of compensation that the recordkeeper may receive such as float and direct payments by the Plan or its participants. The Banner Health Defendants failed to adequately monitor all sources of Fidelity's compensation, including float and direct payments by the Plan or participants, further causing the Plan to pay excessive recordkeeping and administrative fees.[10]

71.     For purposes of a plan's annual report, revenue sharing payments are classified as "indirect compensation," as distinguished from "direct" payments from the plan. In the Plan's annual reports, the Banner Health Defendants reported that they knew Fidelity received indirect compensation but failed to disclose the amounts, despite being obligated to do so. The Banner Health Defendants' failure to disclose this information concealed their breaches from participants.

---

[10] The Banner Health Defendants and Slocum could have, and should have, requested all information from Fidelity as an integral part of satisfying their fiduciary duty.  For instance, if they had asked for, they would have received documents that summarize Fidelity's compensation such as: fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

Exhibit 1

72.     Based on known revenue sharing rates and the amount of reported direct compensation from the Plan, Fidelity received at least the following approximate amounts of combined direct and indirect compensation for recordkeeping from 2009 through 2013: 2009—$2.2 million; 2010—$2.6 million; 2011—$2.8 million; 2012—$3.1 million; 2013—$3.8 million. These amounts exceeded reasonable compensation based on the per-participant rate that this Plan could have obtained for the same services. Based on information currently available to Plaintiffs regarding the Plan's features, the nature of the administrative services provided by Fidelity, the approximate number of Plan participants (30,000), and the recordkeeping market, a reasonable recordkeeping and administrative fee for the Plan would be approximately $30 per participant. Based on information currently available, the Plan paid approximately *$100 to $140* per participant per year from 2009 through 2013 for recordkeeping and administrative services, up to *466% higher* than a reasonable fee for these same services. The Plan continues to pay unreasonable fees for recordkeeping and administrative services to date.

73.     In addition, Fidelity also received revenue from float interest, short term trading fees that were applied to almost half of the Plan's investment options, finders fees, brokerage window fees, revenue sharing from investments through the brokerage window, revenue paid to Fidelity from Strategic Advisors, and revenue derived from Plan participants' use of the "Portfolio Advisory Service®" and may have received other sources of income related to the Plan or its investments.

Exhibit 1

74. In negotiating its recordkeeping compensation, Fidelity considers its overall relationship with Banner Health, and the revenue derived from services provided to Plan and other Banner Health plans. Due to the overall profitable relationship with Banner Health, which was derived from the substantial revenue sharing payments and investment management fees received from the Plan, Fidelity provided free or discounted services to Banner Health's other plans. In exchange for preferential pricing on services provided to non-Plan assets, the Banner Health Defendants allowed Fidelity to receive uncapped, unreasonable compensation for recordkeeping services provided to the Plan. Moreover, individual Directors and Committee members *personally benefitted* from the below-market pricing on the Banner Health non-qualified plans in which they participated. Using "revenue sharing to benefit [the plan sponsor and recordkeeper] at the Plan's expense" while "failing to monitor and control recordkeeping fees" and "paying excessive revenue sharing" is a breach of fiduciary duties. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

75. The Plan's subsidization of the expenses incurred by Banner Health's other plans has continued and is further demonstrated through Fidelity's pricing practices. For instance, when negotiating recordkeeping fees to be charged to the Plan, Fidelity proposed a single recordkeeping fee to be applied to the Plan and *seven* other Banner Health-sponsored plans, including Banner Health's non-qualified plans. This recordkeeping fee was based on the total number of

Exhibit 1

participants across *all* plans. Because participants in the Plan accounted for the vast majority of the total number of participants count across all Banner Health plans, and the cost of recordkeeping services on a per-participant basis declines as the number of participants increases due economies of scale experienced by the recordkeeper, Plan participants directly subsidized the recordkeeping expenses of the smaller plans, which would have demanded far higher expenses on a per-participant basis for recordkeeping services.

76.     In addition to the excessive payments to Fidelity, the Banner Health Defendants also caused the Plan to pay Banner Health almost $2 million from 2009 through 2013 for putative administrative services. These services provided by Banner Health were of the same kind and nature as those provided by Fidelity, if not entirely duplicative. On Plaintiffs' information and belief, these services were not necessary for the Plan and the Plan paid unreasonable compensation to Banner Health and included payments beyond reimbursement of direct expenses. The Banner Health Defendants also never engaged in a competitive bidding process for services putatively provided by Banner Health, or otherwise ensured that only reasonable and necessary expenses were charged to the Plan for these services.

77.     From the beginning of 2009 to year-end 2014, the Plan's assets almost doubled from $1.1 billion to over $2 billion. Because revenue sharing payments are asset based and because the Banner Health Defendants chose to pay recordkeeping fees on the basis of assets instead of the number of participants, the revenue

Exhibit 1

sharing alone paid to Fidelity each year skyrocketed (almost doubling) even though the administrative services that Fidelity provided to the Plan remained the same.

78.     When Slocum evaluated the Plan's recordkeeping and administrative fees, it did so disloyally and imprudently. Slocum routinely disregarded its own data on recordkeeping fees paid by clients demonstrating the unreasonableness of the Plan's recordkeeping and administrative fees, and had direct knowledge of the below-market pricing Banner Health received on its other plans serviced by Fidelity, which was derived from the excessive asset-based fees paid by the Plan. Slocum consistently ignored industry data and appropriate metrics that further demonstrated the unreasonable recordkeeping and administrative fees paid by the Plan.[11] Moreover, Slocum knowingly participated in the Banner Health Defendants' concealment of the unreasonable fees and subsidization. For instance, when Slocum presented its own data to the Committee illustrating that the Plan was paying over twice as much as its peers, *and the Banner Health 403(b) Plan was paying less than half compared to its peers*, the Committee, with Slocum's approval, recorded in the fiduciary committee minutes that both plans' recordkeeping fees were competitive with industry peers.

79.     Based on these facts, among others, the Banner Health Defendants failed without good cause to put the Plan's recordkeeping compensation out for competitive bidding on a prudently regular basis and failed to prudently monitor

---

[11] Slocum also failed to take into account any fees paid to Banner Health putatively for administrative services.

Exhibit 1

and control Fidelity's total recordkeeping compensation, particularly asset-based, uncapped revenue sharing, and caused the Plan to provide Fidelity excessive recordkeeping compensation for the services provided.

80.     The Banner Health Defendants and Slocum failed to prudently and loyally monitor the Plan's recordkeeping and administrative fees to ensure that only reasonable fees were charged to the Plan. Since at least 2009, these breaches and prohibited transactions caused Plan participants to lose in excess of $20 million from their retirement savings and many more millions before then.

**Excessive Investment Management Fees and Performance Losses**

*A. Excessive fees compared to other mutual funds.*

81.     At all relevant times, the Plan's investment options charged unreasonable fees for the investment services provided to the Plan. The average investment management fee before 2014 was 93 bps. Based on the lowest-cost share class of the current funds in the Plan, which were available to the Plan because of its jumbo size, the Plan could have paid 50 bps or less, making the amount paid over 176% higher. Comparing the fees of the Plan's prior investments to the current investments shows that the Plan paid vastly higher mutual fund fees than it should have and would have had the Plan been managed prudently and loyally:

Exhibit 1

| Plan's Current Options as of 2014–2015 | Investment Style | Expense Ratio of Lowest Share Class for Current Option | Average Expense Ratio of Prior Options in the Plan | % Excess Fee of Prior Options Over Current Options |
|---|---|---|---|---|
| JPM SmartRetirement Funds | Target Date Funds/ Asset Allocation Funds | 68 bps | 77 bps | 113% |
| PIMCO All Asset Fund | Asset Allocation | | | |
| AF Europacific Growth | International | 49 bps | 109 bps | 222% |
| BlackRock Total Return | Fixed income | 40 bps | 58 bps | 145% |
| Managed Income Portfolio II | Fixed Income | 34 bps | | 171% |
| Dodge & Cox Stock Fund | Large Cap | 52 bps | 96 bps | 185% |
| Fidelity Growth Co Fund | Large Cap | 71 bps | | 135% |
| Spartan 500 Index Fund | Large Cap | 2 bps | | 4800% |
| Vanguard Small Cap Index | Small Cap | 6 bps | 115 bps | 1917% |

82.    The fees in the Plan's mutual funds were and are significantly higher than comparable institutional investments available to 401(k) plans. When advising the Banner Health Board of Directors concerning the investment of Banner Health's

Exhibit 1

corporate assets, Slocum expressly recognized that mutual funds are the *most* expensive investment vehicle available to large retirement plans. The fees, moreover, are and were far higher than the fees available from alternative mutual funds, including Vanguard institutional funds with similar investment styles that were readily available as Plan investment options. The fees for the Plan's investment options were up to *41 times more expensive* than comparable Vanguard alternatives, as demonstrated by the following chart.

| Plan Options Investment Category | % of Funds in the Plan Priced Higher than the Alternative | Vanguard Alternative | Expense Ratio |
|---|---|---|---|
| Large Cap Equity Funds | 99% | Vanguard 500 Index Fund | 5 bps |
| MidCap Equity Funds | 100% | Vanguard Mid-Cap Index Instit'l Plus | 6 bps |
| Small Cap Equity Funds | 100% | Vanguard Small Cap Inst'l Plus | 6 bps |
| International Funds | 100% | Vanguard Developed Markets Index Inst'l Plus | 6 bps |
| Fixed Income Funds | 100% | Vanguard Admiral Treasury Money Market | 5 bps |
| Asset Allocation Funds | 100% | Vanguard Target Retirement Funds | 17 bps |

83.    The Banner Health Defendants and Slocum also failed to prudently investigate and use the lowest-cost share class of certain mutual funds in the Plan, which would have provided an identical, but less expensive version of the exact same fund:

Exhibit 1

a.  Since at least 2007, the Banner Health Defendants have provided to participants not only higher-cost share classes of investments but also multiple share classes of the exact same fund at the exact same time. The Plan invested for at least five years in two different share classes for the following funds, with the majority of assets in the retail share class that charged over 130 bps for a large-cap style fund.

| Fund | Ticker | Expense Ratio (bps) |
|---|---|---|
| Aberdeen US Equity I Class A | GXXAX (A) | 115 |
| Aberdeen US Equity I IS | GXXIX (Institutional Service) | 90 |
| | | |
| Allianz NFJ Small Cap Value Adm Class | PVADX | 111 |
| Allianz NFJ Small Cap Value Inst'l Class | PSVIX | 86 |
| | | |
| CRM Mid Cap Value Inst'l | CRIMX | 81 |
| CRM Mid Cap Value Inv | CRMMX | 103 |
| | | |
| Dreyfus Equity Growth | FRMAX (A) | 125 |
| Dreyfus Equity Growth | FRMUX (F) | 101 |
| | | |
| Dreyfus Research Growth A | DWOAX | 136 |
| Dreyfus Research Growth Z | DREQX | 100 |
| | | |
| Invesco Basic Balanced | BBLIX (Institutional) | 73 |
| Invesco Basic Balanced Inv | BBLTX (Investor) | 117 |
| | | |
| Neuberger Berman Genesis – Inv | NBGNX | 106 |
| Neuberger Berman Genesis TR | NBGEX | 114 |
| | | |
| Fidelity Spartan 500 Index | FUSVX (Advantage) | 7 |

Exhibit 1

| Fund | Ticker | Expense Ratio (bps) |
|---|---|---|
| Fidelity Spartan 500 Index Inst'l | FXSIX | 4 |

b.   For years, the Banner Health Defendants included hundreds of investment options in the Plan, and neither the Banner Health Defendants nor Slocum analyzed the performance and fees for over *98%* of the investment options to ensure they remained prudent for inclusion in the Plan. Only in late 2014 and 2015 did the Banner Health Defendants reduce the number of investment options from *over 400* to 8 core funds, target date funds, and a brokerage window. Prior to that date, the Banner Health Defendants and Slocum failed to adequately investigate and consider the reduction of the number of Plan investment options, or come to a reasoned decision for maintaining over 400 investment options. A prudent and loyal fiduciary would have made these changes well before late 2014, if not before 2009. However, the Banner Health Defendants, as advised by Slocum, continue to provide more expensive, but otherwise identical, share classes of mutual funds that are readily available to the Plan because of its jumbo size, as shown in the following table.

Exhibit 1

| Existing Fund in Plan | | | Lower-Cost Share Class | |
|---|---|---|---|---|
| Fund | Ticker | Exp. Ratio (bps) | Ticker | Exp. Ratio (bps) |
| J.P. Morgan ("JPM") SmartRetirement Income Fund Inst'l | JSIIX | 55 | JSIYX | 51 |
| JPM SmartRetirement 2015 | JSFIX | 59 | JSFYX | 54 |
| JPM SmartRetirement 2020 | JTTIX | 63 | JTTYX | 58 |
| JPM SmartRetirement 2025 | JNSIX | 65 | JNSYX | 60 |
| JPM SmartRetirement 2030 | JSMIX | 67 | JSMYX | 62 |
| JPM SmartRetirement 2035 | SRJIX | 69 | SRJYX | 64 |
| JPM SmartRetirement 2040 | SMTIX | 70 | SMTYX | 65 |
| JPM SmartRetirement 2045 | JSAIX | 70 | JSAYX | 65 |
| JPM SmartRetirement 2050 | JTSIX | 70 | JTSYX | 65 |
| JPM SmartRetirement 2055 | JFFIX | 72 | JFFYX | 67 |
| American Funds Europacific Growth | RERFX | 54 | RERGX | 49 |
| Fidelity Managed Income Portfolio II Class 1 | | 59 | Class 3 | 34 |
| Fidelity Spartan 500 Index Fund Inst'l | FXSIX | 4 | FXAIX | 2 |
| Vanguard Small Cap Index Inst'l | VSCIX | 8 | VSCPX | 6 |

### B. Excessive fees compared to separate accounts.

84.     Aside from excessive fees compared to other mutual funds that were available to the Plan, the Banner Health Defendants and Slocum also failed to prudently investigate, or come to a reasoned decision, for failing to provide non-mutual fund institutional alternatives, such as collective trusts and separately managed accounts. Each mutual fund in the Plan charged fees in excess of what the Plan could have obtained by purchasing these comparable products. According to the United States Department of Labor, separate accounts, which are available for

Exhibit 1

a minimum investment of $15 million to $25 million, are available to "large plans …
with total assets of over $500 million[.]" *Study of 401(k) Plan Fees and Expenses*
(April 13, 1998). As the Plan had well over $1 billion in assets, separate accounts
were readily available. By using separate accounts, "[t]otal investment management
expenses can commonly be reduced to *one-fourth* of the expenses incurred through
retail mutual funds." *Id.* (emphasis added).

85.   Separate accounts also have multiple advantages over mutual funds,
including the ability to negotiate a fee structure that is lower and best-suited for the
specific plan; the ability to set investment standards specific to the plan's needs;
and the ability to take advantage of far lower turnover by 401(k) participants than
by shareholders in mutual funds who are not in 401(k) plans. Investors in a mutual
fund cannot negotiate individual fees or individually modify the fund's investment
guidelines. In addition, since only the plan's participants can invest in the separate
account, all investors have similar long-term investment horizons and the separate
account is not subjected to the frequent trading and short-term investment
activities (with the attendant costs and inefficiencies) of retail, short-term, non-
retirement investors in mutual funds.

86.   Even the few Plan options that were institutional mutual fund shares
did not capture the far lower expenses available with separate accounts given the
size of the Plan's investment in each fund. Had the Plan obtained separate accounts

Exhibit 1

with expenses of one-fourth the costs of the retail shares, the Plan's expenses would have been reduced dramatically.

87.     Many of the providers of the Plan's options also offered separate account versions of their mutual funds with the same manager at a much lower cost than the fees paid by mutual fund investors. All or nearly all of the Fidelity mutual funds in the Plan had separate account or collective trust equivalents provided by Fidelity that provided the same investment at a lower cost. The Artisan International Fund was available as a separate account investment that provided the same investment at a much lower cost. The William Blair Small Cap and Small Cap Value funds were available as separate account investments that provided the same investments at a much lower cost. The Perkins Mid-Cap Value fund also was available as a separate account investment that provided the same investment at a much lower cost. Defendants provided mutual funds from Franklin Templeton and Invesco, who also provide investment advisory services for separate accounts. For these and other mutual funds in the Plan, Defendants could have provided participants the same investment through a much lower cost structure by using a separate account alternative that was available to the Plan.

88.     Even the J.P. Morgan SmartRetirement Fund mutual funds that the Banner Health Defendants selected, as recommended by Slocum, for the Plan in 2015 were available in separate accounts (as well as lower-cost collective trust or commingled funds) that charged far lower fees than the mutual fund version that

Exhibit 1

the Banner Health Defendants provided, as shown in the following chart. Because

of the Plan's massive size, the Banner Health Defendants and Slocum could have,

but did not, prudently and loyally negotiate with J.P. Morgan to provide the same

SmartRetirement Fund investment program in separate accounts that would have

charged participants far less and consequently provided participants far greater

benefits upon retirement.

| J.P. Morgan Target Date Funds | Expense Ratio | Separate Account Fee Available | Excess of Current Mutual fund Options Over Available Separate Account Options |
|---|---|---|---|
| JPM SmartRetirement Income Fund | 55 bps | 11 bps | 500% |
| JPM SmartRetirement 2015 | 59 bps | 10 bps | 590% |
| JPM SmartRetirement 2020 | 63 bps | 9 bps | 700% |
| JPM SmartRetirement 2025 | 65 bps | 9 bps | 722% |
| JPM SmartRetirement 2030 | 67 bps | 9 bps | 744% |
| JPM SmartRetirement 2035 | 69 bps | 9 bps | 767% |
| JPM SmartRetirement 2040 | 70 bps | 10 bps | 700% |
| JPM SmartRetirement 2045 | 70 bps | 10 bps | 700% |

Exhibit 1

| J.P. Morgan Target Date Funds | Expense Ratio | Separate Account Fee Available | Excess of Current Mutual fund Options Over Available Separate Account Options |
|---|---|---|---|
| JPM SmartRetirement 2050 | 70 bps | 10 bps | 700% |
| JPM SmartRetirement 2055 | 72 bps | 10 bps | 720% |

### C. Excessive fees compared to collective trusts.

89.     Collective trusts or commingled funds are investment vehicles designed for and limited to retirement plans with long-term investment horizons. Thus they have lower fees and better performance than retail-oriented mutual funds whose investors usually have short-term investment horizons and engage in frequent trading. Collective trusts are a common investment vehicle in large 401(k) plans and are available even to midsize plans with as little as $100 million in assets. Anne Tergesen, *401(k)s Take a New Tack*, WALL ST. J. (Sept. 25, 2015).[12] For plans with over $1 billion in assets, collective trusts charge an average of 54 bps in investment management fees, whereas retail mutual funds on average charge 101 bps, and institutional share mutual funds charge 85 bps. *Id.* As noted above, *see supra* ¶88, the Plan's J.P. Morgan target date mutual funds are also offered in lower-cost collective trusts. In advising the Banner Health Board of Directors concerning the investment of Banner Health's corporate assets, Slocum notes that

---

[12] Available at http://www.wsj.com/articles/some-funds-in-your-401-k-arent-really-mutual-funds-after-all-1443173400.

Exhibit 1

collective trusts can offer lower fees than mutual funds or even separate accounts for a given strategy.

90.    Overall, the Banner Health Defendants could have used the Plan's bargaining power to obtain high-quality, low-cost mutual fund alternatives and negotiated far lower prices for the Plan. The Banner Health Defendants and Slocum failed to adequately investigate and consider the use of these institutional alternatives, or come to a reasoned decision for failing to provide these dramatically lower-cost investments, while instead populating the Plan with high-cost mutual funds that generated unreasonable compensation for Fidelity. These failures caused Plan participants to pay millions of dollars per year in unnecessary fees.

### D. The Banner Health Defendants and Slocum imprudently monitored and retained poorly performing funds.

91.    When monitoring the performance of an investment, the Banner Health Defendants and Slocum applied differing standards of care depending on the placement of the investment. In evaluating Banner Health's *corporate* investments, the Banner Health Defendants and Slocum applied a much higher standard of care and a much greater level of diligence than when they monitored the Plan's investments, which contained Plan participants' retirement savings. For example, the Banner Health Defendants and Slocum regularly monitored and evaluated the added value of active management and whether the corporation could achieve the same returns with much less costly index funds. No such analysis was performed on the hundreds of actively managed funds in the Plan.

Exhibit 1

92.    Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 FIN. ANALYSTS J. 7, 8 (Jan./Feb. 1991);[13] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1915 (2010)("After costs…in terms of net returns to investors, active investment must be a negative sum game.").

93.    To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; *see also* Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000)("on a net-return level, the funds underperform broad market indexes by one percent per year").

94.    If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark

---

[13] Available at http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7.

Exhibit 1

M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. FIN. 57, 57, 59 (1997)(measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart*, On Persistence in Mutual Fund Performance,* at 57.

95. Prudent fiduciaries of large defined contribution plans conduct an analysis to determine whether actively managed funds will or continue to outperform their benchmark net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the participants' best interest to offer an actively managed option, with its much higher fees. No such reasoned and prudent analysis was conducted by the Banner Health Defendants or Slocum when selecting, monitoring, or retaining the Plan's investment options.

96. The high fees of the Plan's mutual funds were not justified by superior investment performance. The Banner Health Defendants, as advised by Slocum, retained funds in the Plan that historically underperformed and continued to underperform, indicating that the reason the funds were retained in the Plan was to maintain the revenue stream to Fidelity from the excess asset-based fees charged by the funds.

97. Out of over 400 funds, 166 of the Plan's mutual funds were ranked in the bottom half of their peers for either a 3-, 5-, or 10-year period, 51 were ranked in

Exhibit 1

the bottom half of their peers for all periods, and over 200 mutual funds underperformed their benchmark over a recent 5-year period.[14]

98.     Until August 2014, the Banner Health Defendants, as advised by Slocum, provided in the Plan very narrow, risky sector funds that had a history of wild volatility and underperformance. For example, the Fidelity Select Gold Fund, a highly risky and volatile sector fund, underperformed the S&P 500 Index by 36% over a preceding 5-year period. The Gold Fund had been kept in the Plan since at least 2003. The Fidelity Select Natural Gas Fund had been kept in the Plan since 2003 as well, and has underperformed the S&P 500 Index by over 15% over a preceding 5 years. In fact, the Natural Gas Fund underperformed the S&P 500 Index 7 out of the preceding 10 years. These facts, at a minimum, further indicate that the Banner Health Defendants and Slocum engaged in no prudent or loyal process to monitor Plan investment options to ensure that all options were prudent throughout the time that they were in the Plan.

99.     As further evidence of the Banner Health Defendants' and Slocum's failure to engage in a prudent or loyal process of monitoring Plan investments, the Banner Health Defendants repeatedly and consistently failed to remove mutual funds whose performance was so poor, or management tenure so insufficient, that the mutual funds either were removed from the market entirely by the mutual fund

---

[14] Performance data references and calculations provided herein, and in subsequent paragraphs, were based on the most recent performance data as of the time of the filing of Plaintiffs' complaint on November 20, 2015. *See* ¶¶98, 103, 106, 107.

Exhibit 1

company or merged into other mutual funds. Instead, the Banner Health Defendants and Slocum merely allowed the Plan's shares of the withdrawn mutual fund to be liquidated or provided to the mutual fund into which the failed mutual fund had been merged without any prudent or loyal process to determine the propriety of providing the new mutual fund as a Plan investment option. Even when the Banner Health Defendants and Slocum determined that a particular plan investment option was no longer prudent, they did not remove the fund from the Plan. Rather, they continued to allow Plan participants' assets to remain in that fund and permit future participant contributions to be directed to the fund, thereby causing participants to incur additional losses.

100. In violation of their responsibilities under the Plan document and the IPS, the Banner Health Defendants and Slocum did not even monitor the performance of over 98% of the Plan's mutual fund investment options at any given time. *See supra* ¶83(b). In particular, the Plan document requires that the Plan's fiduciaries conduct an ongoing review of all investment options and the IPS requires that they evaluate the investment option's relative performance, risk-adjusted performance, relative peer rankings, organizational changes, and deviation from investment methods, to ensure the investment option is or remains appropriate for inclusion in the Plan. The Banner Health Defendants' and Slocum's failure to follow these mandated procedures further caused Plan participants to lose millions of dollars of their retirement savings.

Exhibit 1

***E. Elimination of the overlapping and dilutive investment options.***

101.    In August 2014, the Plan's fiduciaries redesigned the Plan to include 8
core options and the Fidelity target date funds. Approximately one year later, the
Fidelity target date funds were replaced with the J.P. Morgan SmartRetirement
Fund target date mutual funds.

102.    The Plan's current lineup reflects a dramatic shift from the
overwhelming number of hundreds of investment options and many overlapping
funds in the same investment style to a core group. This reduction in options also
included the removal of consistently underperforming and imprudent investments.
Instead of 35 asset allocation funds, the Plan now has only 1 J.P. Morgan series of
target date funds and the PIMCO All Asset allocation fund. Instead of 68
international stock funds, the Plan now has 1 international fund. Instead of 61
fixed-income funds, the Plan now has 1 total return fund and a stable value fund.
Instead of 92 large-cap stock funds, the Plan now has 3 large-cap funds. Instead of
41 small-cap stock funds, the Plan now has 1 small-cap index fund. The Plan now
has no mid-cap stock or sector funds, whereas it previously had 60 mid-cap stock
funds and 47 sector funds.

103.    As examples, demonstrating that the Banner Health Defendants' and
Slocum's breaches caused significant losses, the Plan lost over $4 million from
having been invested in the Plan's prior target date funds instead of the Plan's
current J.P. Morgan SmartRetirement Funds. The Plan lost over $35 million from

Exhibit 1

having been invested in the prior 68 international stock funds instead of the Plan's current single international fund. The Plan lost over $31 million from having been invested in the prior 61 fixed-income funds instead of the Plan's current single fixed-income index fund. The Plan lost over $65 million from having been invested in the prior 92 large-cap stock funds instead of the Plan's current S&P 500 Index fund. The Plan lost over $39 million from having been invested in the prior 41 small-cap stock funds instead of the Plan's current single small-cap index fund. The Plan's losses are even greater when compared to prudent alternative collective trusts, separate accounts, and the lower-cost institutional share class of the Plan's current investment options.

### F. Imprudent money market and short-duration mutual funds.

104.   Stable value funds are a common investment in defined contribution plans and are designed specifically for use in large, defined contribution plans. Stable value funds are conservatively managed to preserve principal and provide a stable rate of interest that is greater than the interest of a money market mutual fund, at lower cost, but also provide a guaranty of principal and accumulated interest and liquidity as a money market mutual fund. "Because they hold longer-duration instruments, [stable value funds] generally outperform money market funds, which invest exclusively in short-term securities." *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 806 (7th Cir. 2013); *see also* Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined*

Exhibit 1

*Contribution Plans and the Choice Between Stable Value and Money Market*, 39 AKRON L. REV. 9, 20–27 (2006).

105.   Even during the period of market turbulence in 2008, "stable value participants received point-to-point protection of principal, with no sacrifice of return[.]" Paul J. Donahue, *Stable Value Re-examined*, 54 RISKS AND REWARDS 26, 28 (Aug. 2009).[15]

106.   The Banner Health Defendants provided eight money market mutual funds and an ultrashort bond fund as short-term investment options, even though prudent fiduciaries of plans with assets as large at this Plan use instead a stable value fund. The Banner Health Defendants and Slocum imprudently and disloyally disregarded prudent, non-Fidelity stable value funds and instead provided participants extremely low yielding, ultra-short-duration money market mutual funds and the ultrashort bond fund. The Plan lost over $1.5 million from having been invested in those money market mutual funds and the like instead of a stable value fund that provided an average return.[16] The Plan lost over $30 million from having invested in the prior 61 fixed-income funds instead of the average stable value fund.

107.   The Banner Health Defendants provided Fidelity's Managed Income Portfolio collective trust, an investment with some similarities to a stable value

---

[15] Available at http://www.soa.org/library/newsletters/risks-and-rewards/2009/august/rar-2009-iss54-donahue.pdf.

[16] The Hueler Index is a recognized index of stable value funds that provides an average return for stable value funds and serves as a benchmark.

Exhibit 1

fund. The Banner Health Defendants and Slocum did not prudently monitor the performance of Fidelity's Managed Income Portfolio relative to stable value funds, and instead used it as a Plan investment option apparently merely because it was a Fidelity product. The Plan lost over $5 million from having invested in Fidelity's Managed Income Portfolio instead of the average stable value fund.

**The Banner Health Defendants concealed their fiduciary breaches.**

108.    The Banner Health Defendants concealed their breaches of fiduciary duty and other ERISA violations through a series of false and misleading statements and by omitting disclosure of material information, thereby preventing Plaintiffs from discovering Defendants' breaches and violations.

109.    The Banner Health Defendants told participants that they engaged in periodic reviews to ensure the lowest-cost options were available to participants. This is false. This concealed the facts that the Banner Health Defendants failed to prudently and loyally assess the reasonableness of the Plan's investment management and administrative fees, that they failed to prudently consider alternative options with lower fees, and that they failed to put Plan recordkeeping services out for competitive bidding on a regular basis.

110.    Starting for the 2009 plan year, the Banner Health Defendants were required to report annually to the Department of Labor all direct and indirect compensation received by each of the Plan's service providers. While each year Banner Health reported that Fidelity received indirect compensation, and that

Exhibit 1

there was a formula to determine this compensation, Banner Health did not provide these formulas or the amount of the indirect compensation in their annual Form 5500 filing to the Department of Labor as required, or anywhere else. Thus, participants had no way of knowing the amount of Fidelity's indirect compensation.

111.   The Banner Health Defendants concealed from the government regulatory body important information required by the Department of Labor for enforcement of ERISA requirements and prevented participants from discovering the excessive compensation paid by the Plan to Fidelity.

112.   This concealment was compounded in a Summary Annual Report sent each year. In that report, Banner Health falsely informed participants that the Plan's administrative expenses were of an amount that was a fraction of the actual amount received by both Fidelity and Banner Health for recordkeeping and administrative services.

113.   Because of the concealment of the facts revealing Defendants' breaches of fiduciary duty and prohibited transactions, Plaintiffs could not have discovered Defendants' breaches through the exercise of reasonable diligence any sooner than within 6 years before filing this complaint.

## CLASS ACTION ALLEGATIONS

114.   29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to recover for the Plan the remedies provided by 29 U.S.C. §1109(a).

Exhibit 1

115.     In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. In light of the Banner Health Defendants' concealment of their misconduct, Defendants' fiduciary breaches and other ERISA violations went undetected for years, and Plaintiffs are entitled to recover for the harm caused during the time the breaches were concealed. While Defendants' long campaign of imprudent conduct in managing the Plan likely began even earlier, the starting date for the class is January 1, 2009. Plaintiffs seek to certify the following class, and to be appointed as representatives of the class:

> All participants and beneficiaries of the Banner Health Employees 401(k) Plan from January 1, 2009 through the date of judgment, excluding the Defendants.

116.     This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.   The Class includes over 30,000 members, which is so large that joinder of all its members is impracticable.

b.   There are questions of law and fact common to this Class because the Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries, and Defendants took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Defendants' actions in doing so were the same actions as a whole for each Plan participant affected. Thus,

Exhibit 1

common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; whether the fees are excessive; what are the losses to the Plan resulting from each breach of fiduciary duty; and what are the profits of any breaching fiduciary that were made through the use of Plan assets by the fiduciary.

c.   Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d.   Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.   Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical

Exhibit 1

matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore this action should be certified as a class action under Fed.R.Civ.P. 23(b)(1)(A) or (B).

117.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter. Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Fed.R.Civ.P. 23(b)(3) if it is not certified under Fed.R.Civ.P. 23(b)(1)(A) or (B).

118.   Plaintiffs' counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

a.   Schlichter, Bogard & Denton has been appointed class counsel in 15 other ERISA class actions regarding excessive fees in large defined contribution plans. As a district court in one of those cases recently observed: "the firm of Schlichter, Bogard & Denton ha[s] demonstrated its well-earned reputation as a

Exhibit 1

pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S.Dist.LEXIS 93206 at 4–5 (S.D. Ill. July 17, 2015). Other courts have made similar findings: "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" of 401(k) fee litigation "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S.Dist.LEXIS 166816 at 8 (N.D. Ill. June 26, 2012). "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S.Dist.LEXIS 184622 at 8 (C.D. Ill. Oct. 15, 2013). "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 U.S.Dist.LEXIS 12037 at 8 (S.D.Ill. Jan. 31, 2014).

b.  Schlichter, Bogard & Denton handled the only full trial of an ERISA excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was affirmed in part by the Eighth Circuit in *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the district court concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S.Dist.LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012).

Exhibit 1

c.  Schlichter, Bogard & Denton is also class counsel in *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015), in which the Supreme Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari, and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all defined contribution plans.

d.  Schlichter, Bogard & Denton has obtained class-wide settlements in a number of ERISA fiduciary breach cases, obtaining both significant monetary and non-monetary relief for the benefit of hundreds of thousands of defined contribution plan participants. *Abbott v. Lockheed Martin Corp.*, No. 06-701 (S.D. Ill.); *Spano v. Boeing Co.*, No. 06-743 (S.D. Ill.); *Krueger v. Ameriprise Financial, Inc.*, No. 11-2781 (D. Minn.); *Kanawi. v. Bechtel Corp.,* No. 06-5566 (N.D. Cal.); *Beesley v. Int'l Paper Co.*, No. 06-703 (S.D. Ill.); *Will* v. *General Dynamics Corp.*, No. 06-698 (S.D. Ill.); *Nolte v. Cigna Corp.,* No. 07-2046 (C.D. Ill); *George v. Kraft Foods Global, Inc.,* No. 07-1713 (N.D. Ill.); *George v. Kraft Foods Global, Inc.,* No. 08-3799 (N.D. Ill.); *Martin v. Caterpillar, Inc.,* No. 07-1009 (C.D. Ill.).

Exhibit 1

119.    Schlichter, Bogard & Denton has agreed to advance the costs of this action contingent upon the outcome, and is aware that no fee can be awarded without the Court's approval.

## COUNT I

### Breach of Duties of Loyalty and Prudence—
### Excessive Administrative Fees

120.    Plaintiffs restate and incorporate herein the allegations contained in the preceding paragraphs.

121.    If a 401(k) plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798–99 (7th Cir. 2011). Similarly, "us[ing] revenue sharing to benefit [the plan sponsor and recordkeeper] at the Plan's expense" while "failing to monitor and control recordkeeping fees" and "paying excessive revenue sharing" is a breach of fiduciary duties. *Tussey,* 746 F.3d at 336.

122.    The Banner Health Defendants failed to engage in a prudent and loyal process for the selection and retention of the Plan's recordkeeper and administrator. Instead of soliciting competitive bids from outside vendors on a flat per-participant fee basis or soliciting bids at all, the Banner Health Defendants used Fidelity and Banner Health to provide these services to the Plan for over 16 years. This not only benefited Fidelity and Banner Health by allowing them to receive millions of dollars in unreasonable compensation and profits without bids, it also benefited Banner

Exhibit 1

Health in discounted or free services to its other Banner Health-sponsored retirement plans and corporate plans, causing Plan participants millions of dollars of losses.

123.    The Banner Health Defendants and Slocum failed to engage in a prudent and loyal process to ensure that the compensation paid to Fidelity and to Banner Health was reasonable for the administrative services provided to the Plan. The Banner Health Defendants allowed Fidelity to receive uncapped, asset-based revenue sharing, yet the Banner Health Defendants and Slocum failed to prudently and loyally monitor the amount of those payments to determine if they were reasonable. Slocum also recommended investment options for inclusion in the Plan based, in part, on the asset-based fees paid to Fidelity for recordkeeping and administrative services, thus securing the unreasonable fees paid by the Plan for recordkeeping services.

124.    As the assets in the Plan grew, the revenue sharing payments to Fidelity grew by a similar percentage, even though the services provided by Fidelity remained the same to this Plan, and the number of participants in the Plan had increased only slightly. This caused the recordkeeping compensation paid to Fidelity to become even more excessive than it had been without any comparable increase in services. Rather than recapturing all excessive fees paid by the Plan for recordkeeping and administrative services, the Banner Health Defendants imprudently and disloyally allowed other Banner Health-sponsored plans to benefit

Exhibit 1

from these excessive fees, which in turn directly benefitted the Banner Health Defendants. Further, the Banner Health Defendants allowed Banner Health to receive millions of dollars without ensuring that the services were necessary, appropriate under ERISA, and reasonable.

125.    The Banner Health Defendants and Slocum failed to engage in a prudent and loyal process to ensure that the expenses paid to Portfolio Advisory Service® were reasonable for the services provided to the Plan. The Banner Health Defendants allowed Portfolio Advisory Service® to receive uncapped, asset-based revenue sharing, yet failed to monitor the amount of those payments to determine if they were reasonable, resulting in excessive fees.

126.    Based on the conduct described above, the Banner Health Defendants and Slocum violated their duties of loyalty and prudence under 29 U.S.C. §1104(a)(1)(A) and (B).

127.    The Banner Health Defendants also caused the Plan to distribute Plan assets to Banner Health and therefore caused Plan assets to inure to the benefit of an employer in violation of 29 U.S.C. §1103(c)(1).

128.    Through these actions and omissions, the Banner Health Defendants and Slocum caused millions of dollars in losses to the Plan, and the Banner Health Defendants benefited themselves at the expense of participants. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated

Exhibit 1

herein based upon the limited information that has been made available to Plan participants to date.

129.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and is subject to other equitable or remedial relief as appropriate. Each Defendant also knowingly participated in the breaches of the other Defendants, knowing that such acts were breaches, enabled the other Defendants to commit breaches by failing to lawfully discharge its own fiduciary duties, knew of the breaches by the other Defendants, failed to make any reasonable effort under the circumstances to remedy the breaches, and thus each Defendant is liable for the losses caused by each breach of its co-fiduciaries under 29 U.S.C. §1105(a).

130.    Plaintiffs seek an accounting from the Banner Health Defendants and Slocum to determine the full nature and extent of the losses caused to the Plan and the profits these Defendants unlawfully gained and must make good to the Plan.

### COUNT II

**Breach of Duties of Loyalty and Prudence, and Violation of the Plan Documents—Imprudent Investment Options**

131.    Plaintiffs restate and incorporate herein the allegations contained in the preceding paragraphs.

132.    The Banner Health Defendants, as advised by Slocum, have provided and now provide as Plan investment options mutual funds with excessively high

Exhibit 1

expenses and poor historical performance relative to other investment options that were readily available to the Plan at all relevant times. The actions of the Banner Health Defendants and Slocum include, and have included, the nearly exclusive consideration and use of both Fidelity and non-Fidelity mutual funds with expense ratios far in excess of other options available to the Plan, such as separate accounts, collective trusts, lower-cost mutual funds, and lower-cost share classes with the identical investment manager and investments. These actions also include, and have included, failing to prudently and loyally monitor the Plan's investment options, and retaining underperforming funds despite their sustained poor performance rather than recommending the removal of, or in fact removing, them from the Plan. In so doing, the Banner Health Defendants and Slocum failed to provide investment advice and make Plan investment decisions based solely on the merits of the investment funds and what was in the interest of participants. The Banner Health Defendants in turn, made investment decisions that would drive revenues and profits to Fidelity. Alternatively, the Banner Health Defendants and Slocum failed to engage in any prudent or loyal selection and retention process when every mutual fund Fidelity offered was included in the Plan, plus an additional 185 others that Fidelity approved, without any analysis.

133.   The Banner Health Defendants and Slocum therefore failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to

Exhibit 1

participants and their beneficiaries and defraying reasonable expenses of administering the Plan. Moreover, the Banner Health Defendants acted for the purpose of benefiting Banner Health and Fidelity. These actions were in breach of the Banner Health Defendants' and Slocum's fiduciary duty of loyalty under 29 U.S.C. §1104(a)(1)(A).

134.    The Banner Health Defendants and Slocum failed to adequately consider lower-cost or better-performing investments for the Plan, and thereby failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims. The Banner Health Defendants and Slocum therefore breached their fiduciary duty of prudence under 29 U.S.C. §1104(a)(1)(B).

135.    The Banner Health Defendants and Slocum further failed to engage in a prudent process for the selection and retention of Plan investment options. Instead, they provided and retained more expensive funds with inferior historical performance that paid revenue sharing and generated investment management fee revenues for Fidelity. A prudent investigation would have revealed to a reasonably prudent fiduciary that the Fidelity mutual funds and the other excessive-cost mutual funds in the Plan were inferior to other options available to the Plan, which had much lower costs and better performance. Had a prudent and loyal fiduciary

Exhibit 1

conducted such an investigation, it would have concluded that the Plan's investment options were selected and retained for reasons other than the best interest of the Plan and its participants and were causing the Plan to waste tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plan.

136.   The Banner Health Defendants and Slocum also violated the terms of the IPS and the Plan document in violation of 29 U.S.C. §1104(a)(1)(D) by failing to select, monitor, and review all investment options provided under the Plan for the investment of Plan participants' retirement assets in accordance with their terms.

137.   The Plan suffered millions of dollars in losses from the Banner Health Defendants' and Slocum's breaches of duty. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been made available to Plan participants to date.

138.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and is subject to other equitable or remedial relief as appropriate. Each Defendant also knowingly participated in the breaches of the other Defendants, knowing that such acts were breaches, enabled the other Defendants to commit breaches by failing to lawfully discharge its own fiduciary duties, and knew of the

Exhibit 1

breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches, and thus each Defendant is liable for the losses caused by each breach of its co-fiduciary under 29 U.S.C. §1105(a).

139.   Plaintiffs seek an accounting of all participant investment transactions and the sources and recipients of all investment option fees, as well as other discovery, in order to determine the full nature and extent of the Plan's losses and the Banner Health Defendants' and Slocum's gains from this breach of duty, which these Defendants must make good to the Plan.

## COUNT III

### Failure to Monitor Fiduciaries

140.   Plaintiffs restate and incorporate herein the allegations contained in the preceding paragraphs.

141.   This count alleges breaches of fiduciary duties against the Banner Health Board of Directors, Peter S. Fine (the Banner Health CEO), and the individual directors.

142.   Given that the Banner Health Board of Directors and the CEO had overall oversight responsibility for the Plan, and the explicit fiduciary responsibility to appoint and remove members of the Banner Health Retirement Plans Advisory Committee, the Board of Directors and its individual members had a fiduciary responsibility to monitor the performance of the other fiduciaries. The Banner

Exhibit 1

Health Board of Directors also had a fiduciary responsibility to monitor the performance of the CEO.

143.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

144.    To the extent any of the Board of Directors' fiduciary responsibilities were delegated to the CEO or another fiduciary, the Board's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

145.    To the extent any of the CEO's fiduciary responsibilities were delegated to the Banner Health Retirement Plans Advisory Committee or another fiduciary, the CEO's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

146.    The Banner Health Board of Directors, the individual directors, and the CEO breached their fiduciary monitoring duties by, among other things:

        a.       failing to monitor their appointees, to evaluate their performance, or to engage in a prudent process for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and omissions with respect to the Plan;

Exhibit 1

b.      failing to monitor their appointees' fiduciary process, which would have alerted a prudent fiduciary to the potential breach because of the numerous poor-performing and expensive investment options;

c.      failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeeper; the amount of any revenue sharing payments, float, and any other sources of revenue derived from the Plan or its investments; a process to prevent the recordkeeper from receiving uncapped revenue sharing that would increase the recordkeeper's compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan;

d.      failing to ensure that the monitored fiduciaries appreciated the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's investment options;

e.      failing to remove appointees whose performance was inadequate in that they continued to maintain the imprudent options for participants' retirement savings in the Plan, and who continued to breach their fiduciary duties under ERISA.

Exhibit 1

147.    As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses. Had the Board of Directors and the individual directors discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, and the Plaintiffs and other Plan participants, lost tens of millions of dollars of retirement savings.

148.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and is subject to other equitable or remedial relief as appropriate. Each Defendant also knowingly participated in the breaches of the other Defendants, knowing that such acts were breaches, enabled the other Defendants to commit breaches by failing to lawfully discharge its own fiduciary duties, and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches; thus each Defendant is liable for the losses caused by each breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT IV

### 29 U.S.C. §1106(a)
### Prohibited Transactions between Plan and Party in Interest

149.    Plaintiffs restate and incorporate herein the allegations contained in the preceding paragraphs.

Exhibit 1

150.    By causing the Plan to engage Fidelity to be the recordkeeper for unreasonable compensation, which was derived in part through the selection and retention of Fidelity's imprudent and unreasonably expensive mutual funds and investments as Plan investment options, the Banner Health Defendants caused the Plan to engage in a transaction that they knew or should have known constituted an exchange or property between the Plan and a party in interest prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and a party in interest prohibited by 29 U.S.C. §1106(a)(1)(C), and/or a transfer of Plan assets to a party in interest prohibited by 29 U.S.C. §1106(a)(1)(D).

151.    By causing the Plan to engage Fidelity to be the trustee of Plan assets for unreasonable compensation, the Banner Health Defendants caused the Plan to engage in a transaction that they knew or should have known constituted an exchange of property between the Plan and a party in interest prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and a party in interest prohibited by 29 U.S.C. §1106(a)(1)(C), and/or a transfer of Plan assets to a party in interest prohibited by 29 U.S.C. §1106(a)(1)(D).

152.    By causing the Plan to utilize Fidelity's Portfolio Advisory Service® that provided unreasonable compensation for the conflicted services provided, the Banner Health Defendants caused the Plan to engage in a transaction that they knew or should have known constituted a direct or indirect furnishing of services between the Plan and a party in interest prohibited by 29 U.S.C. §1106(a)(1)(C).

Exhibit 1

153.    By causing the Plan to pay Banner Health from Plan assets for services that were not necessary or not performed, or to pay an unreasonable amount for whatever necessary services were provided, or to pay Banner Health more than was necessary to reimburse it for expenses directly incurred solely on behalf of the Plan, the Banner Health Defendants caused the Plan to engage in transactions that they knew or should have known constituted an exchange or property between the Plan and a party in interest prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and a party in interest prohibited by 29 U.S.C. §1106(a)(1)(C), and/or a transfer of Plan assets to a party in interest prohibited by 29 U.S.C. §1106(a)(1)(D).

154.    Under 29 U.S.C. §1109(a), these Defendants are liable to restore all losses suffered by the Plan as a result of these prohibited transactions as well as other appropriate equitable or remedial relief. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been made available to Plan participants to date.

## COUNT V

### 29 U.S.C. §1106(b)
### Prohibited Transactions between Plan and Fiduciary

155.    Plaintiffs restate and incorporate herein the allegations contained in the preceding paragraphs.

156.    By causing the Plan to hire Banner Health to provide any putative services and to pay Banner Health from Plan assets, the Banner Health Defendants

Exhibit 1

acting on behalf of Banner Health dealt with the assets of the Plan in their own interests, acted on behalf of Banner Health when its interests were adverse to the interests of the Plan and its participants and beneficiaries, and caused Banner Health to receive consideration for its own personal account from their actions, all of which is prohibited by 29 U.S.C. §1106(b).

157.   Under 29 U.S.C. §1109(a), these Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and to disgorge all amounts Banner Health received from the Plan as well as other appropriate equitable or remedial relief. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been made available to Plan participants to date.

<h3 style="text-align:center">JURY TRIAL DEMAND</h3>

158.   Plaintiffs demand a trial by jury under Fed.R.Civ.P. 38 and the Constitution of the United States.

<h3 style="text-align:center">PRAYER FOR RELIEF</h3>

Plaintiffs, on behalf of the Plan and all Plan participants and beneficiaries, respectfully request that the Court:

1.   Find and declare that the Defendants have breached their fiduciary duties and committed prohibited transactions in every instance alleged herein;

2.   Find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary

76

Exhibit 1

duties or prohibited transactions, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

      3.     Determine the method by which to calculate the losses to the Plan caused by Defendants' breaches or profits gained by Defendants from their breaches and to order Defendants to provide all accountings necessary to determine same, and upon such calculation to compel Defendants to pay into the Plan all such losses;

      4.     Find and adjudge that Defendants must disgorge all sums of money received from their use of assets of the Plan;

      5.     Impose a constructive trust on funds with which the Defendants were unjustly enriched as a result of breaches of fiduciary duty or prohibited transactions and cause the Defendants to disgorge such funds or the proceeds thereof to the Plan;

      6.     Remove the fiduciaries who have breached their fiduciary duties and/or enjoin them from future breaches of ERISA;

      7.     Compel Defendants to render all such accountings as are necessary to provide the Plan complete remedies to Defendants' breaches;

      8.     Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which were improper, excessive and/or in violation of ERISA;

      9.     Order equitable restitution against the Defendants;

      10.    Award to the Plaintiffs and the Class their attorney's fees and costs

Exhibit 1

pursuant to 29 U.S.C. §1132(g)(1) and the common fund doctrine;

11.      Order the payment of interest to the extent it is allowed by law; and

12.      Grant any other and further equitable or remedial relief, as the Court

deems appropriate.

October 3, 2016                          Respectfully submitted,


                                         /s/      Jerome J. Schlichter
                                         SCHLICHTER, BOGARD & DENTON LLP
                                         Jerome J. Schlichter
                                         Michael A. Wolff
                                         Troy A. Doles
                                         Heather Lea
                                         Kurt C. Struckhoff
                                         100 South Fourth Street, Suite 1200
                                         St. Louis, Missouri 63102
                                         Telephone: (314) 621-6115
                                         Facsimile: (314) 621-5934
                                         Email: JSchlichter@uselaws.com
                                         MWolff@uselaws.com
                                         TDoles@uselaws.com
                                         HLea@uselaws.com
                                         KStruckhoff@uselaws.com

                                         Attorneys for Plaintiffs

Exhibit 1