**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 15-cv-2556-WJM-NRN

LORRAINE M. RAMOS, *et al.*,

      Plaintiffs,

v.

BANNER HEALTH, *et al.*,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART
SLOCUM'S MOTION FOR SUMMARY JUDGMENT**

---

This case arises out of alleged mismanagement of Defendant Banner Health's ("Banner") employee 401(k) plan (the "Plan"). Plaintiff Lorraine Ramos and others (together, "Plaintiffs") bring this lawsuit against Banner Health and certain current and former employees (together, "Banner Defendants") and Jeffrey Slocum & Associates, Inc. ("Slocum") (collectively, "Defendants") alleging that Defendants breached their fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1101 *et seq.* (ECF No. 118.) Plaintiffs earlier moved for class certification, which the Court granted as to the Banner Defendants and denied as to Slocum. (ECF Nos. 296 & 345.)

Currently before the Court is Slocum's Motion for Summary Judgment (the "Motion"). (ECF Nos. 306 (restricted) & 307 (public).) For the reasons discussed below, the Court grants in part and denies in part the Motion.

# I. BACKGROUND

The following facts are undisputed unless otherwise noted.[1]

## A.    Plan Investment Options

Banner offers employees an opportunity to invest and save for retirement

through the Plan, a defined contribution plan under ERISA and a 401(k) plan under the

Internal Revenue Code.  Plan participants may invest their voluntary and company-

matching contributions in a "choice of investment options that allow [participants] to

create a diversified portfolio to help [them] meet [their] individual needs."  (ECF

No. 322-3 at 6; ECF No. 306 at 11, ¶ 5.)[2]  Until August 2014, the Plan offered three

"levels" of funds to participants: (1) "Level 1: Ready-mixed Investment Options" or

target-date funds that allowed a participant to invest in a single fund based on a desired

retirement date; (2) "Level 2: Core Investment Options" described as "8 core investment

options to help you create and manage a diversified portfolio"; and (3) "Level 3:

Expanded Investment Options" intended as "[a]dditional investment opportunities for

---

[1] All of briefing on the Motion and exhibits filed in support thereof or opposition thereto have been filed as "Restricted Document: Level 1."  In this order, the Court has endeavored to respect trade secrets.  Nonetheless, having weighed the parties' confidentiality interests against the public's right of access, the Court finds that any material quoted or summarized below does not qualify for restricted access to the extent quoted or summarized, particularly given the need to provide a proper, publicly available explanation of the Court's decision.  *See* D.C.COLO.LCivR 7.2; *cf. Lucero v. Sandia Corp.*, 495 F. App'x 903, 913 (10th Cir. 2012) ("The strongest arguments for [public] access [to court records] apply to materials used as the basis for a judicial decision of the merits of the case, as by summary judgment." (internal quotation marks omitted)).  The Court also notes that the parties failed to fully comply with D.C.COLO.LCivR 7.2(c) and file motions to restrict the referenced filings.  By way a separate order, the Court has issued an Order to Show Cause as to why the briefing on the Motion and all supporting documents (*i.e.*, ECF Nos. 306, 322 & 334, and attachments thereto) should not be made public under D.C.COLO.LCivR(e).

[2] All ECF page citations are to the page number in the CM/ECF header, which does not always match the document's internal pagination, particularly in exhibits.

more sophisticated investors." (ECF No. 322-4 at 10, 16, 20.) Changes to the investment options in any of these three levels required a letter of direction by Banner sent to the Plan recordkeeper.

Level 3 Funds in the form of the "mutual fund window" were eliminated in August 2014, though participants could still access options beyond Levels 1 & 2 Funds through the Plan's "brokerage-account window." (ECF No. 306 at 11, ¶ 7.) Participants were specifically informed that the Plan fiduciaries did not monitor investments available through the brokerage link.

Slocum refers to Levels 1 & 2 Funds collectively as the "Core Funds" and Level 3 Funds as the "Mutual Fund Window" (ECF No. 306 at 11, ¶¶ 5–6). Plaintiffs refer to the Level 1 Funds as the "Freedom Funds" and the Level 3 Funds by the level number. (ECF No. 322 at 8–9, ¶ 5; *id.* at 33–40; *see* ECF No. 322-33 at 14, ¶ 63.) For the sake of clarity, the Court will use the level number, unless referring to a specific fund within a particular level.

## B. Contractual Responsibility for Plan Investment Options

### 1. The Plan's Delegation of Responsibility

The Plan delegates responsibility "for all investment and administrative functions related to the Plan" to the Retirement Plan Advisory Committee (the "RPAC"). (ECF No. 306-2 at 44; ECF No. 306 at 10, ¶ 2.) In addition to the RPAC, Banner Health, its Board of Directors, and the Chief Executive Officer of Banner Health have responsibilities regarding the operation and administration of the Plan. (ECF No. 306-2 at 43; ECF No. 322 at 8, ¶ 2.)

Banner hired Fidelity Management Trust Company ("Fidelity") to serve as the

Plan's recordkeeper in 1999.  The Plan's recordkeeping services were never put out for competitive bidding.  Until the end of 2016, Fidelity was compensated for its services through a revenue-sharing arrangement, which was a percentage of the retirement savings that participants invested in the Plan and was sent to Fidelity in uncapped asset-based fees.  Banner also retained Drinker Biddle as outside ERISA counsel to attend quarterly meetings, provide training to RPAC members, and advise the RPAC on ERISA issues.

The RPAC was tasked with "advis[ing] the Company on Plan investments and administrative functions."  (ECF No. 306-2 at 43; ECF No. 322 at 8, ¶ 2.)  The RPAC's investment responsibilities included, among other things, selecting investment options; reviewing and evaluating the performance of investment options; taking "prudent and appropriate" corrective action regarding investment options, including adding, removing, or replacing options; and "appoint[ing] investment managers to oversee the investment options" and "an independent investment consultant to (I) act as a fiduciary of the Plan, (II) evaluate investment options, and (III) make recommendations regarding appropriate investment funds."  (ECF No. 306-2 at 44; ECF No. 306 at 10, ¶ 3; ECF No. 322 at 8, ¶ 3.)  On the administrative side, the RPAC was responsible for serving as the Plan Administrator, reviewing the reasonableness of administrative fees, and monitoring the recordkeeper.  (ECF No. 306-2 at 44–45.)

2.  Slocum's 2010 and 2014 Contracts with Banner

To assist the RPAC in carrying out its investment responsibilities under the Plan, Banner hired Slocum to serve as an independent investment consultant.  Banner and Slocum signed the 2010 and 2014 Contracts for investment consulting services, and

Slocum served as an independent investment consultant until October 24, 2016, when it was purchased by Pavilion Financial Corporation.  The 2010 and 2014 Contracts state that the investment-related responsibilities of the RPAC and Plan service providers, including Slocum, would be defined in the Plan's "Statement of Investment Objectives and Policies" (referred to by the parties as the "Investment Policy Statements" or "IPSs").  These contracts also outlined other contractual obligations of Slocum, including reviewing investment performance of current investment options in (among other things) the Plan, helping to evaluate and select additional or replacement investment managers, providing written investment performance evaluations on a quarterly basis, and giving asset allocation and asset liability advice.  (ECF No. 306-11 at 2–3; ECF No. 306-12 at 2–3.)

Under the 2010 Contract, Slocum was paid fixed a percentage on Banner's Consolidated Investment Portfolio for services on "the Consolidated Investment Pool, defined benefit, supplemental executive retirement plans, insurance, Foundation and Planned Giving assets."  (ECF No. 306-11 at 4.)  It also received an annual fee of $50,000 for services to the Plan.  (*Id.*)  Under the 2014 Contract, Slocum received a variable percentage fee for non-Plan investments based on the total value of assets, as well as an annual fee of $75,000 for services to the Plan.  (ECF No. 306-12 at 4.)

The 2010 Contract also contemplated Slocum's involvement with "large-scale special projects outside the scope of services" on a negotiated basis.  (ECF No. 306-11 at 2–3.)  The parties dispute whether Slocum was assigned or took on special projects.  Slocum argues that it "was never assigned any special projects and was not paid beyond its contractual fee." (ECF No. 306 at 15, ¶ 22.)  Plaintiffs contend that Slocum

did take on or perform additional work or projects, and cite the Plan Reviews that

Slocum provided.  (ECF No. 322 at 10, ¶ 22.)  Plaintiffs do not address or present any

evidence that Slocum was paid beyond its contractual fee for the Plan Reviews.  In

reply, Slocum cites the testimony of Kyle Schmit, a former Slocum investment advisor,

who testified that Slocum's retention fee for services to the Plan would include a Plan

Review.  (ECF No. 334 at 3, ¶ 22; ECF No. 306-16 at 12.)

The 2010 Contract described Slocum as a "fiduciary within the meaning of

section (3)(21)(A)(ii) of ERISA with respect to the Defined Benefit and 401(k) Plans."[3]

(ECF No. 306-11 at 4.)  The 2014 Contract provided that the "sole standard of care

imposed on us [Slocum] by this Agreement is to act with the care, prudence, and

diligence under the circumstances then prevailing that a prudent person acting in a like

capacity and familiar with such matters would use in the conduct of an enterprise of like

character and with like aims."  (ECF No. 306-12 at 5.)

3. Delegation of Responsibilities by the IPSs

The 2011 & 2014 IPSs outlined the responsibilities of, among other entities,

Banner, Banner's Board of Directors, Banner's CEO, the RPAC, and Slocum.  The

2011 and 2014 IPSs separately outlined the duties of the RPAC (referred to in the IPSs

as the "Advisory Committee") for investment functions and plan administration

functions.

a. *The RPAC's Investment Functions Under the IPSs*

The RPAC was responsible for "overseeing and reviewing the investment of the

---

[3] That section of ERISA provides that a person is a fiduciary to the extent that he or she
renders investment advice for a fee or has the authority to do so.  29 U.S.C. § 1002(21)(A)(ii).

Plan's assets" and required to "act prudently and solely in the interest of the Plan's participants and beneficiaries" when carrying out its "management, investment, and review of the Plan's assets." (ECF No. 306-13 at 7; ECF No. 306-14 at 7.) Among other duties, the RPAC was responsible for "[e]valuating and selecting firms for consideration as . . . [r]ecordkeeper" reviewing the performance of the recordkeeper, taking prudent and appropriate corrective action as necessary, and "[r]eviewing the reasonableness of investment related fees paid by the Plan." (ECF No. 306-13 at 8; ECF No. 306-14 at 8.) As Tom Koebl, a former RPAC board member, testified, Slocum did not have final decision-making authority over which recordkeeper would provide services to the Plan and RPAC was responsible for insuring the reasonableness of recordkeeping and investment fees. (ECF No. 306-6 at 6.) RPAC chair Brenda Schaefer testified that RPAC had a fiduciary responsibility to ensure that the administrative fees for recordkeeping services were reasonable. (ECF No. 334-2 at 5.) She also testified that she understood that Slocum acted in a fiduciary capacity when assessing the reasonableness of the Plan's recordkeeping fees. (ECF No. 332 at 3–5, 8.)

The RPAC was also tasked with "evaluating and selecting investment funds, which may include commingled accounts, bank, common or investment trust funds, or separately managed accounts for participants' directed investments to effect the [RPAC's] investment vehicle selections (collectively, 'Investment Funds'), and, where appropriate, appointing one or more ERISA Investment Managers to provide separately managed Investment Funds." (ECF No. 306-13 at 7; ECF No. 306-14 at 7.)

However, the IPSs made clear that the RPAC had no responsibility "for any self-

directed brokerage accounts to the extent permitted by applicable law." (ECF No. 306-14 at 8; *see* ECF No. 306-13 at 8 (2010 IPS disclaimed any responsibility for "any self-directed brokerage accounts/mutual fund windows").) The IPSs explained that the "primary objective of the self-directed brokerage accounts is to allow participants access to investments not currently available through the core investment options in the Plan," and explicitly disclaimed any fiduciary liability for decisions made by participants within these options to the extent permitted by law. (ECF No. 306-14 at 8–9; *see* ECF No. 306-13 at 8–9 (also including "mutual fund window")).

        b.    *Slocum's Functions Under the IPSs*

The IPSs state that RPAC retained "an Investment Consultant," Slocum, "to provide investment advice in accordance with ERISA." (ECF No. 306-13 at 9; ECF No. 306-14 at 9.) Both IPSs provide that Slocum is a fiduciary "but only with respect to those matters specifically assigned or delegated to Slocum pursuant to its Contract for Consulting Services dated June 28, 2010, or any supplemental assignment of duties mutually agreed to by the parties." (ECF No. 306-13 at 9; ECF No. 306-14 at 9.)

In terms of the recordkeeper advice, under the IPSs, Slocum was tasked with advising the RPAC in selection of the "[r]ecordkeeper, and any other investment related service providers, as requested, by identifying and screening candidates for appropriate characteristics and assisting in performing due diligence checks." (ECF No. 306-13 at 9–10; ECF No. 306-14 at 9–10.) Slocum contends that RPAC never requested Slocum to assist in selecting a recordkeeper, and Plaintiffs do not respond to this factual allegation. (ECF No. 306 at 18 ¶ 36; ECF No. 322 at 12–13, ¶ 36.)

In addition, among other things, Slocum was responsible for:

- "[a]dvising the [RPAC] in selecting the Investment Funds to be offered under the Plan by identifying and researching potential Investment Funds";

- "[p]reparing regular performance evaluations of Investment Funds" and providing a written report for each Investment Fund addressing returns, comparisons, diagnostics, reconciliation, and compliance;

- "[m]aking recommendations, with supporting material, as to the appropriate Investment Funds"; and

- reporting quarterly to the RPAC a "review and reappraisal of the Investment Funds," a "commentary on investment results of each Investment Fund in light of current market conditions and the appropriate standards of performance," and a "discussion of any key policy issues facing the Plan."

(ECF No. 306-13 at 9–11; ECF No. 306-14 at 9–11.)

Plaintiffs and Slocum dispute whether the term "Investment Fund" in the IPSs includes self-directed brokerage accounts or mutual fund windows. Slocum cites testimony of Slocum representatives and RPAC members stating that Slocum had no responsibility for monitoring or reporting to the RPAC on individual funds in the mutual fund window, and Slocum's responsibility was limited to the "Core Funds" (defined by Slocum as Levels 1 & 2). (ECF No. 306 at 16, ¶ 29; ECF No. 322 at 11, ¶ 29.)

Specifically, Edward Oxford, Jr., a current or former member of the RPAC, testified that Slocum did not provide analysis on any of the approximately 300 funds

within Level 3, nor did the RPAC expect Slocum to provide analysis of those funds. (ECF No. 306-9 at 12, 23.) Richard Sutton, another current or former member of the RPAC, testified that the RPAC monitored the general participation in the mutual fund window and the window "overall," but not the individual performance and fees associated with individual mutual funds. (ECF No. 306-5 at 13.) Kyle Schmit testified that he understood Slocum's responsibility to be the same as the RPAC, with no responsibility over funds in the mutual fund window. (ECF No. 306-15 at 153–54.)

In addition, Slocum's principal, Jeffrey Slocum, stated that the annual fees of $50,000 and later $75,000 reflected an understanding that Slocum's responsibility did not include the Level 3 Investment Options. (ECF No. 306-58 at 2.) He also stated that he understood that the RPAC was not responsible for selecting and monitoring Level 3 options, and thus had no need for Slocum's services with respect to those funds. (*Id.*) Had Slocum been hired to perform services for Level 3 options, Mr. Slocum stated, the firm would have charged far more for its services. (*Id.* at 4–5.)

However, Slocum's own expert witness, Terry Dennison, admitted at his deposition that the scope of Slocum's review of "the performance of the current options in the funds" is "[a]dmittedly . . . not precise" and "not terribly specific about . . . what is contemplated." (ECF No. 322-7 at 14, 16.) He also testified, based on the Plan's fee disclosure to participants, that there was no "differentiation being made between the core investment options and the funds that are in the mutual funds window." (*Id.* at 24.) Nonetheless, he went on to explain that because RPAC was "not responsible for the mutual fund window . . . there is nothing that indicates Slocum is responsible for the mutual fund window." (*Id.* at 14.)

**C.      Slocum's Investment Advice**

Slocum provided the RPAC a quarterly written report to coincide with the RPAC's quarterly Plan-related meetings.  A Slocum representative attended each quarterly meeting to present the quarterly report to the RPAC, answer questions, and provide follow-up information.  The quarterly reports generally provided individual reports for the Levels 1 & 2 Funds, including annualized and rolling performance metrics, risk-adjusted performance measures, performance comparisons to peers and benchmarks, and Slocum commentary on the compliance thresholds from the IPS and qualitative considerations.  (ECF No. 306 at 19, ¶ 39.)  Plaintiffs contends that the quarterly reports did not contain a full attribution analysis broken out for each Level 1 Fund (*see* ECF No. 322 at 13, ¶ 39), although the reports did contain general attribution analysis for all Level 1 Funds (*see* ECF No. 334-15 at 2–3; ECF No. 334-3 at 15).  In additional to quarterly reports, Slocum also provided annual Plan Reviews to the RPAC.

1.      Level 3 Funds

The quarterly reports and Plan Review did not evaluate the individual funds in Level 3.  However, Slocum's written and oral reports to the RPAC were not entirely devoid of references to the Level 3 Funds.  The 2010 Plan Review noted that 30% of Plan assets were invested in Level 3, largely because a former Level 2 Fund (the Undiscovered Managers Behavioral Growth Fund) "was once in the core investment lineup."  (ECF No. 322-8 at 3.)  The 2010 Plan Review also summarized the types of asset classes most commonly used in the Level 3 Funds.  (*Id.*)  In addition, at a September 4, 2012 RPAC meeting, Kyle Schmit notified the RPAC that the

Undiscovered Managers Behavioral Growth Fund would be liquidated.  (ECF No. 322-9 at 63.)  Finally, at a May 21, 2009 meeting, a Banner staff member reported—in the presence of Slocum employees—that a particular fund would be moved to Level 3.  (*Id.* at 21–23.)

In the 2012 Plan Review, Slocum first "recommend[ed] that Banner consider **removing** the mutual fund window."  (ECF 306-27 at 4 (emphasis in original).)  Slocum reasoned that recent Department of Labor statements "specific to self-directed brokerage accounts have indicated that plan sponsors may have an increased fiduciary obligation to monitor investments not included in the core line-up."  (*Id.*)  Slocum added that with the addition of certain other options, "the continued use of the mutual fund window [is] relatively unnecessary."  (*Id.*)  Slocum reiterated its recommendation in the August 2013 Plan Review.  (ECF No. 306-10 at 4.)  RPAC elected to remove the Level 3 Funds in August 2013, effective August 2014.  (ECF No. 306 at 20 ¶ 46; *see* ECF No. 306-7 at 5.)

2.    Level 1 & 2 Funds

The quarterly reports often contained recommendations for the RPAC regarding retention of the Level 1 & 2 Funds.  (ECF No. 306 at 19 ¶ 40.)  At various points, the quarterly reports also recommended that the RPAC or Banner consider removing certain funds.  For example, in the 2011 Q4 Quarterly Report, Slocum recommended considering the removal of the Fidelity Balanced Fund from the Level 2 Funds because it "underperformed its benchmark during the fourth quarter and significantly trailed the benchmark for the year."  (ECF No. 306-18 at 13.)  Between 2009 and early 2016, the

RPAC elected to add or remove ten different Level 1 & 2 Funds, based in part on Slocum's recommendations.  (ECF No. 306 at 19, ¶ 41; *see* ECF No. 306-59 at 4–5, ¶ 10.)

Plaintiffs claim that the RPAC and Slocum breached their fiduciary duties by continuing to offer the Level 1 Funds and a particular Level 2 Fund, the Fidelity Balanced Fund.

> a.  *Level 1 Funds*

Plaintiffs contend that the RPAC should have replaced the funds that comprised the Level 1 Funds, namely, the Fidelity Freedom Funds, with the J.P. Morgan target-date funds by June 2011.

Beginning in May 2009, Slocum notified the RPAC of the Freedom Funds' "trailing performance" or underperformance of benchmarks at times in 2008 and 2009, and of changes to the Freedom Funds' glide path design (the formula governing the asset allocation over time for each target-date fund) in 2009.  (ECF No. 306 at 22, ¶ 54.)  Based on the performance and changes to the glide path, Slocum advised the RPAC that the Level 1 Funds should be monitored closely going forward.

In August 2010, Slocum presented a 19-page report comparing the Freedom Funds to other target-date funds, discussing glide path design, evaluating relative fund performance and fees between the Freedom Funds and other target-date funds, and evaluating the Freedom Funds' asset allocation relative to other funds.  (ECF No. 306-43.)  Based on its analysis, Slocum concluded that the Freedom Funds remained a competitive series of target-date funds whose performance and fees were "near average."  (*Id.* at 5.)  Slocum noted that it "would not recommend all of the underlying

funds on a stand-alone basis . . . but the diversification and quantity of underlying funds reduces the potential for any given fund to drive performance," and thus Slocum "currently recommended retaining the Fidelity Freedom Funds." (*Id.* at 5.) Plaintiffs' expert Gerald W. Buetow contends that this report "clearly indicates underperformance and raises several other consequential changes" that should have resulted in performing "far more significant due diligence regarding these funds." (ECF No. 322-34 at 10.)

Thereafter, Slocum continued to monitor the Freedom Funds, providing quarterly performance updates to the RPAC through the quarterly reports, with assessments of the Freedom Funds' performance relative to benchmarks and descriptions of Slocum's quantitative and qualitative assessment, and in-person presentations. (ECF No. 306 at 23, ¶¶ 59–60.) Plaintiffs contend that these reports were insufficient and failed to meet industry standards. (ECF No. 322-34 at 10.)

In 2011, the Freedom Funds ranked consistently "near the middle," and rated as "average", whereas the J.P. Morgan target-date funds consistently ranked among the top target-date funds and received high ratings.

In 2012 and 2013, the Freedom Funds continued to underperform relative to benchmarks. In the 2013 Q1 Quarterly Report, Slocum stated that it was "conducting a comprehensive review of the Fidelity Freedom Funds." (ECF No. 306-46 at 15.) In July 2013, it provided a "Fidelity Freedom Funds Review" that analyzed the causes of underperformance and recommended "reviewing alternatives to the Fidelity Freedom Funds." (ECF No. 306-48 at 2.)

After that report, Slocum continued to raise the issue of the disappointing

14

performance of the Freedom Funds. At a November 2013 RPAC meeting, Slocum discussed options regarding the Freedom Funds and Slocum's representative "did not recommend an immediate change from the Fidelity Freedom Funds." (ECF No. 306-49 at 3.) The RPAC "determined that no immediate action should be taken." (*Id.*)

In the August 2014 Plan Review, Slocum recommended that the RPAC "consider other target date fund options to ensure that the Freedom Funds remain the most appropriate option for Banner." (ECF NO. 306-7 at 3.) In November 2014, Slocum presented another report to the RPAC that compared the Freedom Funds to other target-date fund offerings. Based on this report, Slocum recommended that the RPAC hear presentations from each target-date fund provider and gather additional meeting. The RPAC agreed, and Slocum set up meetings with Fidelity, J.P. Morgan, and Vanguard in February 2015. Thereafter, Slocum recommended that the RPAC replace the Freedom Funds with the J.P. Morgan target-date funds. The RPAC agreed, and directed the replacement in February 2015.

Plaintiffs expert Buetow contends that "the performance gap [between the Freedom Funds and other alternatives] was so glaring by the end of second quarter 2011 that a prudent fiduciary could no longer ignore the need to replace the Fidelity Freedom Funds." (ECF No. 322-34 at 11.) In addition, "a diligent review of the Freedom Funds as compared to prudent alternatives" prior to 2015 "would have led to a diligent choice of including [alternatives] in place of the Freedom Funds." (ECF No. 322-34 at 10.) He concludes that failure to timely remove the Freedom Funds resulted in $40.7 million in Plan losses. (ECF No. 322-35 at 3.)

### b. *Balanced Fund*

The Court need not discuss the facts related to the Balanced Fund—a particular fund within the Level 2 Funds—because Plaintiffs admit that "the Plan did not suffer losses as a result of the imprudent retention of the Balanced Fund" (ECF No. 322 at 14, ¶ 48) and Plaintiffs therefore cannot show a breach of fiduciary duty resulting in a loss to the Plan as to the balanced fund.

### 3. Reasonableness of Fidelity's Fees

Slocum's Plan Reviews in 2008, 2010, 2012, 2013, 2014, 2015, and 2016 each calculated the total recordkeeping compensation received by Fidelity and identified the sources of that compensation. The Plan Reviews discussed fees charged by each of the Level 1 & 2 Funds relative to benchmarks or industry averages. It also compared recordkeeping fees on a per-dollar-invested or per-participant basis, provided comparisons to per-dollar or per-participant fees charged to other Slocum clients, and included input on different practices for the RPAC to consider in evaluating the structure and level of recordkeeping fees paid by the Plan.

## II. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if

the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

Where, as here, "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden on a motion for summary judgment by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (internal quotation marks omitted). If the movant meets this burden, the burden shifts to the nonmovant "to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671 (internal quotation marks omitted). A party must support an assertion that a fact is genuinely disputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

"[C]onclusory and self-serving statements are insufficient to survive summary

17

judgment." *Ford v. West*, 222 F.3d 767, 777 (10th Cir. 2000). Likewise, "general denials, or mere argument of an opposing party's case cannot be utilized to avoid summary judgment," *Pasternak v. Lear Petroleum Expl., Inc.*, 790 F.2d 828, 834 (10th Cir. 1986), and "[v]ague, conclusory statements do not suffice to create a genuine issue of material fact," *Ford*, 222. F.3d at 777. Rather, "[t]o survive summary judgment, a nonmoving party must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which he carries the burden of proof." *Christy v. Travelers Indem. Co. of Am.*, 810 F.3d 1220, 1233 (10th Cir. 2016) (internal quotation marks omitted).

## III. ANALYSIS

Plaintiffs contend that Slocum was a fiduciary and breached its duty of loyalty in two ways: (1) providing imprudent investment advice, and (2) failing to monitor and advise Banner Defendants of excessive recordingkeeping and administrative fees. On summary judgment, Plaintiffs bear the burden of proving that (1) Slocum was a fiduciary with respect to the challenged conduct; (2) Slocum breached its fiduciary duties; and (3) those breaches caused Plaintiffs to incur losses. *See Holdeman v. Devine*, 572 F.3d 1190, 1193 (10th Cir. 2009); *Pioneer Centres Holding Co. Employee Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1336 (10th Cir. 2017).

### A.    Fiduciary Duties Imposed by ERISA

ERISA regulates employee benefit plans, including 401(k) savings plans and the Plan at issue in this litigation. ERISA seeks to protect employees from mismanagement of plans by governing "employers that create and administer benefit plans as well as

third parties that provide services for the plans" and imposing fiduciary duties on those responsible for plan management and administration. *Teets v. Great-W. Life & Annuity Ins. Co.*, 919 F.3d 1232, 1237 (10th Cir. 2019). There are two types of fiduciaries: "named fiduciaries," that have authority to control and manage operations and administration of the plan," and "functional fiduciaries." *Id.* at 1238. Although named and functional fiduciaries obtain their status in different ways, "they are bound by the same restrictions and duties under ERISA." *Id.* at 1239.

Under ERISA § 3(21)(A)(ii), a party is a functional fiduciary if it "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such a plan, or has any authority or responsibility to do so," or if it "has any discretionary authority or discretionary responsibility in the administration of such a plan." 29 U.S.C. § 1002(21)(A)(ii) & (iii). "In every case charging breach of ERISA fiduciary duty, then, the threshold question is . . . whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).

**B.      Fiduciary Duty to Provide Prudent Investment Advice**

1.      <u>Fiduciary Duty to Monitor the Level 3 Funds</u>

No fact finder could conclude that Slocum was a fiduciary with respect to the Level 3 Funds because the term "Investment Fund" in the IPSs did not include the Level 3 Funds, and the weight of the evidence overwhelmingly supports a conclusion that Slocum had no duties with respect to the Level 3 Funds under the Contracts.

Plaintiffs and Slocum dispute whether the term "Investment Fund" in the IPSs

includes the Level 3 Funds (mutual fund window).  The Court finds that there is no genuine dispute that the term "Investment Fund" did not include the Level 3 Funds or that Slocum expanded its fiduciary duties through voluntary conduct.  Under the IPSs, Slocum was a functional fiduciary that agreed to take on fiduciary duties as delineated by the contracts and the IPSs.  With respect to investment advising, Slocum's duties were limited to the "Investment Funds," a term not defined in the "Investment Advisor" section of the IPSs.  However, in the section of the IPSs describing the RPAC's responsibilities, "Investment Funds" was defined to *exclude* fiduciary responsibility for the Level 3 Funds, to the extent allowed by ERISA.  Slocum was hired to advise the RPAC on its investments.  As the IPSs make clear, at the time Slocum was hired, the RPAC was responsible for the Investment Funds, but not the mutual funds window.  Thus, Slocum's fiduciary responsibilities were limited to the "Investment Funds," which did not include the Level 3 Funds.

Plaintiffs contend that the 2010 and 2014 Contracts broadly define Slocum's responsibilities to include reviewing the investment performance of the current investment options in the Plan, and the IPSs cannot limit the scope of Slocum's fiduciary duty.  (ECF No. 322 at 35.)  However, these Contracts speak only in general terms and, at best, the broad language in the Contracts are likely ambiguous as to the scope of Slocum's fiduciary duties.  The Contracts also noted that the IPSs would further define the investment-related responsibilities of Slocum, which, as discussed above, were limited to advising on "Investment Funds."

Extrinsic evidence confirms that Slocum's fiduciary duties did not include the Level 3 Funds.  This understanding of the Contracts is confirmed by the testimony of

multiple RPAC board members and Slocum employees, who testified that Slocum's fiduciary duties did not include advising on the Level 3 Funds. While Slocum's expert acknowledges some vagueness of the language in the contracts and IPSs, he concludes—as did the RPAC board members and Slocum employees—that the Level 3 Funds were beyond the scope of Slocum's engagement. Given this conclusion, the Court finds that Slocum's expert's testimony is not sufficient to demonstrate a genuine dispute of material fact on this issue.

Moreover, Slocum's performance of the Contracts demonstrates that advising on Level 3 Funds was not part of its fiduciary duties. In its quarterly oral and written reports, Slocum makes only limited and passing observations about the usage Level 3 Funds, and never undertakes an assessment of the underlying Funds.

Slocum's recommendation to remove the Level 3 Funds further confirms that Banner, the RPAC, and Slocum did not interpret the Contracts or the IPSs to impose on Slocum a fiduciary duty to monitor the Level 3 Funds. Indeed, Slocum's recommendation to remove the mutual fund window was premised on the fact that neither it nor the RPAC was in fact monitoring those funds. In response to new Department of Labor guidance, Slocum merely suggested that the RPAC could not longer disclaim any fiduciary duty to monitor the Level 3 Funds, as it previously had, and as a result, recommended their removal.

While Plaintiffs cherry-pick Slocum's expert's deposition testimony to the effect that the Contracts alone are somewhat ambiguous, given the plain meaning of the Contracts and the IPSs, as well as the parties' own course of conduct in compliance with these documents, Plaintiffs have failed to raise a genuine dispute of material fact

that Slocum was a fiduciary for the Level 3 Funds. Slocum was not paid to render investment advice as to the Level 3 Funds nor did it have any responsibility to do so. The Court will therefore grant Slocum's Motion with respect to the Level 3 Funds.

2. Prudent Monitoring of the Freedom Funds

Plaintiffs have, however, raised sufficient evidence to show a genuine dispute of material fact as to whether the timing and nature of Slocum's recommendations to replace the Freedom Funds breached Slocum's fiduciary duty.

ERISA imposes the fiduciary duty to act with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). The fiduciary duty of care "requires prudence, not prescience." *DeBruyne v. Equitable Life Assur. Soc. of U.S.*, 920 F.2d 457, 465 (7th Cir. 1990). Thus, "[t]he focus of the inquiry is how the fiduciary acted, not whether his investments succeeded of failed." *Kirschbaum v. Reliant Energy, Inc.*, 529 F.3d 243, 253 (5th Cir. 2008).

In this case, Plaintiffs must establish that Slocum breached its fiduciary duty to act as a reasonably prudent investment advisor when advising the RPAC on the Freedom Funds. Certainly, Slocum presents evidence that it carefully monitored the Freedom Funds beginning in 2009, started recommending that the RPAC consider alternatives in 2013, and finally worked with the RPAC to replace the Freedom Funds in February 2015. However, Plaintiffs have presented expert testimony that a reasonably prudent investment advisor would have recommended replacement significantly earlier (starting in 2011). Plaintiffs also point to evidence that Slocum seemed to mildly suggest, rather than emphatically advocate, that the RPAC consider alternatives,

resulting in the RPAC improperly retaining the Freedom Funds for longer than it should have, and ultimately causing losses to the Plan.  The parties offer differing views of what a prudent process would be for responding to and evaluating the Freedom Funds as of 2011.  Such evidence is sufficient to create a genuine dispute of material fact that must be resolved at trial.

### 3. Evidence that Alleged Breaches of Fiduciary Duty Caused Losses

An ERISA claim for fiduciary breach under § 409(a) requires as an element of the claim that a plaintiff prove that a breach caused losses to a plan.  *Pioneer*, 858 F.3d at 1337.  "Causation . . . is an express element of a claim for breach of fiduciary duty under" ERISA § 409(a), and "the burden falls squarely on the plaintiff asserting a breach of fiduciary duty claim under § 1109(a) of ERISA to prove losses to the plan 'resulting from' the alleged breach of fiduciary duty."  *Id.*

First, Plaintiffs admit that "the Plan did not suffer losses as a result of the imprudent retention of the Balanced Fund."  (ECF No. 322 at 8, ¶ 48.)  Absent a claim for investment loss, Plaintiffs cannot maintain a cause of action against Slocum for a fiduciary breach as to the Balanced Fund.  *See Pioneer*, 858 F.3d at 1337.  The Court will therefore grant Slocum's Motion as to the Balanced Fund.

As for the Level 1 Funds, Plaintiffs claim that Slocum's failure to earlier recommend removal of the Freedom Funds caused the RPAC to continue to offer the Freedom Funds and resulted in losses to Plaintiffs' accounts.  Slocum contends that it recommended removal of the Freedom Funds for years before RPAC actually removed the funds, and claims that it is "hopelessly speculative" for Plaintiffs to suggest that failure to earlier recommend removal resulted in their losses.  (ECF No. 306 at 34.)

23

Slocum also argues that it is not liable under ERISA's co-fiduciary liability provision because "the wrongdoing is wholly beyond the control of the co-fiduciary." *Brandt v. Grounds*, 502 F. Supp. 598, 599 (N.D. Ill. 1980), *aff'd*, 687 F.2d 895 (7th Cir. 1982). However, the co-fiduciary liability provision of ERISA, 29 U.S.C. § 1105(a), would not exempt Slocum from liability if it independently and earlier breached its fiduciary duty by failing to recommend removal of the Freedom Funds.

Plaintiffs' expert has submitted testimony that failure to advise the RPAC to remove the Freedom Funds prior to 2013 resulted in losses to the Plan. Regardless of any breach by the RPAC or Banner, should Plaintiffs prevail on their claim that Slocum breached its fiduciary duty by not earlier recommending removal, at the very least, Slocum may be liable for losses between when it should have recommended removal and when it actually did so. There is a genuine dispute over the amount of losses, if any, caused by Plaintiffs' alleged breach, which must be resolved by the trier of fact. The Court thus denies Slocum's Motion as to the Freedom Funds.

**C.   Fiduciary Duty to Monitor Plan's Recordkeeping Fees**

The parties dispute whether Slocum had a fiduciary duty to ensure the reasonableness of the Plan's recordkeeping fees. (ECF No. 306 at 35; ECF No. 322 at 41.) The Court thus must determine whether Plaintiffs have set forth specific facts that would allow the finder of fact to conclude that Slocum had a fiduciary duty with respect to the reasonableness of recordkeeping fees.

Slocum argues that providing information and input on the Plan's recordkeeping fees does not constitute investment advice, citing a Tenth Circuit case describing investment advice triggering fiduciary status as opining on the "value of securities or

24

property, recommend[ing] the purchase of certain securities, or exercis[ing] discretion with respect to purchasing or selling securities or property."  (ECF No. 306 at 35.)  *See In re Luna*, 406 F.3d 1192, 1201 n.7 (10th Cir. 2005).  Plaintiffs do not directly contest this point; instead, they simply claim that "Slocum played a critical role in purportedly assessing the reasonableness of the Plan's recordkeeping fees."  (ECF No. 322 at 41.)  However, Plaintiffs do not argue that "play[ing] a critical role" in assessing recordkeeping fee reasonableness constitutes investment advice under ERISA sufficient to make an entity a fiduciary, nor do they cite any cases more broadly defining investment advice to include such conduct.  (*Id.* at 41–42.)

Instead, Plaintiffs claim that Slocum was a fiduciary with respect to Plan recordkeeping fees because it had "authority or discretion over administration of the Plan."  (*Id.*)  *See* 29 U.S.C. § 1002(21)(A)(iii).  In support, Plaintiffs contend that the 2011 & 2014 Contracts "directly required Slocum to assist in the negotiation of fees."  (ECF No. 322 at 41.)  However, a review of those contracts demonstrates Slocum was only committed to assisting the RPAC "in the transition process of negotiating fees" after the RPAC selected an investment manager (here, Fidelity).  (*Id.*; *see* ECF No. 306-11 at 3; ECF No. 306-12 at 3.)  The contracts do not support a conclusion that Slocum had any ongoing authority or discretion over this administrative aspect of the Plan.

Plaintiffs also argue that, even if the contracts did not require Slocum to negotiate recordkeeping fees, Slocum exceeded the scope of its contractual obligations and assumed additional fiduciary duties related to negotiating recordkeeping fees.  (ECF No. 322 at 42.)  To support their claim, Plaintiffs cite an e-mail exchange from

May 2016 between Kyle Schmit of Slocum and Suzanne Rogers of Fidelity in which Schmit asks for "the pricing proposal [to be] tightened up a bit," to which Rogers responds with her availability for discussion. (ECF No. 322-13 at 2.) From context, it is clear that they are referencing the fee structure for the Plan. (*Id.* at 5.) Plaintiffs contend that this e-mail is evidence that Slocum did indeed negotiate record keeping fees, and thus exercised authority or discretion over administration of the Plan. Slocum responds that this single e-mail "provides no evidence of negotiation," and in any event is "immaterial because the RPAC alone had the ultimate authority to determine how much Fidelity would be paid." (ECF No. 334 at 18.)

The Court finds that this single e-mail alone cannot reasonably support a conclusion that Slocum assumed a fiduciary duty to negotiate reasonable recordkeeping fees with Fidelity. At summary judgment, Plaintiffs bear the burden to support their argument with specific facts. It is entirely plausible to assume that, had Slocum in fact engaged in negotiations over recordkeeping fees with Fidelity, Plaintiffs would have been able to put before the Court evidence of this conduct far beyond this single e-mail, in order to at least create an issue of fact as to whether Slocum had indeed participated in the negotiation of reasonable recordkeeping fees with Fidelity. The absence of such additional evidence is telling, and substantially undercuts Plaintiffs' position on this point.

Nor do Plaintiffs tie any supposed discretion for negotiating recordkeeping fees to any alleged deficiency of the Plan Reviews. Plaintiffs contend that the Plan Reviews were "deficient" because they concluded that the Plan fees were reasonable, when the Plan Reviews also showed that the Plan's fees were well in excess of other 401(k)

plans.  (ECF No. 322 at 42.)  However, they fail to tie these purported deficiencies to a breach of a fiduciary duty on the part of Slocum to negotiate recordkeeping fees.  On this record, no reasonable finder of fact could conclude that Slocum was a fiduciary with respect to the recordkeeping fees of the Plan.

## D.    Claims on Behalf of Absent Participants

The parties dispute whether Plaintiffs may bring a direct action claim—that is, recover from Slocum all of the Plan's losses that Slocum caused—or may only recover their individual Plan losses.  (ECF No. 306 at 39–44; ECF No. 322 at 42–45.)  The dispute centers on ERISA's provisions that allow a plan participant to bring a lawsuit for breach of fiduciary duty, and render a breaching fiduciary "personally liable to make good to such plan *any losses* to the plan resulting from" the breach."  29 U.S.C. §§ 1109, 1132(a)(2) (emphasis added).

Traditionally, the Supreme Court held that a participant in a defined benefit plan could only bring a claim for recovery that would protect the entire plan, and was not entitled to extracontractual damages.  *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 141 (1985) ("*Russell*").  However, in 2008, the Supreme Court considered whether ERISA § 502(a)(2) authorized "a participant in a defined contribution pension plan to sue a fiduciary whose alleged misconduct impair[s] the value of plan assets in the participant's individual account."  *LaRue v. Dewolf, Boberg, & Assocs., Inc.*, 552 U.S. 248, 250 (2008).  *LaRue*, relying on the nature of a defined contribution pension plan as opposed to a defined benefit plan, cabined the "entire plan" language in *Russell* and clarified that ERISA § 502(a)(2) "authorize[s] recovery for fiduciary breaches that impair

27

the value of plan assets in a participant's individual account," although it does not allow remedies for individual injuries distinct from plan injuries. *LaRue*, 552 U.S. at 255–56.

*LaRue* did not address, however, whether participants in a defined contribution plan may seek remedies only for injury to their individual accounts or for all plan injuries. Nor has either party cited any Tenth Circuit authority on this point. The only Tenth Circuit case citing *LaRue* simply confirms, consistent with *LaRue*'s holding, that ERISA § 502(a)(2) allows a beneficiary of a plan to bring a private cause of action for a breach of fiduciary duty under ERISA § 409. *Holdeman v. Devine*, 572 F.3d 1190, 1193 (10th Cir. 2009). The case arising from this District cited by the parties concluded that the plaintiff failed to plead any alleged harm to the Plan, and is thus inapplicable here. *See Ihde v. United of Omaha Life Ins. Co.*, 2017 WL 5444551 at *6 (D. Colo. Nov. 14, 2017).

District courts considering this issue have reached opposite conclusions in interpreting *LaRue*. *See, e.g.*, *Rader v. Bruister*, 2013 WL 6805403, at *6–7 (S.D. Miss. Dec. 20, 2013) (outlining the various positions).

Courts that allow direct action claims reason that ERISA § 409 makes a plan fiduciary "liable to make good to such plan any losses to the plan" resulting from a breach of fiduciary duty, and ERISA § 502(a)(2) allows a plan participant to bring an action for relief for such a violation. *Almonor v. BankAtlantic Bancorp, Inc.*, 2009 WL 10666974, at *3 (S.D. Fla. Oct. 1, 2009); *Waldron v. Dugan*, 2007 WL 4365358, at *6 (N.D. Ill. Dec. 13, 2007) ("neither ERISA itself, nor the Federal Rules of Civil Procedure, require ERISA participants to bring section 502(a)(2) claims derivatively" or as a class

28

action); *In re AEP Erisa Litig.*, 2009 WL 3854943, at *1 (S.D. Ohio Nov. 17, 2009) (collecting cases).  *See also TBM Consulting Grp., Inc. v. Lubbock Nat'l Bank*, 2018 WL 2448446, at *8 (E.D.N.C. May 31, 2018) (finding that the plaintiffs had adequately pled statutory standing on their individual and direct action claims); *Tullis v. UMB Bank, N.A.*, 515 F.3d 673, 680 (6th Cir. 2008) (rejecting a district court decision that would have required plaintiffs to obtain class certification to seek plan losses).

Courts that have expressed skepticism about the ability of plaintiffs to proceed on behalf of the plan absent class certification cite concerns about whether the action is appropriately structured to bind all plan participants, some of whom may be unaware of the litigation, and about the very real possibility of inconsistent rulings should the defendants face multiple lawsuits.  *Wagner v. Stiefel Labs., Inc.*, 2015 WL 4557686, at *13 (N.D. Ga. June 18, 2015); *George v. Kraft Foods Glob., Inc.*, 2011 WL 5118815, at *11 (N.D. Ill. Oct. 25, 2011); *Fish v. Greatbanc Tr. Co.*, 667 F. Supp. 2d 949, 951 (N.D. Ill. 2009) ("to permit the action to go forward without the type of protections provided by [Rule 23 or Rule 23.1] or their equivalent would be overly myopic").

The Second Circuit has crafted a middle-ground of sorts.  *Coan v. Kaufman*, 457 F.3d 250, 259–62 (2d Cir. 2006).  In *Coan*, the Second Circuit concluded that "plan participants need not always comply with Rule 23 to act as a representative of other plan participants or beneficiaries."  *Id.* at 260.  However, because a plan participant would be acting in a representative capacity, he or she must "take adequate steps under the circumstances properly to act in a 'representative capacity on behalf of the plan.'"  *Id.* at 261.  Congressional silence as to the appropriate safeguards "does not

mean that Congress intended to allow individual participants and beneficiaries to bring suit on behalf of an employee benefit plan without observing any procedural safeguards for other interested parties." *Id.* at 260. Rather, as *Coan* concluded, "Congress was content to leave the procedures necessary to protect absent parties, and to prevent redundant suits, to be worked out by parties and judges according to the circumstances on a case by case basis." *Id.*

District courts following *Coan* have denied plaintiffs' requests to proceed as a direct action because plaintiffs have failed to show that the necessary procedural safeguards are present. *See Fish*, 667 F. Supp. 2d at 951; *Abbott v. Lockheed Martin Corp.*, 2010 WL 547172, at *4 (S.D. Ill. Feb. 10, 2010) ("Because there are no procedural safeguards that the Court can put in place to protect absent members and to prevent redundant suits, this case may not proceed as to [specified funds] under a direct action theory."); *see also Rader*, 2013 WL 6805403, at *6 (finding that *LaRue* broadens the relief available but deferring a decision on whether the plaintiffs took adequate steps to represent the class until after a trial on the merits); *TBM Consulting Grp.*, 2018 WL 2448446, at *8 ("reserv[ing] ruling as to whether any additional procedural safeguards will be required in this case on a more complete record").

The Court recognizes that this is an unsettled area of the law, with no present guidance from the Tenth Circuit, and one which has generated alternative approaches and holdings that are each unsatisfying in their own way. In the Court's view, to allow Plaintiffs to proceed in a direct action for all Plan losses attributable to Slocum, rather than only their individual losses, creates significant due process concerns about

whether and how absent potential plaintiffs will be bound by the instant proceedings,
whether the case is resolved at trial or by settlement. It also would raise the question
as to why any plaintiff under ERISA § 502(a)(2) would ever seek Rule 23 class
certification, as Plaintiffs vehemently argued for earlier in this case. But, to credit
Slocum's arguments would require a plaintiff in all cases to first obtain class certification
under Rule 23 in order to recover Plan-wide losses, despite the language of the statute
and the Supreme Court's historical interpretation in *Russell*.

In the end, the Court has decided that justice is best served in these
circumstances by adopting the Second Circuit's approach articulated in *Coan*. While
ERISA § 502(a)(2) may permit Plaintiffs to pursue a direct action for losses to the entire
Plan, Plaintiffs must show that they have taken adequate steps to act in a
representative capacity, and assure there are procedural safeguards to protect the due
process interests of absent potential plaintiffs. In the absence of a Congressional
standard as to the procedural safeguards necessary to protect absent plaintiffs and the
interests of defendants in a representative action, the Court looks to the Supreme
Court's pronouncements of appropriate procedural safeguards in representative
actions, and as set forth in careful detail in Rule 23.[4] Other courts have used an
informal version of Rule 23's adequacy standards when evaluating whether a direct
action may proceed absent class certification under ERISA § 502(a)(2). *See George*,

---

[4] The Court understands that Rule 23 is not meant to create or abridge any rights.
However, in the absence of other guidance from Congress or the courts, the Court relies on the
principles articulated in Rule 23 as guidance for how courts should evaluate representative
actions, under the assumption that the Supreme Court's adoption of Rule 23 implicitly affirms
that Rule 23's procedures satisfy due process.

2011 WL 5118815, at *11 ("courts have held that plaintiffs seeking to bring direct actions under Section 502(a)(2) must meet the requirements of Rule 23 or otherwise provide procedural protections for interested parties"). Courts that have found the plaintiffs to be inadequate class representatives because of intraclass conflicts also find the plaintiffs inadequate representatives for direct action claims under ERISA § 502(a)(2). *See, e.g.*, *Abbott*, 2010 WL 547172, at *4.

The Court finds that Plaintiffs have failed to show that they have taken adequate steps to act in a representative capacity. The Court notes its earlier decision denying Plaintiffs' request to pursue claims against Slocum as a Rule 23 class action. And, while the Court's earlier denial of a Rule 23 class against Slocum is not alone dispositive of this issue, this prior ruling is not without relevance to the direct action claim, and it indeed serves to inform the analysis here. Specifically, the Court denied Plaintiffs' Rule 23 motion finding that the putative class representatives were not "acting in any meaningful way as parties," and thus were not adequate representatives insofar as the claims against Slocum were concerned. *Ramos v. Banner Health*, 325 F.R.D. 382, 396 (D. Colo. 2018). This earlier ruling can only reasonably be viewed as another arrow in Slocum's quiver to establish that Plaintiffs have failed to undertake adequate steps to represent the interests of absent potential plaintiffs and thus bind them through this litigation, as required by the Second Circuit's middle ground approach in *Coan*.[5] As a consequence, the Court holds that Plaintiffs may recover their individual Plan losses

---

[5] The Court also notes that its certification of a class against Banner alleviates some concern about recovery for the entire Plan for fiduciary breaches by Defendants as a whole, although the Court recognizes that Plaintiffs' claims against Slocum and Banner are not identical.

allegedly attributable to Slocum, but not such losses for the Plan as a whole. Slocum's

Motion as to Plaintiffs' direct action claims will also be granted.[6]

### E. ERISA's Statute of Repose Bars Plaintiffs' Claims or Losses Arising Prior to November 9, 2010

ERISA provides that claims for breach of fiduciary duty are subject to a six-year

statute of repose, except in cases of fraud or concealment. 29 U.S.C. § 1113(1). The

Supreme Court recognizes that an ERISA fiduciary normally has some continuing duty

to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct.

1823, 1829 (2015). It thus determined that "so long as the alleged breach of the

continuing duty occurred within six years of the suit, the claim is timely." *Id.*

Slocum argues that Plaintiffs claims are time-barred to the extent they are based

on acts or omissions before November 9, 2010, six years from when Plaintiffs first

named Slocum in the Amended Complaint. (ECF No. 306 at 44–46.) While Plaintiffs'

header in their response to the Motion suggests that their claims against Slocum are

not time-barred prior to November 9, 2010, the text of their argument suggests

otherwise. (ECF No. 322 at 46.) Indeed, Plaintiffs concede that "the statute of

limitations may preclude Plaintiffs from seeking recover for Slocum's fiduciary breaches

predating November 9, 2010." (*Id.*)[7] Given that there is no genuine dispute on this

---

[6] Given the Court's decision that Plaintiffs cannot pursue a direct action claim against Slocum on behalf of the entire Plan in this case, the Court need not address whether Plaintiffs waived their right to bring a direct action.

[7] Plaintiffs also insist that "Slocum's liability *begins* on that date," seemingly suggesting that if Slocum breached its fiduciary duty prior to November 9, 2010, and was still in breach of that duty as of that date, Plaintiffs may recover their losses beginning on November 9, 2010. In order to do so, Plaintiffs would have to show an alleged breach of a continuing fiduciary duty occurring on November 9, 2010 or later.

issue, the Court agrees with Slocum that claims arising from conduct or losses prior to November 9, 2010 are time-barred.

## IV. CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1.    Defendant Slocum's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART (ECF Nos. 306 (restricted) & 307 (public));

2.    The Motion is GRANTED in favor of Defendant Slocum as follows:

    a.    With respect to claims arising out of Slocum's conduct related to Level 3 Funds/Mutual Fund Window, as well as the Balanced Funds;

    b.    With respect to claims against Slocum related to monitoring recordkeeping fees or arising out of the negotiation of Fidelity's recordkeeping fees;

    c.    Plaintiffs may not bring direct action claims for losses to the entire Plan allegedly attributable to Slocum; and

    d.    Plaintiffs' claims for losses arising from Slocum's conduct prior to November 9, 2010 are time-barred; and

3.    The Motion is DENIED in all other respects.


Dated this 23rd day of April, 2019.

BY THE COURT:

William J. Martinez
United States District Judge

34