**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 15-cv-2556-WJM-NRN

LORRAINE M. RAMOS, *et al.*,

     Plaintiffs,

v.

BANNER HEALTH, *et al.*,

     Defendants.

---

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
ENTERED UPON TRIAL ON THE MERITS TO THE COURT**

---

Plaintiffs Lorraine M. Ramos and others ("Plaintiffs") bring this class action against Banner Health ("Banner"), as well as current and former employees of Banner Health (together, "Banner Defendants"), alleging that Banner Defendants breached their fiduciary duties related to the Banner Health Employees 401(k) Plan ("Plan") under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* Plaintiffs allege that Banner Defendants, fiduciaries of the Plan, violated various provisions of ERISA by failing to prudently monitor certain Plan offerings, retaining certain investment options for too long, using a revenue sharing model to pay for recordkeeping services which resulted in the paying of excessive recordkeeping fees and allegedly improper payments, and impermissibly using Plan assets to pay certain Banner expenses.

Plaintiffs sought and obtained class certification with respect to their claims against Banner Defendants.  ECF No. 296.  The Court certified the following class: "All

participants and beneficiaries of the Banner Health Employees 401(k) Plan from November 20, 2009 through the date of judgment, excluding the Defendants." *Id.* at 25–26, 31.  The class period runs from the date this action was filed, November 20, 2009, through the date of judgment ("Class Period").

On January 6, 2020, the case proceeded to an eight-day bench trial before the undersigned on the following claims:

- Breach of the duties of prudence and loyalty by offering and failing to monitor allegedly imprudent investment options accessible to those who participated in the Plan via a Mutual Fund Window, 29 U.S.C. § 1104 (Count II);[1]

- Breach of the duties of prudence and loyalty by retaining the Fidelity Freedom Funds after they allegedly became an imprudent investment option, 29 U.S.C. § 1104 (Count II);

- Breach of the duties of prudence and loyalty by allowing the Plan's recordkeeper to collect allegedly excessive recordkeeping and administrative fees, 29 U.S.C. § 1104 (Count I);

- Prohibited transactions with a party in interest due to the allegedly excessive fees of the recordkeeping fee arrangement, 29 U.S.C. § 1106(a) (Count IV);

- Prohibited transactions for payment of Banner expenses from Plan assets, 29 U.S.C. § 1106(b) (Count V); and

---

[1] Both parties use the term "counts" which, at least in this District, is typically reserved for criminal matters, instead of the term "claims," more commonly used in civil actions.  However, to be consistent with the parties' filings, the Court will adopt the terms used by the parties and refer to Plaintiffs' claims as "Counts."

- Breach of the duty to monitor performance of other fiduciaries, 29 U.S.C. §§ 1105(a) & 1109(a) (Count III).

As relief, Plaintiffs seek approximately $85 million in Plan losses and appropriate injunctive relief.  Ex. 458 at 127, 179–81.

Post-trial, the parties submitted final proposed findings of fact and conclusions of law.  ECF Nos. 458 & 459.[2]

For the reasons discussed below, the Court orders that, after the supplemental briefing discussed below in Part IV is completed and the Court so orders, the Clerk shall enter judgment on certain Counts in favor of Plaintiffs, and on certain Counts in favor of Banner Defendants.

---

[2] Plaintiffs filed a public version of their proposed findings of fact and conclusions of law and redacted from public view citations to sealed portions of the trial transcripts.  ECF No. 458.  Plaintiffs also filed an unredacted version under restricted access.  ECF No. 456.  The Court will cite to the publicly-filed version.

# TABLE OF CONTENTS

I. FINDINGS OF FACT ................................................................................. 7

    A.    The Parties, Banner Health, and the Banner 401(k) Plan ......................... 7

        1.    Plan Investment Options .................................................. 9

        2.    Plaintiffs and Their Investments .................................... 12

        3.    Defendants, Plan Governance Structure, and Responsible Fiduciaries ..................................................................... 13

        4.    The RPAC .......................................................................... 15

            a.    Duties of the RPAC ........................................... 15

                i.   Slocum ...................................................... 18

                ii.   Fidelity ...................................................... 19

                iii.   Drinker Biddle ........................................... 22

            b.    Logistical Operations of the RPAC ................... 22

    B.    Mutual Fund Window (Count II) ............................................... 23

        1.    Damages Calculation .................................................... 25

        2.    Loss Causation .............................................................. 31

    C.    Fidelity Freedom Funds (Count II) .......................................... 35

        1.    Objective Reasonableness of Fidelity Freedom Funds as an Investment Option ....................................................... 35

        2.    Process for Evaluating the Fidelity Freedom Funds ..................... 40

    D.    Recordkeeping and Administrative Fees (Count I) ................................. 47

        1.    Liability ............................................................................. 47

            a.    Recordkeeping and Administrative Fee Basics ................. 47

         b.     Monitoring of Fee Arrangement with Fidelity ...................... 51

    2.     Damages......................................................................... 61

         a.     Plaintiffs' Loss Calculation................................... 61

         b.     Factual Basis for Alternative Loss Calculation.................... 67

E.     Prohibited Transactions: Payment of Certain Banner Expenses from Plan Assets (Count V) ...................................................................... 74

    1.     Liability ................................................................................ 74

    2.     Damages......................................................................... 80

F.     Failure to Monitor Fiduciaries (Count III)................................... 81

    1.     Liability ................................................................................ 81

         a.     Monitoring of Recordkeeping and Administrative Fees ...... 81

         b.     Monitoring of Transactions Between Plan and Banner....... 84

    2.     Damages......................................................................... 85

II. CONCLUSIONS OF LAW........................................................................ 86

A.     Jurisdiction & Status of the Parties ......................................... 86

B.     Applicable Law................................................................... 88

    1.     Fiduciary Duties Under ERISA ..................................... 88

         a.     Duty of Prudence................................................. 90

         b.     Duty of Loyalty.................................................... 94

    2.     Burden to Show Economic Loss .................................... 96

    3.     Statute of Limitations.................................................... 97

C.     Mutual Fund Window (Count II) ............................................... 98

    1.     Duty of Prudence .......................................................... 98

2.    Duty of Loyalty ............................................................. 101

D.    Fidelity Freedom Funds (Count II) ......................................... 102

E.    Recordkeeping and Administrative Fees (Count I) ................................ 108

1.    Liability ................................................................. 108

2.    Damages.................................................................... 114

F.    Prohibited Transactions With Party in Interest (Count IV)..................... 117

G.    Prohibited Transactions: Payment of Certain Banner Expenses from Plan

Assets (Count V)......................................................... 121

1.    Liability .................................................................. 123

2.    Damages.................................................................... 125

H.    Failure to Monitor Fiduciaries (Count III)................................. 127

I.    Injunctive Relief ................................................................. 130

**III. RULE 52(C) MOTION** .......................................................... 133

**IV. CONCLUSION**.................................................................. 134

# I. FINDINGS OF FACT

## A.   The Parties, Banner Health, and the Banner 401(k) Plan

1.      Defendant Banner is a large non-profit healthcare system, with primary markets in Arizona and Colorado.  Trial Transcript ("Tr.") 666:15–667:1 (Test. of Dennis Dahlen).[3]

2.      Banner sponsors and administers the Plan.  Ex. 689 at 42.  The Plan is an individual account, defined contribution plan.  Ex. 689 at 6.  The purpose of the Plan is to "provide a method of long-term savings and a means of providing retirement benefits for Eligible Employees."  Ex. 689 at 6.

3.      Banner employees who elect to participate in the Plan ("Plan Participants" or "Participants") may contribute a portion of their employment compensation to their own retirement account in the Plan.  Ex. 689 at 16.

4.      During the Class Period, Banner matched each eligible employee's contributions up to 4% of the Participant's salary.  Ex. 689 at 19; Tr. 1255:2–16 (Test. of Margaret DeHaan).  In 2017, Banner reported over $71 million in matching employer contributions.  Ex. 689 at 19; Tr. 1527:25–1528:11 (Test. of Thomas Kmak); Ex. 1114 at 199.

---

[3] Citations to "Tr." refer to the trial transcript, docketed in multiple parts.  *See* ECF No. 444 (Jan. 6, 2020, Vol. 1, pp 1–260); ECF No. 445 (Jan. 6, 2020, Vol. 1, pp. 184–224 (sealed portion of transcript)); ECF No. 446 (Jan. 7, 2020, Vol. 2, pp. 261–531); ECF No. 447 (Jan. 7, 2020, Vol. 2, pp. 282–290 (sealed portion of transcript)); ECF No. 448 (Jan. 7, 2020, Vol. 2, pp. 307–324 (sealed portion of transcript)); ECF No. 449 (Jan. 8, 2020, Vol. 3, pp. 532–774); ECF No. 450 (Jan. 9, 2020, Vol. 4, pp. 775–1034); ECF No. 451 (Jan. 13, 2020, Vol. 5, pp. 1035–1319); ECF No. 452 (Jan. 14, 2020, Vol. 6, pp. 1320–1584); ECF No. 453 (Jan. 14, 2020, Vol. 6, pp. 1542–1545 (sealed portion of transcript)); ECF No. 454 (Jan. 15, 2020, Vol. 7, pp. 1585–1818); ECF No. 455 (Jan. 16, 2020, Vol. 8, pp. 1819–1923).

5.      From 2009 to 2016, Banner grew substantially in terms of the number of constituent units or facilities, merging with and acquiring other healthcare entities. Tr. 667:19–668:16 (Dahlen).

6.      During that same period, the Plan experienced a large growth in the number of Participants and value of assets.  *Compare* Ex. 1106 at 2, 45 *with* Ex. 1113 at 2, 208.  As of December 31, 2009, the Plan had 23,166 Participants and approximately $1.18 billion in assets.  Ex. 1106 at 2, 45.  As of December 31, 2016, the Plan had 41,416 Participants and approximately $2.25 billion in assets.  Ex. 1113 at 2, 208.  Below is a chart, a demonstrative exhibit referenced at trial, showing the number of participants in the Plan and amount of Plan assets as of December 31 of each year included in the chart.  The Court has verified the underlying data, finds that the chart accurately represents the information therein, and reproduces the chart for ease of reference.  The Court has, however, removed the chart's title given to it by Plaintiffs.

| Date | Participants | Assets |
| --- | --- | --- |
| 12/31/2009 | 23,166 | $1,182,545,765 |
| 12/31/2010 | 29,788 | $1,389,586,854 |
| 12/31/2011 | 30,327 | $1,410,659,567 |
| 12/31/2012 | 30,618 | $1,604,374,153 |
| 12/31/2013 | 31,444 | $1,914,416,078 |
| 12/31/2014 | 33,026 | $2,010,841,424 |
| 12/31/2015 | 38,690 | $2,047,562,407 |
| 12/31/2016 | 41,416 | $2,252,261,043 |

Stipulation Between Parties, 5500 Assets and Participant Counts

Ex. 1750 (demonstrative); Ex. 1106 at 2, 208, Ex. 1107 at 2, 46; Ex. 1108 at 3, 50; Ex.

1109 at 3, 47; Ex. 1110 at 3, 47; Ex. 1111 at 5, 40; Ex. 1112 at 2, 37; Ex. 1113 at 2,

208.

### 1. Plan Investment Options

7.      The Plan is governed by a written Plan document (the "Plan Document").

*See generally* Ex. 689.

8.      Banner is responsible for determining "the class or classes of investments

that will be made available as investment option under this Plan" and "may in its sole

discretion add additional options or delete existing options at any time."  Ex. 689 at 23.

9.      Plan Participants may invest the funds in their individual accounts in the

various investment options selected for the Plan by Banner.  Ex. 689 at 23–24.

10.     During the Class Period, the Plan included three tiers of investment

options, ranging from "set-it-and-forget-it" target date funds to a wide range of mutual

funds for active investors.  Ex. 1140 at 9–24.  Information about these tiers, and

investment options within each tier, was communicated to Plan Participants in various

written materials.  *See generally* Ex. 905; Ex. 1140.  The range of investment options

allowed Plan Participants "to create a diversified portfolio to help [Participants] meet

[their] individual needs" based on "goals, time horizon and risk tolerance."  Ex. 905 at 3;

Ex. 1140 at 5.  Participants were informed that the "336 investment options available

through the Plan include conservative, moderately conservative and aggressive funds."

Ex. 1140 at 5.

11.     The first tier of investment offerings was identified to Participants as "Level

1: Ready-mixed Investment Options," and was comprised of retirement target date

funds.  Ex. 1140 at 9–10.  These target date funds provided Participants a diversified portfolio of multiple asset classes that adjusted the level of risk as the fund approached a specified retirement date.  Ex. 905 at 5; Tr. 1636:8–9 (Test. of Dr. Russell Wermers); Tr. 1083:2–9 (Test. of Patricia Block).  The target date funds were "designed for investors who don't want to go through the process of picking several funds from the three asset classes but who still want to diversify among stocks, bonds, and short-term investments."  Ex. 1140 at 9.

12.     If a Participant did not select an allocation for contributions upon enrolling in the Plan, all contributions by that Participant were placed in the Level 1 fund that most closely approximated that Participant's expected retirement date (based on date of birth).  Ex. 1140 at 4.

13.     From at least 2009 until April 30, 2015, the Level 1 funds were comprised entirely of Fidelity Freedom Fund Target Date Funds ("Fidelity Freedom Funds" or "Freedom Funds").  Ex. 1140 at 9; Ex. 588 at 14, 19.  In May 2015, the Fidelity Freedom Funds were replaced by the JPMorgan SmartRetirement Funds ("JPMorgan Funds"). Ex. 588 at 14.

14.     The second tier of investment offerings, identified to Participants as "Level 2: Core Investment Options," included a variety of asset classes and investment styles, which allowed Participants to personalize their investments to meet specific goals and needs.  Ex. 1140 at 15; Tr. 1636:22–1637:2 (Wermers).  Depending on the point in time, there were approximately eight "core investment options."  Ex. 1140 at 15.

15.     The third tier of investment offerings, identified to Participants as "Level 3: Expanded Investment Options," included "additional investment opportunities for more

sophisticated investors." Ex. 1140 at 19; Ex. 905 at 6–43.  The Level 3 funds were also referred to as the "Mutual Fund Window."  Tr. 1057:24–1058:4 (Block); Ex. 300 at 2. The investment options available were a wider variety of more than 300 mutual funds that "span the spectrum of traditional and non-traditional asset classes."  Tr. 1057:24– 1058:4 (Block); Ex. 300 at 2.

16.     Banner added the Mutual Fund Window at the request of Banner executives and physicians who wanted expanded options for their retirement accounts. Tr. 1057:5–10 (Block).

17.     In addition to the three Levels, in 2012, the Plan added a self-directed brokerage window, Fidelity BrokerageLink.  Ex. 199 at 2.  BrokerageLink further increased investment options by allowing Participants to "choose from investments beyond those options offered by the Plan."  Ex. 905 at 3.  To access these investment options, Plan Participants had to open a separate brokerage account with Fidelity. Tr. 476:11–477:9 (Test. of Dr. Gerald Buetow).  Banner Defendants did not monitor investments available in BrokerageLink, nor were they required to do so.  Ex. 905 at 3; Tr. 477:3–19 (Buetow).

18.     On August 8, 2014, all Plan assets invested in the Mutual Fund Window were either (a) removed and "mapped" into the Level 1 funds, or (b) if a Participant had established a BrokerageLink account and requested transfer of her or his assets to that account, transferred to the corresponding fund in the Participant's BrokerageLink account.  Ex. 525 at 4; Ex. 526 at 5; Ex. 212 at 3.  Of the approximately $636 million in assets in the Mutual Fund Window in June 2014, the majority were mapped to the Level 1 funds, while approximately $110 million in assets were transferred by

Participants to their BrokerageLink accounts.  Ex. 525 at 13 (value of assets in Mutual

Fund Window as of June 30, 2014 was $636,709,651); Tr. 626:16–23 (Buetow)

(approximately $110 million moved to BrokerageLink accounts).

## 2.    Plaintiffs and Their Investments

19.    Named Plaintiffs Lorraine Ramos, Cherlene Goodale, Delri Hanson, Linda

Heyrman, Karen McLeod, Robert Moffitt, and Constance Williamson are current or

former Plan Participants who, during the Class Period, were owners of Plan assets held

in Level 1, Level 2, or Level 3 investment options, or BrokerageLink funds.  Ex. 1791

(Ramos); Ex. C28 (Ramos); Ex. 1790 (Moffitt); Ex. L97 (Moffitt); Ex. 1794 at 5, 9, 15,

17–18 (Dep. of Cherlene M. Goodale);[4] Ex. 1795 at 7, 11 (Dep. of Delri Hanson);

Ex. 1798 at 15 (Dep. of Karen McLeod); Ex. 1796 at 12 (Dep. of Linda A. Heyrman);

Ex. 1808 at 5 (Dep. of Constance Williamson); ECF No. 188 at 10–12, ¶¶ 20–26 (all

plaintiffs).

20.    Plaintiffs represent the certified class of "[a]ll participants and beneficiaries

of the [Plan] from November 20, 2009 through the date of judgment, excluding the

Defendants."  ECF No. 296 at 25–26, 31.

---

[4] Prior to trial, the parties designated deposition testimony from eighteen deponents. At the end of trial, the Court admitted the eighteen deposition transcripts as trial exhibits. Tr. 1917:14–20; Tr. 1918:17–1919:18; *see* Ex. 1792 (Dep. of Jeff Buehrle); Ex. 1793 (Dep. of Peter Fine); Ex. 1794 (Dep. of Cherlene Goodale); Ex. 1795 (Dep. of Delri Hanson); Ex. 1796 (Dep. of Linda Heyrman); Ex. 1797 (Dep. of Tom Koelbl); Ex. 1798 (Dep. of Karen McLeod); Ex. 1799 (Dep. of Michael O'Connor); Ex. 1800 (Dep. of Meggan O'Shea); Ex. 1801 (Dep. of Edward F. Oxford, Jr.); Ex. 1802 (Dep. of Brenda Ann Schaefer); Ex. 1803 (Dep. of Kyle Schmit); Ex. 1804 (Dep. of Quentin Smith, Jr.); Ex. 1805 (Dep. of Richard Sutton III); Ex. 1806 (Dep. of Chris Volk); Ex. 1807 (Dep. of Vicki Weber); Ex. 1808 (Dep. of Constance Williamson); Ex. 1809 (Dep. of Jeffrey Slocum).

### 3.      Defendants, Plan Governance Structure, and Responsible Fiduciaries

21.      The Plan Document outlines the responsibilities of Banner, its Board of Directors ("Board"), its Chief Executive Officer ("CEO"), and a committee—referred to as the Retirement Plans Advisory Committee ("RPAC")—appointed to advise Banner on Plan investment and administrative functions.  Ex. 689 at 8, 42; Ex. 679 at 3.

22.      Banner is the Plan sponsor, as defined by ERISA, and a "named fiduciary" under the Plan.  Ex. 679 at 4; Ex. 689.

23.      The Plan Document states that Banner "shall control and manage the operation and administration of the Plan and make all decisions and determinations incident thereto."  Ex. 689 at 42.  It also allows Banner to delegate functions to various committees and individuals.  Ex. 689 at 42–44.

24.      Banner acts through its Board.  Laren Bates, Wilford Cardon, Ronald Creasman, Gilbert Davila, Michael Frick, Susan Foote, Michael Garnreiter, Barry Hendin, David Kikumoto, Larry Lazarus, Steven Lynn, Anne Mariucci, Quentin Smith, Jr., Christopher Volk, and Cheryl Wenzinger were Board members at some point in time during the Class Period.  Ex. 14 at 1; Ex. 670 at 4; Ex. 672 at 1; ECF No. 188 at 16, ¶ 34.  Each of these individuals is a named Defendant in the action.  ECF No. 118 at 1. Under the Plan, each Board member is indemnified by Banner for liabilities, losses, costs, or expenses.  Ex. 689 at 47.

25.      The Investment Committee of the Board ("IC") was the subcommittee responsible for receiving regular updates about the Plan, as well as the work of the CEO and RPAC with respect to the Plan.  Tr. 908:18–909:11 (Test. of David Kikumoto).

At various points, Michael Frick and David Kikumoto served on the IC.  Tr. 831:23–832:6 (Test. of Michael Frick); Tr. 895:18–896:3 (Kikumoto).

26.     In accordance with the Plan, the Board "delegate[d] its responsibilities with respect to all administrative actions under the Plan to the Chief Executive Officer." Ex. 689 at 42.  The Board retained "sole authority and responsibility under the plan" to "review[] and monitor[] the performance of the [CEO] of [Banner] with respect to the duties that are delegated to him or her under the plan" and to "tak[e] any corrective action that is prudent or appropriate with respect to the performance of the [CEO's] duties under the Plan."  Ex. 689 at 42.

27.     According to the Plan Document, the CEO has authority to appoint members to the RPAC, review and evaluate the RPAC's performance, and take prudent and appropriate corrective action, including removal of RPAC members, if necessary. Ex. 689 at 42–43.

28.     Peter Fine served as Banner's CEO during the Class Period.  Tr. 664:20–23 (Dahlen); Ex. 1793 at 3 (Dep. of Peter Fine).  Fine is a named Defendant in this action.  ECF No. 188 at 1.

29.     The RPAC was responsible for investment and administrative aspects of the Plan.  Ex. 689 at 43–44; Ex. 679 at 5–8; Ex. 366 at 6–8.

30.     At some point in time during the Class Period, members of the RPAC included Patricia Block, Jeff Buehrle, Margaret DeHaan, Dennis Dahlen, Paulette Friday, Colleen Hallberg, Thomas Koelbl, Charles Lehn, Robert Lund, Ed Niemann, Jr., Julie Nunley, Ed Oxford, Brenda Schaefer, Jennifer Sherwood, Richard Sutton, and Dan Weinman.  Ex. 182 at 1; Ex. 193 at 1, Ex. 212 at 1; Ex. 220 at 1.  Each of these

individuals is a named Defendant in this action.  ECF No. 118 at 1.  Patricia Block served as the RPAC Chair from at least 2009 until her retirement in 2014.  Tr. 1037:17–18 (Block); Tr. 1041:4–5 (Block).  She was succeeded by Brenda Schaefer who, at least as of the date of her deposition, remained the RPAC Chair.  Ex. 1802 at 3 (Dep. of Brenda Schaefer).  Under the Plan, each RPAC member is indemnified by Banner for liabilities, losses, costs, or expenses.  Ex. 689 at 47.  The RPAC members participated in the Plan during the Class Period, but are not members of the class.  Tr. 710:8–17 (Dahlen).

31.     Per the Plan Document, each fiduciary was required to "discharge its duties with respect to the Plan solely in the interests of Participants and their Beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use."  Ex. 689 at 46.

## 4.     The RPAC

32.     The overarching purpose of the RPAC was to advise Banner on Plan investment and administrative functions.  Ex. 689 at 8.

### a.     Duties of the RPAC

33.     Per the Plan Document, the RPAC was charged with, among other things, selecting investment options offered under the Plan, reviewing and evaluating the performance of those investment options, and taking "prudent and appropriate" corrective action when necessary.  Ex. 689 at 43.

34.     To achieve those investment functions, the RPAC appointed Fidelity as its investment manager to oversee the investment options offered, and Jeffrey Slocum &

Associates, Inc. ("Slocum") as an independent investment consultant to act as a Plan fiduciary, evaluate investment options, and make recommendations regarding appropriate investment funds.  Ex. 689 at 43.  The RPAC was to review and evaluate the performance of the investment manager and investment consultant.  Ex. 689 at 43.

35.      The RPAC was also tasked with appointing and monitoring the Trustee, custodian, and recordkeeper for investment functions, as well as reviewing the reasonableness of investment-related fees paid by the Plan.  Ex. 689 at 43.

36.      Alongside Banner, the RPAC was charged with acting as the Plan Administrator or appointing another committee or individual to act as the Plan Administrator, and perform some or all of the Plan's administrative functions.  (Ex. 689 at 43.)  The term "Plan Administrator" may refer to Banner, the RPAC (as the committee designated as such by Banner), or any person so designated.  Ex. 689 at 13.  Two Banner employees served as the Plan Administrators during the Class Period.  Vicki Weber served as the Plan Administrator from at least 2009 until her retirement in 2014.  Ex. 1807 at 3–4, 12 (Dep. of Vicki Weber).  After Weber's retirement, Mike O'Connor served as the Plan Administrator.  Ex. 1807 at 14 (Weber); Tr. 1428:4–9 (Test. of Dan Weinman).  The Plan Administrator has authority to review the reasonableness of administrative-related fees paid by the Plan.  Ex. 689 at 44.

37.      The RPAC adopted a "Statement of Fiduciary Duties and Procedures and Investment Objectives and Policies," alternatively called the "Investment Policy Statement" ("IPS"), which set forth Plan governance structures and created "standards of investment performance."  Ex. 679 at 3; Ex. 366 at 3.  The IPS was periodically updated.  *See* Ex. 679 at 1 (May 2008 IPS); Ex. 366 at 1 (November 2011 IPS).

38.     Under the IPS, the RPAC had additional responsibility for, among other things, "[d]eveloping objectives, guidelines and performance measurement standards that are consistent with the Plan's investment objectives," "[p]reparing, maintaining, and reviewing the Statement," "[r]eviewing and evaluating the results of each investment option in context with established standards of performance," "[e]nsuring that the Plan maintains Investment Funds in accordance with the policies and guidelines of the [IPS] for the benefit of Plan Participants," and "[t]aking whatever corrective action is deemed prudent and appropriate if the investment results of an Investment Fund fail to meet the designated standard of performance."  Ex. 679 at 6; Ex. 366 at 6.

39.     The IPS also set forth the "primary investment objective . . . to provide a diversified set of investment options to participants, consistent with the requirements of ERISA," and provided guidance on the time horizon on which to evaluate returns, the return objectives, and the acceptable amount of volatility of investments.  Ex. 679 at 14; Ex. 366 at 13.

40.     Under the IPS, the RPAC was to review on a quarterly basis the investment manager's performance and assess progress against the IPS's return objectives and other parameters.  Ex. 679 at 16.  Quarterly reports from the investment consultant (Slocum) were to address returns, comparison to benchmarks, diagnostic risk analysis, and compliance with investment guidelines.  Ex. 679 at 16.

41.     In addition to the quarterly reviews, the IPS noted that "certain circumstances or events *may* trigger an automatic formal review and possible reconsideration of the appropriateness of continuing to use the affected manager in the investment structure."  Ex. 679 at 16 (emphasis added).  It further stated that "[w]hile

none of these circumstances or events shall serve as automatic causes for changing investment managers, they will indicate the need for further evaluation of the relationship." Ex. 679 at 16.

42.    Consistent with the Plan Document and IPS, the RPAC hired third parties to support its investment and administrative work.

i.    *Slocum*

43.    The RPAC hired Slocum as the RPAC's investment consultant.  Ex. 749 at 1; Ex. 751 at 1.  Slocum's retention was memorialized in contracts dated June 28, 2010, and December 29, 2014.  Ex. 749; Ex. 751.  Slocum also served as the investment advisor for Banner's corporate investments.  Tr. 699:11–18 (Dahlen).

44.    Banner considered Slocum well-suited to provide advice based on its experience with large health systems and educational institutions.  Tr. 698:8–22. (Dahlen); Tr. 1053:2–4 (Block).  As of the end of 2013, Slocum had approximately 122 clients with aggregate assets of approximately $100 billion.  Ex. 499 at 8; Tr. 1053:2–4 (Block).  RPAC Chair and Banner Treasurer Block visited Slocum's offices in Minneapolis several times to meet with Slocum representatives, and kept herself up-to-date on the firm's activities.  Tr. 1051:1–5 (Block).

45.    The RPAC hired Slocum to assist with ongoing revisions to the ISP, review performance of current investment options, provide asset allocation and asset liability evaluation advice, evaluate and select additional or replacement investment managers as requested, and complete "[l]arge-scale special projects" as separately negotiated.  Ex. 749 at 1–2.

46.     Slocum provided to the RPAC both annual Plan reviews, *see, e.g.*, Ex. 300; Ex. 409, and Plan quarterly reports, *see, e.g.*, Ex. 499, Ex. 277; Ex. 324. These reports contained the information referenced in the IPS, general analysis of the market, observations about Participant preferences across asset classes, information on fees charged by Plan investments, and various performance benchmarks.  Ex. 336; Ex. 409.

47.     A Slocum representative attended each of the RPAC quarterly, annual, and special meetings during the Class Period, and provided the RPAC with quantitative and qualitative assessments of the Plan's Level 1 and 2 investment options.  *See, e.g.*, Ex. 291 at 4–19, Exs. 182, 184–191, 193–204, 206–220.

ii.     *Fidelity*

48.     Banner selected Fidelity Management Trust Company ("Fidelity") to provide recordkeeping and administrative services to the Plan.  Ex. 825 at 14.  Fidelity also managed the Plan's investments.  Banner initially hired Fidelity in October 1999 under a recordkeeping agreement, and entered into a trust agreement with Fidelity in July 2004.  Ex. 825 at 4.  In December 2007, Banner and Fidelity entered into a new trust agreement ("Trust Agreement"), which superseded the recordkeeping agreement and amended and restated the prior trust document.  Ex. 825 at 1, 4.

49.     The Trust Agreement did not contain a sunset provision, and would continue in effect "without limit as to time," unless Banner and Fidelity amended, modified, or terminated the contract.  Ex. 825 at 18.  Banner could terminate the agreement in full or in part at any time with prior written notice to Fidelity.  Ex. 825 at 17.

50.     Banner and Fidelity periodically updated the Trust Agreement, seven times by formal amendment and once by way of a letter agreement.  Ex. 825 at 45 (First Amendment); *id.* at 51 (Second Amendment); *id.* at 52 (Third Amendment); *id.* at 60 (Fourth Amendment); *id.* at 80 (Fifth Amendment); *id.* at 84 (Sixth Amendment); *id.* at 86 (Seventh Amendment); Ex. 826 ("this letter shall constitute an amendment to the applicable Agreements").  These amendments, among other things, added and removed Plan investment options, and established and revised the "Revenue Credit Account" ("RCA").

51.     As part of its recordkeeping duties, Fidelity established and maintained Participant account and election percentages, tracked types of Participant contributions, and maintained Plan investment options.  Ex. 825 at 25.

52.     Fidelity also processed payroll contributions, maintained and updated employee data, provided daily Plan and Participant level account for Plan investment options, reconciled and processed withdrawal requests and distributions, and processed changes to Participants' deferral percentages and investment elections.  Ex. 825 at 26–27.

53.     Fidelity also had reporting obligations to Participants, the Plan, and the government.  Ex. 825 at 27.  Under the Trust Agreement, Fidelity was responsible for "financial reporting to assist in the preparation of Form 5500," a U.S. Department of Labor ("DOL") document required by law to be filed annually and list all investments in which Plan assets are held.  Ex. 825 at 27–28, 46–47.  Starting in 2010, Banner hired the accounting firm of Ernst & Young to prepare the annual Form 5500.  Ex. 191 at 2; Ex. 1107; Ex. 1108; Ex. 1109; Ex. 1110; Ex. 1111; Ex. 1112.  There was no

corresponding change to the Trust Agreement to reflect the change in provider for these services, or to any reduction in fees Fidelity was to receive for performing fewer services to the Plan.

54.     Fidelity also provided services to assist Plan Participants, including making service representatives available by telephone.  Ex. 825 at 25.  Fidelity also "[d]esigned, produce[d] and distribute[d] a customized comprehensive communications program for employees."  Ex. 825 at 28; Tr. 707:19–708:11 (Dahlen).

55.     During Banner's period of rapid growth through the acquisition of other health care providers and facilities, Fidelity was responsible for integrating new Participants into the Plan and providing educational services to new Participants and prospective Participants.  Tr. 707:6–14 (Dahlen).

56.     One or more representatives from Fidelity would attend each of the quarterly RPAC meetings.  Tr. 678:23–679:4 (Dahlen); *see, e.g.*, Ex. 184; Ex. 193.

57.     Until January 1, 2017, Fidelity was compensated by a revenue sharing arrangement, in which fees for recordkeeping and administration were dependent on the total assets in the Plan and investment management fees.  Ex. 825 at 15, 33–35; Ex. 246 at 8; Ex. 945 at 9; Tr. 153:4–19 (Test. of Martin A. Schmidt) (explaining Ex. 945); Tr. 119:17–120:15 (Schmidt).

58.     The asset-based recordkeeping and administrative revenue sharing amount varied by investment option.  Ex. 246.  In August 2012, Slocum reported to the RPAC that the "total administration and revenue sharing fee" was approximately 18 basis points, or 0.18%, of total Plan assets.  Ex. 409 at 11, 14.  Of that amount, the Level 2 funds "generate[d] 10 basis points of revenue sharing," while the Mutual Fund

Window "generate[d] 8 basis points of revenue sharing," based on "total revenue

sharing collected by Fidelity."  Ex. 409 at 11.  That year, Fidelity received $1,145,165 in

administrative fees from the revenue sharing funds generated by Level 2 funds, and

$1,170,578 in administrative fees from revenue sharing from the Mutual Fund Window.

Ex. 409 at 14.  While the record is not clear, Fidelity also received some form of fees

from a revenue sharing arrangement for the Level 1 Fidelity Freedom Funds.  Ex. 1799

at 66–67 (Dep. of Michael O'Connor); Ex. 483 at 27.

59.     As of January 1, 2017, Banner and Fidelity switched to a per-participant

fee model, under which each participant paid a flat $42 annually to Fidelity for

recordkeeping and administrative services.  Ex. 223 at 3.

### iii.     *Drinker Biddle*

60.     The RPAC retained the law firm of Drinker Biddle & Reath LLP ("Drinker

Biddle") to provide advice on Plan legal matters.

61.     Counsel from Drinker Biddle regularly attended the RPAC meetings.

Tr. 678:24–679:4 (Dahlen); Tr. 1052:10–18 (Block); *see, e.g.*, Ex. 184; Ex. 193.  They

informed RPAC members on potential and actual changes in relevant law, and advised

the RPAC on compliance with applicable rules and regulations.  Tr. 1052:3–9 (Block);

*see, e.g.*, Ex. 322.  Drinker Biddle lawyers also provided regular trainings to RPAC

members on their fiduciary duties to the Plan and Plan Participants.  Tr. 1053:7–16

(Block).

### b.     Logistical Operations of the RPAC

62.     The RPAC held regular meetings on a calendar quarterly basis, typically in

February, May, August, and November of each year, and convened special meetings as

necessary.  Tr. 678:21–22 (Dahlen); Tr. 1041:12–20 (Block); *see, e.g.*, Ex. 195 (RPAC

Feb. 2011 minutes); Ex. 196 (RPAC May 2011 minutes); Ex. 197 (RPAC Aug. 2011

minutes); Ex. 198 (RPAC Nov. 2011 minutes); Ex. 202 (RPAC Sept. 2012 special

meeting minutes).

63.     Prior to a meeting, the RPAC distributed to members meeting agendas

and relevant written materials from the Plan's service providers, including Slocum,

Fidelity, Drinker Biddle, and Ernst & Young.  Tr. 679:25–680:18 (Dahlen); Tr. 1042:5–9

(Block).  Members were expected to read materials prior to the RPAC meeting, and

come prepared to ask questions and engage with the material.  Tr. 1042:10–12 (Block);

Tr. 1043:9–20 (Block); Tr. 680:24–681:2 (Dahlen).

64.     The RPAC meetings were conducted in a "very organized, very

structured" manner and according to Robert's Rules of Order.  Tr. 1417:8–13

(Weinman).  RPAC members heard presentations from service providers in attendance

and asked questions about the presentations.  Tr. 1056:20–1057:12 (Block).

65.     The RPAC required three members for a quorum, and took action by a

majority vote of a quorum of members.  Tr. 1045:23–1046:4 (Block).  On occasion, if the

RPAC lacked a quorum at a meeting or wanted input of the entire committee, it would

vote by e-mail.  Tr. 1046:1–4 (Block).

**B.     Mutual Fund Window (Count II)**

66.     As discussed above in ¶ 15,[5] the Plan offered its Level 3 investment

options through what was referenced throughout the trial by all parties as the Mutual

Fund Window.  Ex. 1140 at 19; Ex. 905 at 6–43; Ex. 300 at 2.  The investment options

---

[5] References to "¶__," without more, refer to the numbered paragraphs of this document.

in the Mutual Fund Window were designated as "additional investment opportunities for more sophisticated investors."  Ex. 1140 at 19; Ex. 905 at 6–43.

67.     Between 2009 and 2013, the Mutual Fund Window offered between 300 and 400 different investment options, including a number of Fidelity's proprietary mutual funds.  Ex. 1106 at 45; Ex. 1110 at 47; Ex. 1801 at 56 (Dep. of Edward F. Oxford, Jr.).

68.     The Mutual Fund Window was available to Participants from at least November 2009 until August 8, 2014, at which point the Level 3 funds were transferred either to Level 1 target date funds or a Participant's BrokerageLink account. Tr. 1108:22–1109:2 (Block); Ex. 525 at 4.

69.     Plaintiffs suggest that the Banner Defendants hesitated to remove the Mutual Fund Window because Fidelity received approximately half of its fees under the asset-based fee structure from investments in the Mutual Fund Window.  *See* Ex. 409 at 14 (approximately half of Fidelity's administrative fees in 2012 came from revenue sharing generated by the Mutual Fund Window, while the other half came from the Level 2 investments); ¶ 58.  The Court notes that these figures do not take into account any fees Fidelity derived from the Level 1 investments in the Fidelity Freedom Funds. In August 2013, when the RPAC began to consider elimination of the Mutual Fund Window, Fidelity informed the RPAC that there would be "no impact" to the revenue sharing agreement provided that 75% of the assets were mapped (or transferred) to the Level 1 funds.  Ex. 483 at 27.  Fidelity did not address what would happen if less than 75% of assets were mapped to the Level 1 funds.  There is no evidence before the Court that this information was discussed by RPAC members or other Plan fiduciaries. There is also no evidence to suggest that the potential impact on Fidelity's revenues

under the revenue sharing agreement influenced the decision of the RPAC to maintain

the Mutual Fund Window until August 2014.

70.     The RPAC did not monitor, did not intend to monitor, and did not perceive

any obligation to monitor each of the funds available in the Mutual Fund Window.

Tr. 1058:11–13 (Block); Tr. 754:10–17 (Dahlen); Tr. 765:4–757:11 (Dahlen); *see*

Tr. 1281:3–19 (DeHaan).  Rather, consistent with the advice of counsel at Drinker

Biddle, the RPAC monitored the Mutual Fund Window "at a 'high level.'"  Ex. 408 at 20;

Tr. 1071:10–23 (Block).

71.     The parties dispute whether the funds offered through the Mutual Fund

Window were designated investment alternatives under ERISA, and whether "high

level" monitoring was sufficient to satisfy the RPAC's fiduciary duties of prudence and

loyalty.  ECF No. 458 at 91; ECF No. 459 at 61.

### 1.     Damages Calculation

72.     At trial, Plaintiff's expert Dr. Gerald Buetow opined that a prudent fiduciary

would have removed the Mutual Fund Window at the beginning of the Class Period.

Tr. 487:5–488:14 (Buetow).  He further opined that a "knowledgeable fiduciary familiar

with investment matters" would have mapped all funds invested in the Mutual Fund

Window to a "qualified default alternative"—that is, transferred these Plan assets to the

Level 1 target date funds—at the beginning of the Class Period.  Tr. 487:13–489:7

(Buetow).

73.     Dr. Buetow calculated the alleged resulting losses in accordance with his

opinion.  Tr. 488:3–5 (Buetow).  Dr. Buetow first calculated the estimated return on

investment had Banner Defendants moved all assets in the Mutual Fund Window to

Level 1 target date funds in November 2009, and then compared these returns to the actual returns from November 2009 until the second quarter of 2011.  He also calculated associated losses since 2011.  Tr. 491:15–492:24 (Buetow).

74.     In calculating losses, however, Dr. Buetow made several unsupported assumptions, which undermine the credibility of his opinion that failure to remove the Mutual Fund Window caused losses to the Plan, and his calculation of those losses.

75.     First, Dr. Buetow assumed that a knowledgeable fiduciary would have mapped all funds in the Mutual Fund Window to Level 1, rather than simply chosen to monitor the individual funds in the Mutual Fund Window to determine whether the investment options were prudent, or to move these funds to a structure more akin to that of the BrokerageLink.  He opined that the fiduciary should have mapped the Mutual Fund Window investments to the Level 1 funds because it "represent[s] the best wealth solution for clients."  Tr. 487:21–488:2 (Buetow).  Dr. Buetow did not explain the basis for his opinion, although it appears to be largely shaped by his view that most Plan Participants lack the knowledge and experience to make proper investment decisions. Tr. 616:23–617:5 (Buetow) ("I do have a significant professional disagreement with [window options'] existence"); Tr. 618:3–15 (Buetow).  Accordingly, Dr. Buetow bases his damages calculation on the assumption that a prudent fiduciary would have mapped, without exception or other alternative, all funds in the Mutual Fund Window to Level 1 funds, without offering an alternative option for sophisticated investors.

76.     Dr. Buetow also assumed that the target date funds were a better investment alternative than the funds available in the Mutual Fund Window, without accounting for the risk profile and investment management preferences of Participants.

In doing so, Dr. Buetow failed to account for the personal preferences of sophisticated investors, who knowingly elected to use the Mutual Fund Window to expand their investment options to fit their individual preferred risk profile and investment strategy. For example, Named Plaintiff Mr. Moffitt testified that he held assets in investment options in the Mutual Fund Window, and that after his investments were mapped to the Level 1 funds, he moved them back to a BrokerageLink account.  Tr. 415:6–22 (Test. of Robert Moffitt); Tr. 420:20–21 (Moffitt); Ex. E70.

77.     Mr. Moffitt was not the only Participant who actively sought out the more sophisticated investment options available through the Mutual Fund Window.  When the Mutual Fund Window was eliminated in 2014, nearly one-sixth of the assets which had been held in Mutual Fund Window funds, or approximately $110 million, were transferred by Participants to BrokerageLink funds.  ¶ 18; Tr. 626:16–23 (Buetow) ($110 million mapped from Mutual Fund Window to BrokerageLink accounts); Ex. 525 at 13 (value of assets in Mutual Fund Window as of June 30, 2014 was $636,709,651).  The movement of these assets into BrokerageLink is credible evidence that at a significant number of Participants with assets in the Mutual Fund Window were sophisticated investors who preferred the expanded investment options made available to them.  Dr. Buetow's assumption that all Participants invested in the Mutual Fund Window would be better off investing in target date funds fails to account for the personal preference of Plan Participants.  And his damages calculation makes no provision for the fact that certain investors preferred the options in the Mutual Fund Window to the Level 1 and Level 2 investment options.  Tr. 626:16–627:6 (Buetow).

78.     Additionally, Dr. Buetow assumed that all funds offered through the Mutual Fund Window were not appropriate investment options.  Tr. 488:23–489:8 (Buetow); Tr. 627:7–16 (Buetow).  Dr. Buetow testified that fund performance is an important criterion in evaluating whether an investment option is appropriate.  Tr. 630:12–25 (Buetow).  However, rather than analyze each of the options offered through the Mutual Fund Window, Dr. Buetow assumed that all offerings were inappropriate.  This assumption is unfounded, and indeed contradicted by Dr. Buetow himself.  At trial, Dr. Buetow admitted that it was "probably true" that "some of the funds possibly could have been appropriate."  Tr. 627:17–22 (Buetow).  For example, Dr. Buetow generally agreed that a money market fund would have been an appropriate Level 2 investment option, Tr. 629:25–630:5 (Buetow), and the Mutual Fund Window offered a money market option, *see* Ex. L97 at 18.  However, Dr. Buetow did not assess whether the money market fund offered in the Mutual Funds Window was an appropriate investment option.  In his calculation of damages, Dr. Buetow entirely failed to account for the presence of appropriate investment options in the Mutual Fund Window.  Tr. 628:4–16 (Buetow).

79.     The Court finds that these assumptions significantly undermine the reliability of Dr. Buetow's estimate of losses for the violations alleged in this Count.

80.     Dr. Buetow's method used to calculate losses, and the calculations themselves, also undermine the reliability of Dr. Buetow's loss estimate.

81.     Dr. Buetow acknowledged that there were multiple ways to calculate relevant losses, and that the method he used resulted in enormous variation depending on the end date.  Tr. 614:8–17 (Buetow); Tr. 615:1–6 (Buetow).  Depending on the

calendar quarter examined, Dr. Buetow's method of calculating damages resulted in large variations of his loss estimates.  For example, had the RPAC removed the Mutual Fund Window in the first quarter of 2013, Dr. Buetow's calculation of loss would have been $20.4 million.  However, had the window been removed the previous quarter (fourth quarter 2012), damages would have been negative $59 million; in other words, in that quarter, Plan accounts benefited from the inclusion of the Mutual Fund Window, as compared to having all investments therein invested in Level 1 funds.  Tr. 614:2–7 (Buetow).  Dr. Buetow explained that these swings "could be due to interim cash flows in and out of the plan."  Tr. 614:17–19 (Buetow).  However, Dr. Buetow described such calculations as the "next level of this analysis," and he explained that he did not factor in the cash inflows or outflows in his model so as to "economize time," other than as described in ¶ 82, below, for the 2009 calculations.  Tr. 614:17–25 (Buetow).  Failure to take unrelated inflow into account significantly undermines the credibility of Dr. Buetow's loss model and calculations.

82.     Dr. Buetow also corrected his expert report multiple times to correct serious errors in his damage calculations for the Mutual Fund Window.  Tr.  611:8–22 (Buetow).  His first report calculated damages to be $150 million.  However, he had to correct this report due to an associate—since terminated—calculating quarterly returns by dividing annual returns by three rather than four.  Tr. 606:9–19 (Buetow).[6] Dr. Buetow's corrected report estimated $140 million in damages.  Tr. 607:1–3 (Buetow).  He subsequently issued another corrected report, which claimed $204 million

---

[6]  It is unclear why Dr. Buetow, a well-qualified expert with decades of experience, would not have himself reviewed, or had reviewed by another colleague, the calculations of an associate and caught the error prior to relying on the associate's calculations in his expert report.

in damages.  Tr. 608:1–3 (Buetow).  Finally, Dr. Buetow issued another corrected report, after he realized that the quarterly returns for 2009 were not uniform, but rather significantly impacted due to large inflows in certain months earlier in the year. Tr. 808:10–21 (Buetow).  Dr. Buetow adjusted the inflows, made "other corrections," and issued another corrected report, this time estimating $23 million in damages.  Tr. 608:10–24 (Buetow).

83.     While Banner Defendants' expert Dr. Russell Wermers seemingly agreed that the $23.6 million damages estimate was ultimately free of the calculation errors that plagued Dr. Buetow's earlier opinions, *see* Tr. 1675:14–19 (Wermers), in the Court's view the multiple miscalculations and wild fluctuations in loss estimates significantly undermines its confidence in Dr. Buetow's choice of damages model and the assumptions upon which he based his loss opinions.

84.     In addition, in his final set of calculations, Dr. Buetow assumed that the RPAC would have substituted the Fidelity Freedom Funds for the JP Morgan Funds in mid-2011.  Tr. 634:14–22 (Buetow).  Thus, his estimate of damages is premised on Plaintiffs prevailing on the Fidelity Freedom Fund claim, which, as discussed below in Part I.C, Plaintiffs have failed to do.  Thus, even if the Court were to overlook the unsubstantiated assumptions and colossal calculation errors discussed above, and accept Dr. Buetow's $23.6 million estimate of damages, that figure is calculated based on the Plan switching to the JPMorgan Funds as of the third quarter of 2011, when in fact the RPAC switched to the JPMorgan Funds in May 2015.  Ex. 588 at 14.

85.     Plaintiffs do not offer any estimate of damages using the actual date that Plan ceased using the Fidelity Freedom Funds.  Tr. 635:7–25 (Buetow).  Dr. Wermers

testified that, without the so-called "flawed mapping," he calculated "almost zero damages." Tr. 1675:1–5 (Wermers).  However, as Dr. Wermers observed, even this re-calculation does not take into account the "other mistakes and problems in [Dr. Buetow's] analysis that renders even that flawed number there as being meaningless." Tr. 1675:1–5 (Wermers).

86.     In light of these deficiencies, the Court finds that Dr. Buetow's calculation of losses resulting from offering unmonitored funds in the Mutual Fund Window is unreliable, and cannot be considered an accurate estimate of losses resulting from any alleged breach.

87.     The Court also finds that Buetow's assumptions, methods, and calculations are so unreliable that they cannot support a finding, by the preponderance of the evidence, that offering unmonitored funds through the Mutual Fund Window caused any loss to the Plan.

88.     The Court will next consider whether other evidence in the record can support a finding that any breach of fiduciary duty to monitor the funds in the Mutual Fund Window caused losses to the Plan Participants.

### 2.     Loss Causation

89.     Because the damages calculation offered by Dr. Buetow does not correspond to any actual loss suffered by Plan Participants, the Court will consider whether other evidence in the record can support a finding that an alleged breach of the duty of prudence by failing to monitor the individual funds in the Mutual Fund Window, or the failure to remove the Mutual Fund Window prior to the Class Period, caused losses to the Participants.

90.    The Mutual Fund Window provided multiple investment options in similar
asset classes, but occasionally with different expense ratios.  Ex. 1792 at 41 (Dep. of
Jeff Buehrle); Tr. 483:23–485:10 (Buetow).  Dr. Buetow opined that it was
"irresponsible" to expect Plan Participants to select among similar investment options
with different expense ratios, and that "having all of those funds in the [P]lan just opens
up wealth destruction" for Plan Participants.  Tr. 485:3–18 (Buetow).  However, as
Buehrle testified at his deposition, apparently duplicative funds may "provide a different
purpose to an investor."  Ex. 1792 at 41 (Buehrle).  On this limited record, the Court
cannot find that the potentially duplicative options available through the Mutual Fund
Window actually caused losses to the Plan.

91.    Dr. Buetow did not analyze whether some or all of the 300–400 funds
offered through the Mutual Fund Window were appropriate options for the Plan.
Tr. 627:11–16 (Buetow).  Rather, to demonstrate that the individual funds offered in the
Mutual Fund Window were imprudent investment options and resulted in losses to Plan
participants, Dr. Buetow selected only four funds—the Select Energy Fund, the Select
Gold Fund, the Select Latin American Fund, and the Select Natural Gas Fund—and
analyzed their performance over the Class Period.  Tr. 631:4–12 (Buetow).

92.    Plaintiffs argue that "Dr. Buetow analyzed examples to demonstrate the
risk inherent in these types of funds" and "did not use these isolated calculations to
demonstrate liability or establish losses."  ECF No. 458 at 85.  Indeed, Dr. Buetow
testified that he intended for this analysis to "illustrate some of the extreme levels of risk
that a[n] investor would be exposed to."  Tr. 633:9–20 (Buetow).  However, in the
absence of other credible evidence to establish that any alleged breach caused losses

to the Plan, the Court nonetheless considers whether Dr. Buetow's analysis of the four funds may establish the causal link between any breach of a duty of prudence and actual losses.

93.    First, it is unclear how Dr. Buetow selected these funds as exemplars, or why (if at all) he believed they were representative of the funds available in the Mutual Fund Window.  Presumably, Dr. Buetow selected these funds because he found them to be particularly apt examples of "extreme levels of risk," and therefore they may be more risky or volatile than other Plan options.  The likely unrepresentative nature of these four funds adds to the uncertainty of whether they can be sufficient evidence that the investment options available through the Mutual Fund Window caused losses to the Plan.

94.    Even so, proper analysis of these funds fails to support a finding that there was any loss to the Plan as a result of offering these options in the Mutual Fund Window.

95.    Dr. Buetow compared the performance of these four funds to the performance of the S&P 500 over the same period.  Tr. 1759:3–5 (Test. of Dr. Lassaad Adel Turki).  However, Dr. Buetow failed to establish that the S&P 500 was the appropriate benchmark for each of the four funds.

96.    Banner Defendants' expert Dr. Lassaad Adel Turki testified that the S&P 500 was not the correct benchmark for these funds.  Tr. 1758:13–1759:14 (Turki).  For example, Dr. Turki explained that comparing the returns of a gold fund (here, the Select Gold Fund) to the returns of the S&P 500 was inappropriate because gold funds are generally held in an investment portfolio to hedge against fluctuation in the stock

market.  Tr. 1759:3–14 (Turki).  Accordingly, gold and gold funds tend to be countercyclical to the stock market, and benchmarking a gold fund against the stock market would result in large differentials that are not truly representative of the prudence of offering the gold fund as a Plan investment option.

97.     Dr. Turki further explained that he repeated Dr. Buetow's analysis of the performance of the same four funds over the same period, but instead compared the returns of these funds with the appropriate fund benchmarks identified in prospectuses filed with the U.S. Securities and Exchange Commission.  Tr. 1759:15–24 (Turki); Tr. 1760:10–1764:9 (Turki) (analyzing each of the four funds).  Through this process, Dr. Turki determined that, over the relevant period, the Select Natural Gas fund had returns of 13.67%, compared to its benchmark returns of 13.21%; the Select Energy Fund had returns of 16.69%, compared to its benchmark returns of 17.40%; the Select Gold Fund had returns of -5.23%, as compared to its benchmark returns of -6.71%; and the select Latin American Fund had returns of 4.05%, compared to its benchmark returns of 5.79%.  Tr. 1760:10–1764:9 (Turki).  Based on these data, Dr. Turki opined that there was "no evidence whatsoever that [the four funds] systematically underperformed their benchmarks or . . . created any loss to the participants [who] chose to invest in those options."  Tr. 1759:25–1760:6 (Turki).  The Court finds this testimony of Dr. Turki well-reasoned and supported by the record, and credits the same on this issue.

98.     Given Dr. Turki's analysis and opinion, even if the Court were to conclude that offering these four funds—the only funds examined by Plaintiffs' expert—was a violation of  Banner Defendants' duty of prudence, there is simply no credible evidence

(in the form of expert opinion or otherwise), that Plan Participants who invested in these four selected funds suffered any economic loss as a result.

99.     Nor can the Court conclude from this small sample that the inclusion of the remaining investment options in the Mutual Fund Window caused losses to the Plan.  In other words, the Court finds there to be an insufficient factual basis to support a conclusion that the Mutual Fund Window included imprudent investment options, or that inclusion of these investment options caused any economic damages to the Plan Participants.

**C.**     **Fidelity Freedom Funds (Count II)**

**1.     Objective Reasonableness of Fidelity Freedom Funds as an Investment Option**

100.     From at least the beginning of the Class Period until May 2015, the Level 1 target date funds consisted of the Fidelity Freedom Funds.  Ex. 588 at 14.

101.     Target date funds were introduced into the market in the late 1990s, and Fidelity was a pioneer in the field.  Tr. 1644:6–12 (Wermers).  Fidelity remains a market leader in the target fund space, although other funds have gained in popularity (as measured by total assets under management) since 2010.  Tr. 1644:6–12 (Wermers).  In 2009, the Fidelity Freedom Funds had almost $90 billion in assets across all platforms, and, by 2016, this had increased to approximately $150 billion.  Tr. 1643:16–19 (Wermers).  In 2009, the JPMorgan Funds had approximately $3 billion in assets.  Tr. 1644:22–1644:2 (Wermers).  The JPMorgan Funds also grew substantially over the next seven years, reaching $58 billion in assets by 2016.  Tr. 1644:22–1644:2 (Wermers).

102.    Target date funds are now common investment options in retirement plans throughout the country, and offer participants a straightforward way to invest their retirement savings in a fund based on an estimated retirement date.  Tr. 1639:5–12 (Wermers); Tr. 474:16–475:7 (Buetow).

103.    The asset allocations within a particular target date fund are adjusted from more aggressive to more conservative as the retirement target year approaches. Tr. 474:16–475:7 (Buetow).  The schedule of how a target date fund's strategic asset allocation changes over time is commonly referred to as the fund's "glide path."  Tr. 1639:5–1641:18 (Wermers); *see* Ex. 852; Ex. 845 at 8.

104.    Different fund managers, for instance, Fidelity and JPMorgan, have different philosophies about the appropriate allocation of risk over the time period in which in target funds are held.  In determining target fund allocations, these fund managers use sophisticated modeling that takes into account, among other things, "macroeconomic indicators, consumer confidence, interest rates, [and] dividend yields on the stock market relative to the interest rate on treasuries."  Tr. 1640:14–1641:24 (Wermers).  Dr. Wermers testified that the Fidelity Freedom Funds followed a more conservative glide path than did the JPMorgan funds, with less equity exposure and, therefore, less risk, at any comparable point in time prior to a participant's planned retirement date.  Tr. 1641:19–24 (Wermers).

105.    Dr. Buetow opined that Banner Defendants should have removed the Fidelity Freedom Funds, at the latest, by the end of the second quarter of 2011, and that any prudent fiduciary would have come to the same conclusion.  Tr. 566:20–23 (Buetow); Tr. 637:22–638:1 (Buetow).  By contrast, Dr. Wermers opined that the Fidelity

Freedom Funds performed reasonably well at the time, at least relative to their peers, and thus were a reasonable investment choice for the Plan until the Plan switched to the JPMorgan Funds in 2015.  Tr. 1633:8–15 (Wermers).

106.    Information obtained from a leading journal in the investment field, *Pensions & Investments*, showed that, as of December 31, 2010, and as measured by total assets, four out of the five most popular target date mutual funds in defined contribution plans were Fidelity Freedom Funds.  Tr. 1644:20–1645:6 (Wermers).  In addition, from 2009 until 2015, thousands of other 401(k) plans, and at least 30 other large 401(k) plans with more than $1 billion in assets (so-called "mega plans") offered the Fidelity Freedom Funds.  Tr. 1641:25–1643:7 (Wermers).  In the Court's view, the fact that several other mega plans were invested in the Fidelity Freedom Funds during that period is at odds with Dr. Buetow's opinion that a prudent fiduciary would not have continued to hold the Freedom Funds after 2011.  To the contrary, the evidence suggests that other similarly situated fiduciaries found the Fidelity Freedom Funds to be a prudent investment option beyond that date.  *See* Tr. 1643:1–7 (Wermers).

107.    Dr. Buetow testified that an extended Slocum report to the RPAC in August 2010—which stated that Slocum would not recommend certain underlying funds in the Fidelity Freedom Funds as standalone investments—should have been a red flag to the RPAC.  Tr. 544:20–545:6 (Buetow).  However, as Dr. Wermers explained, the individual mutual funds making up a target date fund are often intended to diversify one another, and thus the underperformance of a single fund within a target date fund is not necessarily indicative of the performance of the target fund as a whole.  Tr. 1646:20–1647:12 (Wermers).  The Court credits Dr. Wermers explanation regarding the hedging

strategy of selecting counter-cyclical constituent funds for inclusion in a particular target date fund.  The Court finds that Slocum's report on the performance of constituent funds in the Fidelity Freedom Funds was not, alone or in combination with other factors, a sufficiently significant red flag which should have caused a prudent fiduciary to divest out of the Fidelity Freedom Funds by the middle of 2011.

108.    In addition, Dr. Wermers compared the returns of the Fidelity Freedom Funds to those of peer funds over both a five- and seven-year period.  Tr. 1650:7–1653:19 (Wermers).  Dr. Wermers explained that he used five- and seven-year periods because of the importance of evaluating fund performance over longer time periods, and preferably over an entire market cycle, to better understand whether fund performance is tied to luck or actual investing skill.  Tr. 1648:8–1650:5 (Wermers).  According to Dr. Wermers, a typical market cycle consists of several quarters of down markets and several quarters of up markets, and typically takes place over the course of ten to fifteen years.  Tr. 1649:13–21 (Wermers).  The IPS, which guided the RPAC's evaluation of investment options, also recognized the importance of evaluating a fund's performance over a longer period of time, and advised that the "[p]rogress of each investment option against its return objectives shall be measured over a full market cycle."  Ex. 679 at 14.

109.    Dr. Wermers found that the Fidelity Freedom Funds performed, on the whole, above average when compared to its peer funds.  Tr. 1650:7–1653:19 (Wermers).  Moreover, Dr. Wermers was of the opinion that the expense ratios or fees for the Fidelity Freedom Funds were actually lower than many of their peers, and therefore an attractive option for Plan Participants.  Tr. 1663:5–15 (Wermers).  Dr.

Buetow also acknowledged that the Fidelity Freedom Funds were in the "middle of the pack." Tr. 640:7–21 (Buetow).  The Court credits Dr. Wermer's testimony on this issue.

110.    Dr. Wermers also compared the returns of the Fidelity Freedom Funds to a benchmark index (although not the custom benchmark index used by Slocum in the quarterly reports) over one-, three-, five-, seven-, and ten-year periods, and found that the difference in returns were so small that they were not statistically meaningful.  Tr. 1654:7–1655:8 (Wermers).  Dr. Buetow criticized the use of statistical significance for analyzing investment options, preferring to use the criteria of "economic significance" to better reflect the actual impact of investment option selection on an investor.  Tr. 495:23–96:11 (Buetow).  However, he did not criticize Dr. Wermers' calculations.

111.    Dr. Buetow testified that Slocum quarterly reports to the RPAC on the Fidelity Freedom Funds from 2009 and 2010 evinced "three years of underperformance—meaningful underperformance of this series of funds."  Tr. 541:16–22 (Buetow).  In 2009 and 2010, these quarterly reports show that Fidelity Freedom Funds often underperformed as compared to their three- and five-year custom benchmarks, but performed more in line with the Morningstar category averages.  *See, e.g.*, Ex. 269 at 13; Ex. 277 at 13; Ex. 284 at 13; Ex. 291 at 13; Ex. 301 at 13. Dr. Buetow did not, however, explain how a one-point underperformance from a custom benchmark resulted in "meaningful underperformance," especially given his preferred metric of "economic significance."  Tr. 495:23–96:11 (Buetow).

112.    The Court credits the analysis of Dr. Wermer, and finds that the Fidelity Freedom Funds' returns from 2009 until around 2013, while not consistently best-in-class, were generally in line with the average returns of their peer funds.  This finding

constrains the Court to reject Dr. Buetow's opinions that (1) the Fidelity Freedom Funds performed poorly relative to comparator funds; and (2) they did so to such a significant degree such that they should have been replaced by no later than the second quarter of 2011.

113.   While hindsight is not a basis from which to evaluate whether a fiduciary acted prudently, *see Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 918 (8th Cir. 1994), Dr. Wermers' analysis of the impact of switching to the JPMorgan Funds in 2015 rather than in 2011 confirms the Court's finding that the performance of the Fidelity Freedom Funds were in line with peers until the RPAC started the divestment process. Dr. Wermers analyzed the returns of investing a dollar from the second quarter of 2011 until the second quarter of 2018 in the 2020, 2030, and 2040 target date funds of Fidelity and JPMorgan.  Tr. 1661:3–1663:3 (Wermers).  The results for each of the target date fund years were "basically identical, within a penny of each other," and "not really meaningful[ly]" different.  Tr. 1662:12–23 (Wermers).

## 2.   Process for Evaluating the Fidelity Freedom Funds

114.   The IPS set the investment objectives and performance standards to guide the RPAC's selection of investment options for the Plan.  ¶¶ 39–40; Ex. 679 at 14–17.  It directed that the investment consultant (here, Slocum) should review performance of the investment manager (here, Fidelity) on a quarterly basis, and report on returns, comparisons to benchmarks, diagnostic risk analysis, and compliance with investment guidelines.  Ex. 679 at 16.  The IPS also listed performance metrics for Slocum to use in assessing the Plan's investments' relative performance and risk-adjusted performance.  Ex. 679 at 16.  These metrics included whether the "three year

annualized return trails benchmark index . . . [or] is below peer group median," and whether the three- or five-year Sharpe Ratio is below benchmark, as well as more qualitative assessments such as certain organizational changes.  Ex. 679 at 16–17. The IPS clearly stated that such "circumstances or events may trigger an automatic formal review and possible reconsideration of the appropriateness of continuing to use the affected [investment] manager," but would not serve as "automatic causes for changing investment managers."  ¶ 41; Ex. 679 at 16.  Rather, not meeting the performance standards would "indicate the need for further evaluation of the relationship."  ¶ 41; Ex. 679 at 16.

115.    Slocum provided written and oral reports at the RPAC's quarterly meetings that addressed, among other things, the performance metrics set forth in the IPS.  *See, e.g.*, Ex. 277; Ex. 291; Ex. 324.  Slocum's quarterly reports also included commentary on the performance of the Fidelity Freedom Funds, Slocum's observations on analysis, and recommendations about the Fidelity Freedom Funds.  *See, e.g.*, Ex. 324 at 14; Ex. 336 at 14.

116.    A Slocum representative attended each RPAC quarterly meeting, and presented on the written reports provided to the RPAC.  Exs. 182, 184–191, 193–204, 206–220.  The reports and presentations served as a basis for the RPAC's discussions of, among other things, the economic climate, investment outlook, and the appropriateness of continuing to offer the Fidelity Freedom Funds as the Level 1 option for the Plan.  The RPAC meeting minutes reflect these discussions.  Exs. 182, 184–191, 193–194, 196–204, 206–220.

117.    Not all RPAC members attended every meeting.  Tr. 1046:6–15 (Block).
However, RPAC members reviewed materials even for meetings they could not attend,
and asked other members to raise certain points at the meetings.  Tr. 1046:16–24
(Block).  RPAC members also discussed any issues or concerns about the RPAC or
investments outside of formal RPAC meetings.  Tr. 715:5–716:4 (Dahlen).  The Court
does not find it significant that members missed meetings occasionally, because the
RPAC members were still provided with information material to their responsibilities as
RPAC members, and could perform their duties even if not always present at each
quarterly meeting.

118.    In quarters where the Fidelity Freedom Funds met or exceeded their
respective benchmarks, Slocum explained the reasons for performance, and noted any
potential changes.  Ex. 284 at 14; Ex. 324 at 14; Ex. 336 at 14.

119.    In calendar quarters where the Fidelity Freedom Funds did not meet all of
the performance standards, Slocum explained the reasons for the underperformance.
For instance, in the fourth quarter of 2011, Slocum noted that the lagging performance
of the Fidelity Freedom Funds was "due largely to structural differences in the glide path
design." Ex. 382 at 14.  However, Slocum also explained that "Fidelity has steadily
made changes," which Slocum viewed favorably, and recommended retaining the
Fidelity Freedom Funds on that basis.  Ex. 382 at 14.

120.    In this context it is important to note that the IPS did not require a review
based on the Fidelity Freedom Funds underperforming a single metric in any particular
or isolated calendar quarter.  Contrary to Dr. Buetow's testimony that a violation of the
IPS should trigger a *mandatory* formal review process, *see* Tr. 555:17–24 (Buetow), the

IPS actually left it to the discretion of the RPAC as to whether a formal review was necessary or appropriate.  Ex. 679 at 16 ("circumstances or events *may* trigger an automatic formal review" (emphasis added)).

121.    The Court finds that the RPAC wanted to make comprehensive assessments of the funds, and did not want divest the Plan from funds at the first indication of underperformance.  The RPAC recognized when investments missed their benchmarks, and was concerned about how performance would impact Participants. Ex. 1093:12–19 (Block).  However, the RPAC was also concerned with taking a longer-term view, and evaluating investment success over a longer time period and full market cycle, consistent with the IPS.  Ex. 1093:12–19 (Block).  Therefore, in quarters when the Fidelity Freedom Funds lagged the custom benchmarks, the RPAC considered the reasons for underperformance with Slocum, and attempted to understand the reasons for the relative underperformance.  Ex. 1093:12–19 (Block).

122.    Emerging from the 2008 recession, the RPAC was also wary of "locking in" (through sales of funds) what otherwise would only have been paper Plan losses, and just as the performance of the market as a whole was beginning to improve.  Ex. 1797 at 25 (Dep. of Tom Koelbl); *see* Tr. 1095:8–18 (Block); Ex. 1792 at 55 (Buerhle). In the Court's view, this approach was particularly prudent and appropriate given the macroeconomic and market realities at the time.

123.    In August 2010, Slocum gave a detailed report and presentation to the RPAC on the Fidelity Freedom Funds.  Ex. 304.  At trial, former Chair Block explained that Slocum recommended this analysis because it wanted to make sure that the Fidelity Freedom Funds remained an appropriate investment, particularly in light of

changes Fidelity had made to the Freedom Funds, as well as the significantly increasing number of Participants with assets in the Freedom Funds.  Tr. 1087:12–1089:13 (Block); Ex. 304 at 3.  The presentation provided the RPAC with a full report on the positive aspects of the Fidelity Freedom Funds, but also outlined areas of potential concern.  Ex. 304 at 3.  Slocum followed up on such concerns, and reported back its findings for the RPAC's consideration.  Ex. 313 at 14 (reporting on Slocum's meeting with a Fidelity co-portfolio manager to discuss recent structural changes to the funds).

124.    Until August 2013, Slocum continued to recommend the Fidelity Freedom Funds in light of changes made to the glide path and management of these Funds.

125.     In August 2013, Slocum recommended that the RPAC investigate alternatives to the Fidelity Freedom Funds, because the Freedom Funds had for some time trailed their benchmarks, and the expected improvements had not materialized. Ex. 208 at 1; Tr. 1100:5–1101:4 (Block).  The RPAC asked Slocum to engage with Fidelity to further discuss and review the glide path.  Tr. 1100:5–1101:4 (Block).

126.    Once Slocum started to express concern, and suggested that the RPAC review alternatives to the Fidelity Freedom Funds, the RPAC took that duty seriously. From August 2013 until the RPAC voted at its February 2015 meeting to move to the JPMorgan Funds, the Committee discussed the performance of the Fidelity Freedom Funds at each quarterly meeting.  Exs. 182, 184–191, 193–194, 196–204, 206–220.

127.    During the third quarter of 2013, the Fidelity Freedom Funds "rebounded . . . and out-performed the benchmark."  Ex. 209 at 1.  Nonetheless, at the November 2013 RPAC meeting, Slocum noted the longer-term performance had been disappointing and thus prepared a comprehensive review of the Fidelity Freedom

Funds.  Ex. 209.  Slocum addressed the changes Fidelity had made to the glide path, and presented the RPAC with a series of options: (1) retain the Fidelity Freedom Funds; (2) transition to the Fidelity Freedom Index Funds; (3) replace the Fidelity Freedom Funds with another series of target date funds; or (4) create custom target date funds. Ex. 209 at 2.  Slocum did not recommend making an immediate change.  Ex. 209 at 2. The RPAC discussed and analyzed these options.  Ex. 209 at 2.  While the RPAC decided to take no immediate action, it agreed that short-term follow up was necessary. Ex. 209 at 2.

128.    At the next RPAC quarterly meeting, Slocum reviewed the Fidelity Freedom Funds' historic performance, and Fidelity representatives presented to the RPAC about the Freedom Funds and addressed changes to the glide path to improve performance.  Ex. 210 at 1.  Changes to the Freedom Funds' management and the glide path were set to take place in late 2013 and early 2014.  Ex. 211.

129.    At its August 2014 meeting, the RPAC again reviewed the performance of the Freedom Funds, and directed Slocum to provide a more detailed analysis and recommendation for its consideration at its November 2014 meeting.  Ex. 212 at 2.

130.    In November 2014, the RPAC discussed alternatives to the Fidelity Freedom Funds, and approved a special meeting with representatives from Vanguard, T. Rowe Price, JPMorgan, and Fidelity to compare target date funds.  Ex. 213 at 3.  The RPAC directed Slocum to schedule the special meeting before the next quarterly RPAC meeting.  Ex. 213 at 3.

131.    As the RPAC came closer to formally reevaluating whether the Fidelity Freedom Funds remained the best target date fund options for Plan Participants over

the longer timeframe contemplated by the IPS, in early February 2015, Chair Schaefer and O'Connor asked Slocum for additional information on how changes to investments with Fidelity would impact the recordkeeping arrangement.  Ex. 1503; Ex. 1504.  The RPAC was aware that moving from the Fidelity Freedom Funds would impact Fidelity's ability to collect recordkeeping fees from Participants' accounts.  Ex. 1503.  The questions acknowledged the reality that moving from the Fidelity Freedom Funds would impact the revenues paid to Fidelity under the revenue sharing arrangement.  However, the Court finds that there is insufficient evidence from which it can determine that the revenue sharing arrangement was a prevailing consideration for the RPAC in the course of these analyses, rather than simply a procedural inquiry.  Moreover, and as elsewhere noted in this Order, the recordkeeping fees (paid by Plan Participants), some of which were remitted to Banner for payment of Plan expenses, were relatively limited, at least as compared to Banner's substantially larger annual matching contributions to Participants' accounts.  ¶ 4.

132.    The special meeting took place on February 13, 2015.  Ex. 214.  The RPAC solicited advice from Slocum and legal counsel on how to evaluate and select target date fund providers.  Ex. 548.  They also heard presentations from Fidelity, Vanguard, and JPMorgan about their target date fund offerings.  Tr. 1439:22–1441:1 (Weinman).  At the conclusion of the meeting, the RPAC voted to move from the Fidelity Freedom Funds to the JPMorgan Funds.  Ex. 214 at 4.  The Plan started offering the JPMorgan Funds as the Level 1 family of target date fund options in May 2015.

133.    The Court finds that the RPAC engaged in a prudent monitoring process to determine periodically whether the Fidelity Freedom Funds were an appropriate

investment option, and whether retention of the Fidelity Freedom Funds was in the best interest of the Plan Participants.  To this point, the Court further finds that when the RPAC determined that the Fidelity Freedom Funds were no longer a prudent investment option for the Plan, it engaged in an appropriate review process to consider alternative peer investment options for the Plan Participants.

**D.    Recordkeeping and Administrative Fees (Count I)**

      **1.    Liability**

          a.    Recordkeeping and Administrative Fee Basics

134.    Recordkeeping fees are typically paid by the participants of a plan, rather than the plan sponsor.  Tr. 66:19–25 (Schmidt).

135.    The costs of recordkeeping and administrative services for a 401(k) plan are not dependent on the amount of assets held in participants' accounts.  Tr. 67:5–15 (Schmidt); Tr. 71:20–72:14 (Schmidt).  Rather, these costs depend primarily on the number of participant accounts in the plan.  Tr. 67:16–68:4 (Schmidt).

136.    Recordkeepers can achieve economies of scale by managing a large number of accounts on the same plan because they can spread overhead costs among a greater number of participant accounts, and the cost to administer each additional account is relatively low.  Tr. 67:16–68:2 (Schmidt); Tr. 1574:3–9 (Kmak) ("Generally as participants go up, fees go down."); Ex. 859 at 48.  Accordingly, a large 401(k) plan with more than $1 billion in assets, such as the Plan, should be able to negotiate favorable recordkeeping and administrative fees with the recordkeeper.  Tr. 80:16–81:2 (Schmidt).

137.    The market for recordkeepers has been, and continues to be, "extremely competitive," particularly for large or mega plans.  Tr. 81:3–82:5 (Schmidt).  And indeed,

recordkeeping fees have gone down over the past fifteen years.  Tr. 245:18–21 (Schmidt).

138.    The length of the recordkeeper engagement is important to determining recordkeeping fees, in part because fees have gone down over time.  Tr. 245:13–23 (Schmidt).

139.    When selecting a recordkeeper, plans consider services, quality of those services, and price, and must take into account the unique characteristics and needs of the plan.  For example, Banner was going through a period of growth during the Class Period, and needed a sophisticated recordkeeper who could handle the volume of Banner's transactions and integrate new Participants to the Plan.  Other services may include extensive user support, education, and outreach to participants or potential participants.  However, recordkeepers are fungible, to a degree.  Schmidt testified that during the Class Period, there were a number of good recordkeepers whose services and quality matched those of Fidelity.  Tr. 252:2–18 (Schmidt).  Kmak agreed that at least four other firms offered quality services, even if they were not identical to those of Fidelity.  Tr. 1560:2 – 1562:6 (Kmak).

140.    Prudent plan sponsors or fiduciaries periodically (approximately every three to five years) determine market pricing for specific recordkeeping services necessary for the Plan.  Tr. 181:2–7 (Schmidt).  This process may, but is not required to, include a request for proposal ("RFP") or request for information ("RFI") (a less robust tool than an RFP), or other competitive means of pricing fees.  Tr. 180:25–181:22 (Schmidt); Tr. 53:13–56:12 (Schmidt).  Schmidt opined that an RFP is the "best way to assess the reasonableness of fees."  Tr. 87:4–11 (Schmidt).  Kmak opined that a

benchmarking analysis is another acceptable method of assessing reasonableness of fees, and may be performed more quickly and with less expense than an RFP. Tr. 1517:20–1519:7 (Kmak).  Nonetheless, Kmak agreed that an RFP is a tool for assessing reasonableness of fees.  Tr. 1517:20–1519:7 (Kmak).

141.   When plan participants pay for recordkeeping and administrative fees, payments are typically made in one of two ways: (1) indirect payments referred to as "revenue sharing"; or (2) direct, fixed per-participant payments.  Tr. 74:4–19 (Schmidt). Both revenue sharing and per-participant fees are standard industry practice, although use of revenue sharing arrangements has declined in recent years.  Tr. 78:13–18 (Schmidt).

142.   Revenue sharing allows the fund manager of an investment option offered through a 401(k) plan to share a percentage of its fund management fee with the investment manager or recordkeeper.  Tr. 77:13–20 (Schmidt).  For example, Fidelity received some percentage of the management fee for many of the investment options in which Plan Participants held assets.  Ex. 246.

143.   Revenue sharing arrangements are common in the investment industry, particularly where investment managers and recordkeepers do some work otherwise done by the investment company, such as tracking the holdings of each plan participant.  Tr. 77:23–78:5 (Schmidt).  Revenue sharing arrangements can be used to pay a portion or all of recordkeeping fees, and may be capped or uncapped.  Tr. 74:19– 75:1 (Schmidt).  A capped revenue sharing arrangement prevents the recordkeeper from earning excessive payments when the share of revenue exceeds its actual costs,

and allows excess revenue to be allocated back to the plan sponsor for other plan expenses or to plan participants.  Tr. 75:16–19 (Schmidt); Tr. 78:22–79:2 (Schmidt).

144.   It is incumbent upon a plan fiduciary to monitor the revenue sharing amounts paid to the recordkeeper, because revenues are based on the amount of assets in the plan, rather than directly tied to the cost of providing recordkeeping services and the funds in which they are invested.  Tr. 78:20–79: 2 (Schmidt).  As assets in the plan increase (whether by prudent investing or the addition of participants), the revenue paid to the recordkeeper also increases, irrespective of whether the costs incurred by the recordkeeper in performing its recordkeeping and administrative tasks similarly increase.  Given the economies of scale, an increase in plan assets and corresponding revenue sharing amounts may or may not precisely correlate with the costs of recordkeeping and administrative services.

145.   Thus, as Schmidt testified, a plan sponsor should ensure that the revenue sharing amounts received by a recordkeeper reasonably correlate to the costs of providing recordkeeping services.  Tr. 79:3–19 (Schmidt); Tr. 80:13–15 (Schmidt).  If a plan sponsor determines that the revenue share paid to the recordkeeper exceeds recordkeeping costs, the balance may be allocated back to the plan for other administrative expenses, to participants, or to a particular fund. Tr. 78:22–79:19 (Schmidt).  This process is called "fee-leveling."  Tr. 79:3–19 (Schmidt).

146.   The other approach to paying plan fees is a fixed per-participant fee based on the number of participants in a plan.  Tr. 74:4–19 (Schmidt).  A per-participant fee allows for the plan sponsor to understand each of the fee components and assess the impact of adding or removing certain recordkeeping services.  Tr. 776:23–77:8

(Schmidt).  A fixed per-participant fee closely aligns the fee paid to the actual cost to the recordkeeper of providing those services.  Tr. 75:23–76:3 (Schmidt).  The economies of scale for recordkeeping fees suggest that large plans may be able to negotiate very favorable per-participant fees, particularly since the market for recordkeepers is "extremely competitive."  Tr. 80:16–81:2 (Schmidt); Tr. 81:3–82:5 (Schmidt).

147.    Schmidt advises plan sponsors to use the per-participant fee structure because of the transparency it brings to recordkeeping costs.  Tr. 75:23–76:18 (Schmidt); Tr. 76:23–77:8 (Schmidt).  He testified that revenue sharing can incentivize poor behavior by plan sponsors when a particular fund is underperforming but offers high revenue sharing (and therefore pays more of the plan recordkeeping fees).  Tr. 79:24–80:7 (Schmidt).

148.    Some plans use a hybrid approach, where plan fees are determined on a per-participant basis, and then paid through revenue sharing.  In that scenario, when the revenue share exceeds the total, per-participant fixed fee, the excess is transferred to a credit account, which in turn is used to pay plan expenses, or remitted to plan participants.  Tr. 384:13–25 (Schmidt).

b.    Monitoring of Fee Arrangement with Fidelity

149.    It is uncontroverted that from the establishment of the recordkeeping arrangement with Fidelity until December 31, 2016, Plan Participants paid Fidelity for recordkeeping and administrative fees under an uncapped, asset-based, revenue sharing agreement that had no sunset provision.  Ex. 825 at 14.  During much of that time, Fidelity's own proprietary target date funds, the Fidelity Freedom Funds, were Level 1 investment options.  ¶¶ 13, 100.

150.    As of January 1, 2017, Banner and Fidelity switched to a per-participant fee model for Fidelity's recordkeeping and administrative services to the Plan.  Ex. 223 at 3.  Under the new per-participant fee model, the Plan agreed to pay Fidelity a flat rate of $42 per Plan Participant per year.  Ex. 233 at 3.  The per-participant fee is paid through revenue sharing, and revenues in excess of total fees are remitted to the Plan.  Tr. 384:13–25 (Schmidt).

151.    This change was not the outcome of an RFP or blind fee bid.  Rather, the $42 amount was proposed by Fidelity, and accepted without apparent negotiation by Banner. Ex. 220 at 3; Tr. 180:4–15 (Schmidt).

152.    During the Class Period, the Plan constituted a mega plan, both in terms of the number of participants and assets under management (in excess of $1 billion), and would have had considerable market power to negotiate favorable recordkeeping fees on behalf of Plan Participants.  Tr. 243:13–23 (Schmidt); Tr. 81:3–82:5 (Schmidt).  Between 2009 and 2016, the number of Plan Participants nearly doubled, from 23,166 Participants to 41,416 Participants.  ¶ 6; *compare* Ex. 1106 at 2, 45, *with* Ex. 1113 at 2, 208.  As did the amount assets in the Plan, increasing from $1.18 billion to approximately $2.25 billion.  ¶ 6; *compare* Ex. 1106 at 2, 45, *with* Ex. 1113 at 2, 208.

153.    Despite this considerable market power, recordkeeping and administrative fees under the revenue sharing arrangement, as calculated on a per-participant basis, fluctuated between $52.45 and $108.29 from 2009 to 2016.  Ex. L93.  While the number of Plan Participants increased steadily over this period, *see* ¶ 6—providing a larger base over which to spread fixed costs—the recordkeeping and administrative fees, as calculated on a per-participant basis, fluctuated with little discernable relation to the

services provided by Fidelity.

154.   For example, in 2010, there were 29,788 participants in the Plan, and the revenue sharing arrangement resulted in fees on a per-participant basis of $72.11.  Ex. L93.  In 2013, with an increasing number of participants in the Plan (31,444), the revenue sharing arrangement resulted in fees on a per-participant basis of $108.  Ex. L93.  Despite the increase in Plan Participants—providing a larger base over which to spread fixed costs—the recordkeeping fees paid to Fidelity, as calculated on a per-participant basis, were, counter-intuitively, actually *increasing*.

155.   In the over twenty years since Banner first engaged Fidelity as the recordkeeper for the Plan, Banner has not conducted an RFP for recordkeeping services.  While a Plan is not required by ERISA to engage in an RFP to determine the reasonableness of fees, *see* Tr. 1515:18–23 (Kmak), RPAC Chair Schaefer acknowledged that RFPs are reasonable to perform every five to seven years, to see what "other opportunities" exist in the market.  Ex. 1802 at 38 (Schaefer).  Slocum informed Banner that it could perform such requests for proposals and had prior experience doing so.  Ex. 749 at 3.  Despite the availability of this service to the RPAC, the RPAC has not performed an RFP, RFI, or other market-based analysis for recordkeeping services for the Plan in over 20 years.  Tr. 180:16–19 (Schmidt); Tr. 1467:1–11 (Weinman).

156.   The Court finds it highly significant that Banner has not undertaken a single RFP in nearly 20 years, despite the recognized utility of an RFP for assessing reasonableness of fees.  *See* Tr. 1519:5 (Kmak).

157.   For no charge, Slocum provided limited reviews of the Plan's

recordkeeping and administrative fees paid to Fidelity.  Ex. 1803 at 11–12 (Dep. of Kyle

Schmit); Tr. 168:14–169:9 (Schmidt).  Slocum, however, was not engaged by the RPAC

for the purpose of addressing or evaluating recordkeeping fees, and was not a fiduciary

for the purpose of negotiating or assessing recordkeeping or administrative fees

charged to the Plan.  Ex. 749 at 1; Ex. 751 at 1; ECF No. 372 at 27.  Accordingly, it was

the Banner Defendants—the actual Plan fiduciaries—who had an independent

obligation to inquire into the basis for Slocum's summary reviews, and to satisfy

themselves that the recordkeeping and administrative fees paid by the Plan were

reasonable.

158.    Had the Banner Defendants further inquired about the data underlying

Slocum's fee reviews, they would have learned that other Slocum plan clients with more

than $1 billion in assets and a large number of total participants were paying far less

than the Plan for recordkeeping and administrative fees on a per-participant basis,

whether through fixed, per-participant fees, or by way of bundled fee structures.  Ex.

1072.  At a minimum, such information should have led a prudent fiduciary to engage in

a more robust process to determine the appropriateness of the recordkeeping and

administrative fees charged to the Plan by Fidelity.

159.    In an August 18, 2010 presentation to the RPAC, Drinker Biddle educated

RPAC members about ongoing excessive fee litigation, and emphasized that

"[e]valuating and re-evaluating fund performance and fees is an integral part of any

good fiduciary process!!"  Ex. 299 at 7 (emphasis in original).  In a subsequent

presentation in the second quarter of 2014, Drinker Biddle warned the RPAC that "the

recovery in equity markets will significantly increase asset-based compensation, and, in some cases, the increase may lead to excessive fees." Ex. 509 at 13.

160. In August 2014, Slocum recommended that the RPAC consider alternate fee structures and determine the most appropriate structure for Plan Participants. Ex. 212 at 2. In November 2014, the RPAC tabled consideration of using different fee structures until the end of 2015. Ex. 213 at 2.

161. Accordingly, from the Drinker Biddle and Slocum presentations, the RPAC members knew, or should have been aware, that they had a fiduciary duty to regularly evaluate the appropriateness of recordkeeping and administrative fees, and that the asset-based, revenue sharing model used by Fidelity for the Plan risked the Participants paying an excessive amount for these fees. Ex. 299 at 7; Ex. 509 at 13. Despite this advice from advisors, the RPAC delayed consideration of the appropriateness of the recordkeeping fee model, and the fees paid thereunder, until 2016. Ex. 213 at 2; Ex. 220 at 3.

162. Also, as noted in ¶ 53, *supra*, the Trust Agreement with Fidelity required Fidelity to prepare the Form 5500 required to be submitted to the DOL on an annual basis. As of May 2010, Banner hired Ernst & Young to prepare this Form instead, at the annual cost of about $120,000 in 2010. Ex. 1107 at 6. Fidelity's asset-based fees were not, however, reduced to account for this reduction in the services it was required to perform for the Plan. Ex. 191 at 2; Ex. 1107; Ex. 1108; Ex. 1109; Ex. 1110; Ex. 1111; Ex. 1112.

163. Schmidt testified that, based on his review of materials in this case, Banner did not even attempt to renegotiate the recordkeeping fee in light of Ernst &

Young providing services formerly performed by Fidelity.  Tr. 387:13–23 (Schmidt).  He reasoned that there was no negotiation because Fidelity's fee was based on revenue sharing.  Tr. 387:13–23 (Schmidt).  As noted by Schmidt, the disconnect between fees generated by a revenue sharing agreement and actual costs to a plan is a risk of such an agreement, and requires oversight by the plan sponsor or fiduciary to assure that revenue and costs are aligned.  Tr. 78:20–79:2 (Schmidt).

164.    The Court finds that the Banner Defendants' failure to so much as raise the issue of reducing recordkeeping fees, given the reduction in the services Fidelity provided to the Plan, is early evidence that Banner Defendants were not considering how the recordkeeping fees paid under the revenue sharing agreement related to actual costs, or whether those fees were reasonable.

165.    In February 2012, Fidelity offered to establish the RCA.  ¶ 50; Ex. 388 at 5–6.  The RCA was funded by Fidelity from revenue sharing proceeds and could be used by Banner to pay Plan expenses.  Ex. 388 at 5–6.

166.    In late 2012 to early 2013, Fidelity and Banner established the RCA by amending the Trust Agreement.  Ex. 825 at 81.  The amount of the revenue credit was "based on the Plan characteristics, asset configuration, net cash flow, fund selection[,] and number of Participants," and subject to change as these factors changed.  Ex. 825 at 81.

167.    Fidelity, not Banner, determined the initial amount of the revenue credit.  Ex. 1807 at 14 (Weber).  It is unclear the extent to which Banner Defendants engaged in negotiations (if any).  DeHaan testified that the process of calculating the revenue credit was not as "black-and-white as we . . . hope," but that Fidelity had "offered

350,000" and Banner "wound up getting [$700,000], so apparently we asked for something." She could not provide further detail about the negotiation process. Tr. 1278:3–1279:6 (DeHaan). Schmidt testified that he did not see any indication that Fidelity and Banner really negotiated the credit. Tr. 163:18–23 (Schmidt).

168. Schmidt testified that in his experience, this lack of negotiation for the revenue sharing credit should be an "immediate red flag." Tr. 165:15 (Schmidt). He explained that "if the amount is being allocated back and it's not something that has been referred to back on how it as calculated, . . . [a]s a fiduciary I would—I would start to ask questions." Tr. 165:16–20 (Schmidt). Specifically, Schmidt would ask "what does this amount represent? Why is it being allocated now? What about prior years for this?" Tr. 165:16–20 (Schmidt). He also testified that allocations back to a plan of revenue sharing proceeds from a recordkeeper are common in capped revenue sharing arrangements, and such payments are often made when fees from revenue sharing exceed recordkeeping costs. Tr. 75:16–19 (Schmidt); Tr. 78:22–79:2 (Schmidt).

169. Banner Defendants did not ask Fidelity why the revenue credit was provided at that point in time, how the revenue credit was determined, nor did they ever demand (or even request) that a credit be paid for previous years. Ex. 1799 at 22 (O'Connor); Ex. 1802 at 26 (Schaefer); Ex. 1792 at 38 (Buehrle); Ex. 1801 at 57 (Oxford); Ex. 1807 at 30 (Weber). RPAC Chair Brenda Schaefer admitted that she was unaware of how Fidelity calculated the revenue credit, and she further admitted that the revenue credit indicated that Fidelity was receiving more than needed for expenses. Ex. 1802 at 26–27 (Schaefer). Former IC member Sutton was unaware that Fidelity remitted revenue credit to Banner, did not know how such rebates were negotiated, and

never discussed revenue credits with other IC members.  Ex. 1805 at 63 (Dep. of Richard Sutton III).

170.    The Court finds that, as of 2012, when Fidelity approached Banner about using fees paid from the revenue sharing arrangement to pay other Plan expenses, the RPAC should have recognized the unusual situation inherent in such a proposal, and should have investigated the situation further.

171.    The Court also notes that there is no mention in the RPAC meeting minutes of any inquiry about Fidelity's level of compensation from 2009 until 2011, and little mention thereafter until 2015.  Exs. 182, 184–191, 193–204, 206–220.  RPAC members understood the importance of keeping detailed minutes and documentation as part of their fiduciary duties.  Block testified that "if important topics were discussed" there would be a record "included in the minutes."  Tr. 1200:13–21 (Block).

172.    In February 2012, the RPAC noted that it would begin to receive the revenue credit, and was, at that time, briefed on recordkeeper pricing models.  Ex. 199 at 2.  It does not appear that any action was taken, however, even though the revenue credit should have indicated that Fidelity's fees from revenue sharing were potentially excessive.  Ex. 199 at 2; Ex. 1802 at 26–27 (Schaefer).  In August 2012, Slocum provided information on recordkeeping fees in terms of the "total administrative fee" for the Plan and discussed the revenue sharing generated by the Level 2 funds.  Ex. 201 at 1; *see* Ex. 207 (May 2013 minutes); Ex. 208 (August 2013 minutes).  It is unclear whether the RPAC did any independent investigation of Slocum's report.  Ex. 201 at 1.

173.    Only in 2015 did the RPAC take seriously Slocum's August 2014 suggestion to investigate fee structures and begin to conduct a more concerted inquiry

into the actual level of appropriate recordkeeping fees paid to Fidelity.  Ex. 217 at 2;

Ex. 218 at 2; Ex. 219 at 3; Ex. 220 at 3.  This process culminated in the RPAC voting in

June 2016 to move away from the uncapped, asset-based fee structure and move to an

unbundled, per-participant fee model beginning January 1, 2017.  Ex. 220 at 3.

174.    Based on the foregoing, the Court finds that Plaintiffs have shown, by a

preponderance of the evidence, that Banner Defendants, and in particular the RPAC,

failed to monitor the reasonableness of recordkeeping fees paid to Fidelity under the

uncapped, asset-based, revenue sharing agreement with no termination date.  During

the Class Period, the RPAC never assessed the reasonableness of fees using any form

of a competitive bid process, RFP or otherwise.  While the RPAC members were

notified of their obligation to assess fee reasonableness on an ongoing basis, and

warned by legal counsel that the economic recovery following the 2008 recession could

lead to excessive fees under uncapped, asset-based revenue sharing arrangements,

the RPAC did not thoroughly investigate the fees being paid to Fidelity (measured on a

per-participant basis) or analyze the reasonableness of those fees, until at the earliest

late-2015.  Instead, the RPAC relied solely on non-fiduciaries to provide a high-level

summary of the fee reasonableness.

175.    Moreover, when Fidelity finally offered to start funding the RCA to pay for

additional Plan administrative expenses, the RPAC did not—as a prudent fiduciary

should have—investigate why the RCA was established at that time, consider the

implications for the reasonableness of fees as measured on a per-participant basis, or

question whether payments should be made for the years before 2012, a period of time

approximately a decade and a half in length.  For these reasons, the Court finds that

Banner Defendants did not act as reasonably prudent fiduciaries in response to the information they received about the likely excessive recordkeeping and administrative fees being paid to Fidelity under the revenue sharing agreement.

176.   The Court further finds that a reasonable plan sponsor or fiduciary would have recognized that the per-participant fee equivalent that the Plan was paying to Fidelity through the end of 2016 was potentially excessive.  Further investigation would also have revealed that per-participant fees had fallen over the last 20 years due to changes in technology and the desirability of managing mega plans, and such a prudent fiduciary would have used the resulting market leverage of the Plan to negotiate a more favorable fee arrangement with Fidelity.

177.   Evidence in the record supports a finding that had the RPAC acted in a prudent manner and investigated the reasonableness of the recordkeeping and administrative fees being paid to Fidelity, it would have discovered that other similarly situated plans had significantly lower per-participant recordkeeping fees, even when considering the generous array of services offered by Fidelity.  The evidence also supports a finding that had the RPAC acted on this information and used the Plan's significantly increasing assets and participants as negotiating leverage—either with Fidelity or another recordkeeper—it could have negotiated more favorable recordkeeping fees for the same level and quality of recordkeeping and administrative services.  The RPAC's failure to do so resulted in Plan Participants paying excessive recordkeeping and administrative fees from the beginning of the Class Period through December 31, 2016.

###### 2.      Damages

###### a.      <u>Plaintiffs' Loss Calculation</u>

178.    Schmidt opined that reasonable recordkeeping fees calculated per-participant, taking into consideration the Plan's size, complexity, services provided, and the quality of those services, were: (1) $45–$55 per participant from 2009 to 2011; (2) $35–$45 per participant from 2012 to 2014; and (3) $30–$40 per participant from 2015 through today.  Tr. 230:10–231:1 (Schmidt); Tr. 295:1–296:9 (Schmidt).

179.    To determine the reasonable recordkeeping and administrative fee for Banner, Schmidt first started with a range of total fees that he would expect to be proposed by competing recordkeepers if an RFP process had been performed by Banner from 2009 to the present.  Tr. 231:17–25 (Schmidt).  In estimating these fee ranges, Schmidt took into consideration the individual services and unique characteristics associated with the Banner Plan and services provided by Fidelity, what types of recordkeepers would be capable of servicing a Plan similar to Banner's in each respective year, and the fact that fees in the recordkeeping market had generally decreased from 2009 to the present, along with his recommended best practice of contracting with a recordkeeper for a three-year term.  Tr. 228:18–230:9 (Schmidt). Among the individual services required by the Banner Plan, Schmidt considered a "level of activity of acquisition and divestiture as part of" his opinion of a reasonable fee for the Banner Plan because he "knew that was something that was relevant to the Banner Plan."  Tr. 367:5–14 (Schmidt).  Indeed, during the Class Period, Banner was growing rapidly through acquisition, and each acquisition required new employees to be integrated into the Plan.  ¶ 5.  Fidelity performed these services for the Plan.

180.    From these figures, Schmidt then determined the specific, expected per-participant recordkeeping and administrative fee within each range from 2010 to the present based on anticipated negotiations, and confirmed through his experience negotiating on behalf of his clients, Plans "A" and "B." Tr. 232:1–11 (Schmidt).  For each range, Schmidt anticipated that the Plan would have negotiated the lowest per-participant fee in the range.

181.    Plans A and B, the names and identifying details of which were restricted at trial, are two large plans for which Schmidt performed an RFP and a request for information ("RFI").  Tr. 186:12–187:13 (Schmidt); Tr. 197:12–199:6 (Schmidt).[7]

182.    To calculate damages for each year, Schmidt subtracted his estimated, expected per-participant fee (the bottom of his expected fee ranges) from the actual annual per-participant fee (thus calculating the alleged excessive payment per participant).  He then multiplied that sum by the number of Plan Participants.  Schmidt thus calculated the loss from excessive fees paid between 2009 and 2016 to be approximately $19 million.

183.    While Schmidt presented data about Plans A and B during his testimony, *see* Tr. 186:6–209:6 (Schmidt), he emphasized that he cited Plans A and B solely as an example of his relevant experience, and did not rely on them to form his opinions about

---

[7] Certain trial testimony was restricted from public view.  *See* ECF No. 445; ECF No. 447; ECF No. 448.  The Court has endeavored to cite only to publicly available material in this document.  Nonetheless, having weighed the confidentiality interest against the public's right of access, the Court finds that any restricted material quoted or summarized below does not qualify for Restricted Access to the extent quoted or summarized, particularly given the need to provide a proper, publicly available explanation of the Court's decision.  *See* D.C.COLO.LCivR 7.2; *cf. Lucero v. Sandia Corp.*, 495 F. App'x 903, 913 (10th Cir. 2012) ("The strongest arguments for [public] access [to court records] apply to materials used as the basis for a judicial decision of the merits of the case, as by summary judgment." (internal quotation marks omitted)).

the Plan, *see* Tr. 285:9–19 (Schmidt).  He explained that he did not, and should not, rely on these examples to assess a reasonable fee because the information underlying a reasonable fee "needs to really be plan-specific," and thus using the data from other plans is generally insufficient.  Tr. 223:1–2 (Schmidt).

184.    Even if the Court were to assume that Plans A and B were part of the "experience" on which Schmidt relied (notwithstanding his assertions to the contrary), the Court finds that Plans A and B are insufficient to support Schmidt's conclusions.  To be sure, the Plan had significant bargaining power with prospective recordkeepers because of its status as a mega plan.  Tr. 100:22–101:4 (Schmidt).  Comparing apples to apples, the Court notes that record evidence indicates that from 2009 to 2017, there were 4,770 mega plans in this country.  Tr. 1495:17–21 (Kmak).  The Court finds that only two data points, consisting of Plans A and B, out of at least 4,770 possible data points during this eight year period, is not a sufficient sample size to validate Schmidt's assertions about the reasonableness of fees.

185.    Schmidt also testified about other plans with which he had experience.  Tr. 217:16–222:3 (Schmidt).  However, some of these plans were significantly smaller than the Plan, and are therefore inapt comparators.  Tr. 217:16–222:3 (Schmidt).  For these other plans, Schmidt did not assess whether the required recordkeeping services were comparable to those required by the Plan and its Participants.

186.    Indeed, Schmidt's explanation was so unhelpful that Dr. Turki testified that he was unable to determine the accuracy of Schmidt's proposed fee ranges, the actual expected per-participant fees, and damages calculations.  Tr. 1745:9–12 (Turki).  The scant information Mr. Schmidt provided about these other experiences, including Plans

A and B, does not allow the Court to meaningfully assess and consider whether the quality and service of the recordkeeper services provided to these comparator plans were on par with the service and quality of the recordkeeping and administrative services provided by Fidelity to the Plan.

187.    The Court declines to credit Mr. Schmidt's *ipse dixit*, experience-based opinion as to the reasonable annual ranges of recordkeeping fees for the 2009 to 2016 period.  Other than referencing Plans A and B, the trial evidence established that Schmidt derived his reasonable range of fees solely from his "experience," much of which was with smaller plans.  While he was not obligated to conduct a mock or phantom RFP on behalf of the Plan to determine a reasonable recordkeeping fee, the fact that Schmidt's damages opinion is derived solely from his "experience" and the data of dissimilar Plans A and B, drastically reduces the Court's confidence in the accuracy of this opinion.  Schmidt did not, for instance, opine on the relative value of Fidelity's services to the Plan during the Class Period, or the value of these services in relation to other plans.  Nor did Schmidt survey other recordkeepers or similarly-situated plans to determine what their fees for particular services would have been during the Class Period.  Rather, Schmidt relied almost exclusively on his unquantifiable and non-replicable experience for his damages estimates, a process which the Court is constrained to find as unreliable.

188.    Well before trial in this case, the Banner Defendants moved pursuant to Rule 702 to exclude Schmidt's trial testimony based on many of these same issues relating to the reliability of his loss calculation opinions.  ECF No. 387.  The Court denied that motion, and allowed Schmidt to testify at trial, notwithstanding these issues.

ECF No. 397.  The Court declined to exclude Schmidt's damages testimony under Rule 702, given that it retained the ability to effectively arrive at the same place after receiving all the evidence relevant to this question at trial.  Having now heard all of the evidence on this issue, for the reasons discussed above, the Court finds that Schmidt's estimate of the losses incurred by the Plan as a result of the excessive recordkeeping and administrative fees charged to the Plan by Fidelity to be unreliable, and it will not credit such opinion testimony.

189.    Moreover, even were the Court to credit Schmidt's estimated annual ranges of reasonable fees, the rationale underlying his final calculation of $19 million in estimated losses to the Plan as a result of excessive recordkeeping and administrative fees is questionable.

190.    Schmidt provided a range of reasonable per-participant fees for each year from 2009 to 2016.  ¶ 178.  He testified that all of the per-participant fee amounts falling within the fee ranges set forth in his opinion would have been prudent.  Tr. 295:22– 296:1 (Schmidt).  Yet, when calculating his opinion for the resulting losses in this case, he consistently used the lowest possible fee amount in each fee range as the basis for these calculations.  Tr. 296:21–298:21 (Schmidt).  Schmidt reasoned that he used the low end of the reasonableness range based on "a number that [he] felt was reasonable based on the characteristics of the [P]lan," or what he expected the fee to be.  Tr. 298:24–25 (Schmidt); Tr. 299:17–19 (Schmidt).

191.    Schmidt and Kmak both agreed that plan fiduciaries are not required to simply engage the recordkeeper that offers the lowest possible fee.  Tr. 92:22–24 (Schmidt); Tr. 1513:10–22 (Kmak).  Other appropriate considerations include the quality

of the recordkeeper, as well as the level and scope of the services provided.  Tr. 92:22–24 (Schmidt); Tr. 1513:10–22 (Kmak).  Indeed, Schmidt worked with a client on an RFP who did not choose the lowest fee available, selecting instead a provider that offered additional value-added services.  Tr. 196:3–14 (Schmidt).

192.    Prudent fiduciaries must ensure that fees paid by a plan subject to ERISA are reasonable for the services rendered.  There is no obligation in the law that a plan fiduciary go further and ensure that the plan contracts for the lowest fee possible.  Tr. 1566:15–24 (Kmak).

193.    Schmidt's calculation of $19 million in losses uses the lowest fee in an expected annual reasonable fee range for recordkeeping services, rather than, for example, the middle or top of those reasonable fee ranges.  Schmidt provides little justification for this, other than, once again, his experience.  Had Schmidt in fact used the highest estimate within each of the annual reasonable fee ranges, his damages estimate would necessarily have been far lower than his final aggregate $19 million loss estimate.

194.    The Court declines to impose a higher duty upon the Banner Defendants than exists at law.  For this additional reason, the Court finds that Schmidt's actual calculation of losses, based on his unreliable opinion as to various annual ranges of fees, is likewise an unreliable estimate of loss.

195.    Nonetheless, the Court concludes that Plaintiffs have presented evidence that the Plan's recordkeeping and administrative fees should have been more closely monitored, that those fees should as a result have been lower, and that this breach of the duty of prudence caused economic losses to the Plan.

b.    Factual Basis for Alternative Loss Calculation

196.    Having found in favor of Plaintiffs on Count I, the Court must confront the lack of a reliable loss calculation by Plaintiffs' expert for the amount by which Banner overpaid recordkeeping and administrative fees to Fidelity. It is clear that appellate authority requires in this instance for the Court to fashion its own method to calculate the losses caused by the Defendants' unlawful conduct. *Tussey v. ABB, Inc.*, 850 F.3d 951, 960 (8th Cir. 2017) ("*Tussey I*"); *Donovan v. Bierwirth*, 680 F.2d 263, 272 (2d Cir. 1982) ("*Donovan I*"). After careful consideration of possible alternative measures of Plan losses under Count I, the Court has determined that the revenue credits that Fidelity actually paid back to Banner are the best estimate of the excess fees the Plan paid in the first instance. Indeed, the revenue credit may be viewed as the amount that Fidelity itself considered to be excessive recordkeeping and administrative fees, and should be allocated back to Banner for payment of administrative Plan costs.

197.    As discussed in ¶¶ 165–70 above, in late 2012 to early 2013, Fidelity and Banner established the RCA, which was funded by Fidelity and used by Banner to pay Plan expenses. At his deposition, O'Connor stated that "[a]ny change to the revenue credit account would require an amendment to the trust agreement." Ex. 1799 at 22 (O'Connor). He also explained that the revenue credits and RCA were the direct result of agreements made between Fidelity and Banner, including the Fifth, Sixth, and Seventh Amendments to the Trust Agreement. Ex. 1799 at 22 (O'Connor). The amount of the RCA payment was "based on the Plan characteristics, asset configuration, net cash flow, fund selection[,] and number of Participants," and subject to change as these factors changed. Ex. 825 at 81.

198.   Fidelity and Banner agreed that Fidelity would make a onetime payment of $693,433 to the RCA for the calendar year 2012, funded quarterly in arrears.  Ex. 825 at 80.  The agreement was memorialized in the Fifth Amendment to the Trust Agreement.  Ex. 825 at 80.

199.   Fidelity did not make a payment to the RCA for calendar year 2013.  While there was no formal agreement by way of amendment to the Trust Agreement to pay revenue credits from January 1, 2013 through September 1, 2014, it appears that the parties had an informal understanding that Fidelity would continue to pay revenue credits on an annual basis.  Indeed, Slocum's annual reports for 2013 and 2014 both reference ongoing revenue credit payments by Fidelity to Banner.  Ex. 475 at 13; Ex. 525 at 14.  Slocum also discussed the revenue credit in its review of Plan fees in 2016.  Ex. 622 at 5, 10.

200.   In December 2014, Banner and Fidelity signed the Sixth and Seventh Amendments to the Trust Agreement.  The Sixth Amendment established a one-time payment of $1,375,000 to the RCA, and, effective October 1, 2014, ongoing annual payments of $700,000 to the RCA.  Ex. 825 at 85.  It appears that this one-time $1,375,000 payment approximates Banner and Fidelity's informal understanding, reflected in Slocum reports, that Fidelity would continue to pay revenue credits on an annual basis from 2012 forward.  *See* Ex. 475 at 13; Ex. 525 at 14; Ex. 622 at 5, 10.

201.   The Seventh Amendment, effective January 1, 2015, increased the annual payment to $1,100,000, "spread pro rata" across the Plan and the Banner 403(b) Plan, based on each plan's assets as of the end of each billing quarter.  Ex. 825 at 86.  The vast majority of assets were held in the Plan as opposed to the 403(b) Plan, and

accordingly, most of the $1,100,000 was allocated to the RCA.  *See* Ex. 622 at 4, 6 (as of March 31, 2016, the market value of Plan assets was over $2 billion, and the market value of the 403(b) plan assets was approximately $1.6 million).

202.    On June 17, 2015, the parties again amended the RCA agreement. Rather than sign a formal amendment, Fidelity sent Banner a letter (the "Fidelity Letter") that constituted an amendment to their previous Revenue Credit "agreements." Ex. 826.  According to the Fidelity Letter, effective April 1, 2015, Fidelity would "make a one-time payment in the amount of $222,916.67, which shall be spread pro rata across [the Plan and 403(b) Plan] based on each Plan's assets as of the end of each billing quarter."  Ex. 826.

203.    Further, effective on July 1, 2015, Fidelity would "make a quarterly payment in the amount of $118,750.00, which shall be spread pro rata across each of the [Plan and 403(b) Plan]."  This change effectively reduced the $1.1 million annual payment to $475,000 annually.  According to O'Connor, the revenue credit was reduced because Banner switched from the Fidelity Freedom Funds to the JPMorgan Funds. Ex. 1799 at 38 (O'Connor).  Fidelity continued to pay revenue credits to Banner until December 31, 2016.  As discussed earlier, as of January 1, 2017 Banner began compensating Fidelity for its recordkeeping and administrative services under a per-participant fee model, and Fidelity ceased revenue credit payments to Banner.

204.    Fidelity did not pay Banner a revenue credit for any period prior to January 1, 2012.

205.    Fidelity sent Banner a quarterly invoice reflecting the recordkeeping and administrative fees, as well as revenue credit amounts.  Ex. 1799 at 22 (O'Connor).

O'Connor testified that deposition exhibit 67—an invoice for the January 1, 2015 to January 31, 2015 billing period—showed the quarterly payment of the $1.1 million revenue credit to which the parties agreed in the Seventh Amendment.  Ex. 1799 at 37–38 (O'Connor).  Deposition exhibit 67 corresponds, at least in part, to Exhibit 1036.[8]

206.   The following chart compares the Fifth, Sixth, and Seventh Amendments plus the letter amendment with the Fidelity invoices for billing periods from January 1, 2009 through June 30, 2015.  Ex. 825; Ex. 826; Ex. 1036.  These invoices clarify the exact dollar amount that Fidelity paid, and Banner received, in revenue credits during that period.

| Billing Period | Invoice Amount Paid | Revenue Credit Period | Amendment | Payment Provision in Amendment |
|---|---|---|---|---|
| 7/1/2012–9/30/2012 | $520,074.75[9] | Revenue credit for 1/1/2012–9/30/2012 | 5th Amendment[10] | $693,433 funded quarterly in arrears for 2012 |
| 10/1/2012–12/31/2012 | $173,358.25[11] | Revenue credit for 10/1/2012–12/31/2012 | | |

---

[8] Exhibit 1036, according to Plaintiffs' exhibit list, is Bates stamped BH0062774–BH0062847.  Deposition exhibit 67 begins at Bates stamp BH0062827 and continues for six pages, presumably to Bates stamp BH0062832.  *See* Ex. 1799 at 37 (O'Connor).  Thus, Deposition exhibit 67 appears to correspond, at least in part to Exhibit 1036.

In its discretion, the Court has reviewed the substance of Exhibit 1036 to confirm its understanding of Fidelity's payments to the RCA.  The Court notes that while Exhibit 1036 was not admitted at trial, the parties stipulated to its authenticity pretrial.  Additionally, the Court admitted designated portions of O'Connor's deposition transcript in lieu of testimony at trial.  Tr. 1917:14–20; Tr. 1918:17–1919:18; Ex. 1799 at 37–38.  Had O'Connor testified at trial on the same issue, he would have provided testimony on Exhibit 1036, some portion of which would likely have been admitted as a basis for O'Connor's testimony.  Under these circumstances, and given that the Court must fashion some remedy for breach of fiduciary duty in the absence of a reliable damages calculation, *see Tussey I*, 850 F.3d at 960, the Court will consider the substance of Exhibit 1036 to the extent that it aligns with the amendments to the Trust Agreement and provides additional detail about the allocation of revenue credits between the Plan and the 403(b) Plan.

[9] Ex. 1036 at 32.
[10] Ex. 825 at 80–83.
[11] Ex. 1036 at 34.

| Billing Period | Invoice Amount Paid | Revenue Credit Period | Amendment | Payment Provision in Amendment |
|---|---|---|---|---|
| 7/1/2014–9/30/2014 | $1,375,000.00[12] | Revenue credit for 1/1/2013–9/30/2014[13] | | $1,375,000 one-time payment |
| 10/1/2014–12/31/2014 | $175,000.00[15] | Revenue credit for 10/1/2014–12/31/2014 | 6th Amendment[14] | As of October 1, 2014, $700,000 ongoing annual payments, funded quarterly |
| 1/1/2015–3/31/2015 | $272,715.77[16] | Revenue credit for 1/1/2015–3/31/2015 | 7th Amendment[17] | As of January 1, 2015, $1,100,000 ongoing annual payments, funded quarterly, and allocated pro rata between the Plan and 403(b) Plan |
| 1/1/2015–3/31/2015 | $221,065.06[18] | Revenue credit for 4/1/2015–6/30/2015 | Fidelity Letter[19] | As of April 1, 2015, $222,916.67 one-time payment allocated pro rata between the Plan and 403(b) Plan |
| TOTAL: | $2,737,213.83 | Revenue credit for 1/1/2012–6/30/2016 (42 months) | | |

207. From July 1, 2015 to December 31, 2016, Fidelity paid a quarterly revenue credit to Banner for Plan expenses of approximately $118,750.00, the majority of which was allocated to the Plan. Ex. 826 at 2; Ex. 1036 at 61–74.

---

[12] Ex. 1036 at 51.

[13] *See* Ex. 475 at 13; Ex. 525 at 14; Ex. 622 at 5, 10.

[14] Ex. 825 at 84–85.

[15] Ex. 1036 at 53.

[16] Ex. 1036 at 55 ([pro rata share of Plan assets] x ($1,110,000 annual amount/4 billing periods) = $272,715.77).

[17] Ex. 825 at 86

[18] Ex. 1036 at 55 ([pro rata share of Plan assets] x $222,916.67 = $221,065.06).

[19] Ex. 826 at 2.

208.    From January 1, 2012 until June 30, 2015, Fidelity paid a total of

$2,737,213.83 in revenue credits to Banner.  ¶ 206.  From July 1, 2015 until December

31, 2016 (when the Banner started paying a per participant fee), Fidelity paid an

additional $669,243.42 in revenue credits.  Ex. 826 at 2; Ex. 1036 at 61–74.  These

amounts represent the excessive losses to the Plan due to unreasonable recordkeeping

and administrative fees from January 1, 2012 until December 31, 2016.  These amounts

were actually paid by Fidelity in the form of revenue credits to Banner for use for Plan

expenses.  Accordingly, the Court finds that there are no remaining losses from January

1, 2012 until December 31, 2016.

209.    Next, the Court must determine the loss to the Plan for unreasonable fees

from November 20, 2009 (the first day of the Class Period) until December 31, 2011.

For the reasons discussed above, the Court has concluded, after substantial

consideration and analysis, that what would have been paid in revenue credit from

November 20, 2009 until December 31, 2011 is the best estimate of the amount of

excess recordkeeping fees paid to Fidelity during that same period of time.

210.    To determine what revenue credit would have been paid for that period,

the Court will consider the average monthly revenue credit paid from January 1, 2012

(when the revenue credits began) through June 30, 2015.  The Court elects to use June

30, 2015 as the cutoff date for these calculations because the Fidelity Freedom Funds

were replaced by the JPMorgan Funds in May 2015, and the revenue credit amount

starting in the third quarter of 2015 was renegotiated between the parties, and ultimately

substantially reduced.  *See* Ex. 826 at 2.  In the Court's view, including the period of

July 1, 2015 to December 31, 2016 in the applicable time period for these loss

calculations would inaccurately reduce its approximation of the Plan's losses, and as a consequence unjustly reduce the monetary recovery owed to the Plan Participants.

211.    From January 1, 2012 to June 30, 2015, a period of 42 months, Fidelity paid a total of $2,737,213.83 to the RCA, or an average monthly revenue credit of $65,171.76.  Multiplying the number of months from November 20, 2009 until December 31, 2011 (25.5 months) by the average monthly revenue credit, results in $1,661,879.83.

| | |
|---|---|
| Total Revenue Credits (Jan. 1, 2012–June 30, 2015): | $2,737,213.83 |
| | ÷ |
| Number of Months | 42 |
| | = |
| Average Monthly Revenue Credit | $65,171.76 |

| | |
|---|---|
| Average Monthly Revenue Credit | $65,171.76 |
| | X |
| Number of Months (Nov. 20, 2009–Dec. 31, 2012) | 25.5 |
| | = |
| **Losses:** | **$1,661,879.83** |

212.    The Court finds that $1,661,879.83 is the best estimate of the amount of loss to the Plan from November 20, 2009 to December 31, 2011, caused by Banner Defendants' failure to monitor and ensure that Plan recordkeeping and administrative fees were reasonable during that period of time.

213.    The Court will also exercise its discretion and permit Plaintiffs to recover prejudgment interest on this amount, in lieu of and to approximate the lost investment opportunity of funds that would have otherwise remained in the Plan.  *See Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985) ("*Donovan II*") ("the district court should

presume that the funds would have been treated like other funds being invested during the same period"); *Blankenship v. Liberty Life Assur. Co.*, 486 F.3d 620, 628 (9th Cir. 2007) (granting prejudgment interest on ERISA claim).

**E.** **Prohibited Transactions: Payment of Certain Banner Expenses from Plan Assets (Count V)**

### 1. Liability

214. ERISA allows a plan sponsor to recover certain administrative expenses incurred for the benefit of a 401(k) plan. Ex. 497 at 14–16; *see* Tr. 966:10–22 (Kikumoto). Reimbursements to a plan sponsor or plan fiduciary must meet the stringent requirements of ERISA and DOL regulations, which include keeping track of time and ensuring that the work performed was related to the plan's administration and not to other plans or sponsor-related functions. Ex. 497 at 14–16. Further, any reimbursement for an allowed plan expense must occur within 60 days to avoid becoming a prohibited transaction. Ex. 497 at 16.

215. Schmidt testified that he counsels clients who receive payments from plan assets to have a process in place to track "how their time [is] spen[t], how it [is] allocated," and to document it. Tr. 98:18–23 (Schmidt).

216. From 2009 to 2017, the Plan reimbursed Banner for a total of $3.4 million in administrative expenses. The following table, which was presented to the Court as a demonstrative exhibit at trial, shows the payments made to Banner from the Plan for each calendar year from 2009 until 2017. The amounts in the table were derived from a compilation of Banner's Form 5500s from 2009 until 2017. The Court has reviewed the underlying documents, and finds that the demonstrative exhibit accurately reflects the information therein. Ex. 1754 (demonstrative); Ex. 1108 at 8 ($507,323 paid to Banner

in 2011); Ex. 1109 at 6 ($188,955 paid to Banner in 2012); Ex. 1110 at 6 ($373,266 paid

to Banner in 2013); Ex. 1111 at 9 ($289,553 paid to Banner in 2014); Ex. 1112 at 6

($901,517 paid to Banner in 2015); Ex. 1113 at 6 ($379,803 paid to Banner in 2016);

Ex. 1114 at 6 ($141,774 paid to Banner in 2017); Tr. 123:5–9 (Schmidt) (noting that the

parties had stipulated to the amounts Banner was paid from the Plan from 2009 to

2012).  The Court will reproduce the table for ease of reference.

## Payments to Banner Health From the Plan

| Date | Payment to Banner from the Plan |
| --- | --- |
| 12/31/2009 | $520,705 |
| 12/31/2010 | $180,266 |
| 12/31/2011 | $507,323 |
| 12/31/2012 | $188,955 |
| 12/31/2013 | $373,266 |
| 12/31/2014 | $289,553 |
| 12/31/2015 | $901,517 |
| 12/31/2016 | $379,803 |
| *12/31/2017 | $141,774 |

Stipulation Between Parties, Payments to Banner; *Exhibit 1114

Ex. 1754 (demonstrative).

217.    From 2009 until 2016, Banner sought reimbursement for, among other

things, fees charged by Slocum, Drinker Biddle, and Ernst & Young, costs associated

with plan audits, and staff time and expenses for their work on the Plan.  Tr. 966:10–

967:11 (Kikumoto); Tr. 1147:11–1148:4 (Block); Ex. C32 at 6.

218.    Weber worked for Banner and served as the Plan Administrator from at least 2009 until her retirement in 2014.  Ex. 1807 at 3–4, 12 (Weber).  After her retirement, she was replaced by O'Connor.  Ex. 1807 at 14 (Weber); Tr. 1428:4–9 (Weinman).

219.    Prior to 2012, whenever Banner needed to be reimbursed for Plan expenses, Weber would coordinate with Fidelity, and ask Fidelity to send Banner a payment.  Ex. 1807 at 13–14, 19 (Weber).  Fidelity would then deduct the requested amounts directly from Plan accounts and remit payment to Banner.  Ex. 1807 at 14 (Weber); Ex. 1799 at 47.

220.    Named Plaintiffs Ms. Ramos and Mr. Moffitt both testified that administrative fees were deducted from their accounts in 2009, 2010, and 2011.  Tr. 789:24–793:15 (Test. of Lorraine Ramos); Tr. 400:9–403:716 (Moffitt); *see* Ex. 1147 at 12, 27, 41, 55, 69, 97, 124, 134, 139, 179; Ex. 1790 at 2–6.

221.    When Fidelity and Banner established the RCA in 2012, Banner no longer had to ask Fidelity each time it needed to be reimbursed by the Plan.  Instead, Banner could simply submit expenses and use the RCA to reimburse Plan expenses.  Tr. 137:10–138:3 (Schmidt); Ex. 1799 at 40–41, 47 (O'Connor).

222.    During the Class Period, the Plan reimbursed Banner for the salaries of human resources personnel who worked on the Plan.  Tr. 1147:11–1148:4 (Block); Weber's and O'Connor's salaries were paid, in part by the Plan, as were the salaries of their assistants, Pat Wilkie and Jan White.  Ex. 1807 at 13 (Weber); Ex. 1799 at 14, 46–47 (O'Connor).  All of these individuals provided administrative services to the Plan and other retirement plans offered by Banner.  Ex. 1807 at 4, 39 (Weber).

223.    From at least 2009 until 2014, Weber, Wilkie, and White did not maintain precise time records detailing the amount of time they spent working on the Plan or other retirement accounts.  Ex. 1807 at 39 (Weber); *see* Ex. 1500 at 3 ("Vicki was not properly tracking the hours she and Jan spent working on the plans").  Instead, they each simply estimated what percentage of their time they spend on each plan. Ex. 1807 at 39 (Weber).  By contrast, O'Connor kept a spreadsheet to track the hours he spent working on each of the Banner plans so that he could allocate his time (and salary reimbursement) accordingly.  Ex. 1799 at 5, 70 (O'Connor).

224.    In 2012, DOL randomly audited another of Banner's retirement plans. During that audit, DOL found that the procedure used by Banner staff to allocate their time among all the retirement plans was problematic.  Ex. 206 at 2; Ex. 1799 at 59 (O'Connor).  To resolve the audit, Weber wrote and instituted a policy that required all Banner staff who worked on Banner's retirement plans to track their time for each plan, including the Plan, in the future.  Tr. 1208:6–13 (Block); Ex. 1799 at 59–60 (O'Connor). DOL was satisfied by the policy update, and did not levy any fines or penalties as a result of the audit.  Tr. 1208:14–16 (Block).

225.    Despite the 2012 DOL audit and subsequent time-recording policy, Weber and White still did not track their hours in accordance with the policy.  Ex. 1799 at 60 (O'Connor); Ex. 1500 at 3; Ex. 1807 at 39 (Weber) ("[I]t was just more a remembering.").

226.    When O'Connor took over after Weber retired, he found that Banner staff had not been properly tracking their time in accordance with the policy.  Ex. 1799 at 60, 73 (O'Connor); Ex. 1500 at 3.  The failure to follow Banner's internal policy resulted in

improper charges to the Plan.  Ex. 1799 at 80, 84 (O'Connor).  Starting in August 2014, O'Connor clarified to staff how to document time, and he believes that the policy has been followed since that time.  Ex. 1799 at 60 (O'Connor).

227.    In early 2016, O'Connor discovered potential issues with how Banner had allocated costs to the Plan during a conversation with counsel at Drinker Biddle. Tr. 964:13–21 (Kikumoto).  As a result of that conversation, O'Connor reviewed and investigated potential issues, and then hired an outside accounting firm, Moss Adams, to conduct an audit.  Tr. 964:22–965:1 (Kikumoto).  Moss Adams found additional ineligible reimbursements, and recommended that such amounts be paid back to the Plan.  Ex. 1799 at 81 (O'Connor).

228.    In May 2017, DOL initiated another investigation of Banner, this time into possible ERISA violations resulting from the improper reimbursement of Banner by the Plan.  Ex. 897 at 1–2.  Banner self-disclosed to the DOL the issue it had discovered with respect to the inadequate documentation of expense reimbursements.  Tr. 968:16–19 (Kikumoto).

229.    O'Connor, with the assistance of Moss Adams, prepared and provided a summary spreadsheet detailing the improper reimbursement of Banner expenses paid by the Plan from 2012 to 2017.  Ex. 899; Ex. 1799 at 81 (O'Connor).  As a result of the internal investigation, the process of working with Moss Adams, and the DOL audit, O'Connor determined that the Plan had improperly reimbursed Banner $1,476,072.42 from Plan assets from January 1, 2012 to December 31, 2017.  Ex. 899.

230.    The improper reimbursements were broken down into the following categories:

- Ineligible Expenses: $137,405.35
- Prohibited transactions: $570,614.55
- Non-Trust Ineligible Expenses: $111,802.28
- Other Plan Ineligible Expenses: $598,455.48
- Drinker Biddle Ineligible Expenses: $16,112.53
- Drinker Biddle Retainer Ineligible Expenses: $16,623.58
- Early Ineligible Expenses: $3,221.67
- Duplicate Ineligible Expenses: $765.00
- 2017 Ineligible Expenses: $21,071.98

Ex. 899.

231.   In February 2019, DOL concluded that, between January 1, 2013 and December 31, 2017, the Banner "fiduciaries allowed the Plan to improperly reimburse Banner for expenses totaling $1,291,859.12."  This amount does not include the $184,213.30 in ineligible expenses from 2012.  *See* Ex. 899.  The  total amount of unauthorized expenses calculated by DOL consisted of payments "toward Banner employees' salaries, which included more than direct expenses paid based on estimated time spent on Plan-related work, as well as for time spent working on other plans sponsored by Banner," as well as ineligible payments to third-party service providers.  Ex. 897 at 2.

232.   To resolve the DOL audit, Banner restored $1,476,072.42 (the 2013 to 2017 ineligible payments plus the 2012 ineligible payments), plus $7,396.09 in lost earnings, to the Plan.  Ex. 897 at 2.  In its closing letter, DOL noted that its "decision to close this investigation does not prevent [DOL] or any other individual or governmental agency from taking any action with respect to these or other matters related to the Plan."  Ex. 897 at 2.

233.   Banner now uses a robust "allocation process" before charging staff administrative time to the Plan.  Tr. 976:17–977:4 (Kikumoto).

234.    Schmidt testified that specific fees "paid to Banner Health by the [P]lan" were "not monitored and assessed for reasonableness" and "not documented" between 2009 and 2012.  Tr. 130:7–18 (Schmidt).  Despite this fact, O'Connor's investigation, Moss Adams' audit, and DOL's investigation considered only expense reimbursements made from the RCA, and as a result did not consider any pre-2012 expenses.  Ex. 1799 at 81 (O'Connor); *see* Ex. 897; Ex. 899.

### 2.    Damages

235.    From 2010 to 2011, Banner paid itself approximately $687,589 from the Plan.  Ex. 1108 at 8 ($507,323 paid to Banner in 2011); Ex. 1109 at 6 ($188,955 paid to Banner in 2012).  Banner has provided no documentation to support the propriety of these payments.  O'Connor did not review pre-2012 expenses charged to the Plan by Banner, and Schmidt testified that these expenses were not properly documented. Ex. 1799 at 81 (O'Connor); Tr. 130:7–18 (Schmidt); Ex. 899.

236.    Plaintiffs seek the return of the entire payments from the Plan to Banner for 2010 and 2011, a total of $687,589.  ECF No. 458 at 81.  Plaintiffs do not seek any payments for that six-week portion of the Class Period in 2009.  ECF No. 458 at 81.

237.    From January 1, 2012 to December 31, 2017, Banner Defendants allowed the Plan "to improperly reimburse Banner for expenses" in the total amount of $1,476,072.42.  Ex. 899 at 1.  Banner restored this amount to the Plan on November 1, 2017, and then paid $7,396.08 in lost interest to approximate lost earnings.  Ex. 898 at 1, 3–4; Tr. 981:3–24 (Kikumoto).  This total amount was then allocated back to Plan Participants on a pro rata basis in August 2019.  Ex. 1799 at 76–77 (O'Connor).

238.    Lost earnings were calculated for the 2012 to 2017 period using an interest rate of 0.4%–0.5%, the rate of return on the RCA for that period.  Ex. 898 at 3; Ex. 1799 at 92 (O'Connor).

**F.    Failure to Monitor Fiduciaries (Count III)**

      **1.    Liability**

          a.    Monitoring of Recordkeeping and Administrative Fees

239.    As discussed in ¶ 27, *supra*, the Plan Document requires the CEO—at the time of relevant events, Defendant Fine—to appoint members of the RPAC, review and evaluate the RPAC's performance, and take any necessary corrective action.  Ex. 689 at 42–43; Ex. 1793 at 3 (Fine).

240.    During his deposition, Fine acknowledged his oversight responsibilities for the Plan.  Ex. 1793 at 18 (Fine).  Fine also testified that from January 2009 until the time of his deposition, he did not recall any discussion with Weber (former Plan Administrator), Block (former Banner Treasurer and RPAC Chair), Richard Sutton (former head of certain Banner hospitals), or Ed Oxford, Jr. (former head of human resources at Banner) about the Plan, *see* Ex. 1793 at 10 (Fine); did not receive or review written documentation evaluating the performance of the RPAC, *id.* at 32; did not assess the performance of any RPAC member, *id.* at 33; and did not recall ever meeting with RPAC members to discuss the Plan, *id.* at 14.  *See* Tr. 1037:19–21 (Block); Tr. 1039:6–12 (Block); Ex. 1801 at 3 (Oxford); Ex. 1805 at 4 (Sutton).

241.    Fine explained that his oversight of the RPAC occurred through appointment of RPAC members and reviewing the information sent to the Board for review by the IC, and a yearly review of a report on the RPAC's annual activities.

Ex. 1793 at 20 (Fine).  Fine also stated that he would review Slocum's report to the Board to assess how the Plan was performing.  Ex. 1793 at 32 (Fine).  He assumed that any problematic performance of the Plan would have been brought to his attention through such a report.  Ex. 1793 at 32–33 (Fine).  From the trial evidence it does not appear that recordkeeping or administrative fees were addressed in the annual report of RPAC activities.

242.  Block, the RPAC Chair from 2008 until 2014, did not attend any meetings with Fine to discuss the functioning of the RPAC, or its roles and responsibilities with respect to the Plan, nor was she aware of Fine discussing the Plan at any CEO staff meetings.  Tr. 1144:13–1144:17 (Block); Tr. 1144:24–1145:8 (Block).

243.  The IC was the subcommittee of the Board responsible for, among other things, overseeing and monitoring Banner's retirement funds.  Tr. 831:24–832:6 (Frick).

244.  Slocum, which also served as an investment advisor on Banner's separate consolidated investments, *see* Ex. 749, would provide to the IC on a quarterly basis, among other things, information about the aggregate performance of the Plan and whether it was meeting performance expectations.  Tr. 834:10–837:2 (Frick).  Frick explained that once a year, typically at the March IC meeting, "we really drilled down because we had the year-end results for the prior year and occasionally someone would ask, 'Well, where are we on the fee structure? Is it reasonable? Are we achieving effective rates of return?'"  Tr. 835:23–836:5 (Frick).  Frick did not address how the IC evaluated rates of return or fee structure.

245.  Frick testified that he would review the Plan's aggregate returns.  Tr. 835:5–9 (Frick); Tr. 878:2–13 (Frick).  However, on cross-examination, he

acknowledged that Slocum's reports to the IC did not always report the return for the Plan in writing, and, when they did, Slocum's reports included a footnote noting that "Total performance for the Banner Health 401(k) Plan is not meaningful, as the investment allocation is employee-directed." Ex. 72 at 1; Tr. 879:14–16 (Frick).

246.    From at least November 20, 2009, to September 2012, neither the Board nor the IC reviewed the Plan. Dahlen testified that he did not recall any conversation about the Plan at an IC meeting prior to March 2012, nor did the minutes from IC meetings between 2009 and March 2012 reflect any conversation about the Plan. Tr. 737:13–748:22 (Dahlen).

247.    Fine testified that he did not recall attending any IC meeting, or ever discussing the RPAC with any member of the Board.  Ex. 1793 at 12, 14 (Fine).

248.    Block testified at trial that she was not aware of the Board or IC soliciting input, advice, or updates about the Plan from the CEO; of Fine providing input or updates to the IC about the Plan; or of any discussion during CEO staff meetings about the performance or administration of the Plan.  Tr. 1143:24–1144:5 (Block); Tr. 1144:6–12 (Block); Tr. 1144:13–1145:8 (Block).

249.    From this factual summary the Court finds that the CEO, the IC, and the Board did not follow the Plan Document, nor did they monitor the RPAC or the Plan with respect to the reasonableness of recordkeeping and administrative fees paid by the Plan to Fidelity.  The Court finds that this failure to monitor Plan fiduciaries resulted in losses to the Plan, described in ¶¶ 196–213, *supra*.

b.      Monitoring of Transactions Between Plan and Banner

250.    Banner, the RPAC, and any individual designated as the "Plan Administrator" are all "Plan Administrators" responsible for assuring the reasonableness of administrative fees paid by the Plan.  ¶ 36; Ex. 689 at 43–44.

251.    The RPAC minutes first mention reimbursement of Banner expenses by the Plan in February 2012.  Ex. 199 at 2; Ex. 380 (expense recap); Tr. 1304:2–4 (DeHaan).  After beginning in 2012, it appears that the RPAC was updated about expenses on an annual basis.  Ex. 496; Ex. 498; Ex. 561; Ex. 557; Ex. 611; Ex. 613.

252.    Block testified that the RPAC received information about Banner's administration of Plan benefits and Plan expenses on an annual basis, but she was unaware of whether the Plan paid for service providers to attend quarterly meetings. Tr. 1131:22–23 (Block).

253.    DeHaan, Weber's supervisor, testified that she did not consider it her responsibility to confirm that Weber properly tracked her time spent on the Plan. Tr. 1297:6–13 (DeHaan).  Rather, she assumed that Weber's time would be audited by Banner's internal auditors and Ernst & Young.  Tr. 1297:12–22 (DeHaan).

254.    Fine testified that he was unaware that Banner sought partial reimbursement of employee salaries from the Plan for employee time spent on Plan administration.  Ex. 1793 at 54 (Fine).

255.    Frick, former Board and IC member, testified that he was not aware that, between 2009 until he left the Board in 2013, Banner sought partial reimbursement for staff salaries from the Plan. Tr. 859:2–8 (Frick).

256.    Kikumoto, a current Board member and former chair of the IC, testified that he learned of the inappropriate reimbursements to Banner by the Plan after O'Connor began his investigation into improper past administrative fees.  Tr. 964:13–965 (Kikumoto).  By implication, Kikumoto was unaware of improper payments before that time.

257.    After O'Connor discovered issues with the Plan's reimbursement of Banner expenses, the RPAC adopted new policies about the allocation and documentation of employee time.  Tr. 994:6–20 (Kikumoto).  The IC did not review this policy because it was not reported to the IC.  Tr. 994:21–25 (Kikumoto).

258.    Until at least 2016, the RPAC, CEO, IC, or Board did not review, request, or assess any reimbursement of expenses paid to Banner by the Plan, nor did any of them evaluate or consider the appropriateness of the policy of reimbursing Banner from the Plan for staff salaries related to the Plan.  Ex. 1799 at 79 (O'Connor); *see* Tr. 134:6–18 (Schmidt) (opining that neither Fine nor the Board took any steps to assess the reasonableness of payments to Banner by the Plan).

259.    From this factual summary the Court finds that the RPAC, CEO, the IC, and the Board did not follow the Plan Document, nor did they monitor the transactions which resulted in the excessive payment of Banner expenses from Plan assets.  The Court also finds that this breach of the duty to monitor Plan fiduciaries resulted in losses to the Plan, described in ¶¶ 235–38, *supra*.

## 2.    Damages

260.    The Court finds that Banner Defendants' breach of the duty to monitor Plan fiduciaries, as alleged in Count III, resulted in economic losses to the Plan that are

equal to and coextensive with the losses to the Plan caused by Defendants' conduct challenged in Counts I and V.  ¶¶ 212–13, 236–38, *supra*.  In other words, the Court finds that there are no economic losses suffered by Plaintiffs which are independent of or in addition to the losses the Court will award to Plaintiffs under Counts I and V.

## II. CONCLUSIONS OF LAW

A.    <u>Jurisdiction & Status of the Parties</u>[20]

261.    The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this is an action under ERISA § 502(a)(2) and (3), for which federal district courts have exclusive jurisdiction.  29 U.S.C. § 1132(e)(1); *id.* § 1132 (a)(2) & (3).

262.    Plaintiffs and Class Representatives Lorraine Ramos, Cherlene Goodale, Delri Hanson, Linda Heyrman, Karen McLeod, Robert Moffitt, and Constance Williamson, are Participants within the meaning of ERISA § 3(7).  29 U.S.C. § 1002(7).

263.    The Plan is an individual account plan and defined contribution plan under ERISA § 3(34) and an employee pension benefit plan under ERISA § 3(2)(A).  29 U.S.C. § 1002(2)(A) & (34).

264.    The Plan was "established and maintained pursuant to a written instrument" under ERISA § 402(a)(1).  29 U.S.C. § 1102(a)(1).

265.    Banner is the Plan Administrator, as set forth in the Plan Document. Ex. 689 at 13.  The RPAC is also a Plan Administrator.  ¶ 36.  Weber and O'Connor were individuals designated as Plan Administrators.  ¶ 36.

---

[20] The Banner Defendants did not dispute the following jurisdictional facts in any filing— including their Findings of Facts and Conclusions of Law—or at trial.  The Court finds that because Banner Defendants did not challenge the Court's jurisdiction over this proceeding or the status of the parties when they had the opportunity to do so, they have effectively conceded that the Court has jurisdiction over the parties and subject matter of this action, and that Banner Defendants are fiduciaries of the Plan.

266.    Under ERISA, a party may acquire fiduciary duties on one of two ways.

*Teets v. Great-W. Life & Annuity Ins. Co.*, 921 F.3d 1200, 1206 (10th Cir. 2019).  First,

under ERISA § 402, the written document establishing a plan must identify "one or more

named fiduciaries who jointly or severally shall have authority to control and manage the

operation and administration of the plan."  29 U.S.C. § 1102(a)(1).

267.    Alternatively, a party not named by the written document can be a

"'functional fiduciary' by virtue of the authority the party holds over the plan."  *Teets*, 921

F.3d at 1206.  Generally, a person is a functional fiduciary under the plan

> to the extent (i) he exercises any discretionary authority or discretionary
> control respecting management of such plan or exercises any authority or
> control respecting management or disposition of its assets, (ii) he renders
> investment advice for a fee or other compensation, direct or indirect, with
> respect to any moneys or other property of such plan, or has any authority
> or responsibility to do so, or (iii) he has any discretionary authority or
> discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).  A functional fiduciary's obligations are limited in scope to the

extent of the discretionary authority or control, and the fiduciary must actually exercise

that authority or control.  *Teets*, 921 F.3d at 1206–07.

268.    "[A]lthough named fiduciaries and functional fiduciaries obtain fiduciary

status in different ways, they are bound by the same restrictions and duties under

ERISA."  *Id.* at 1207.

269.    Banner is a named fiduciary of the Plan under ERISA § 402(a).  ¶ 22.

270.    The Banner CEO, Defendant Peter Fine, is also a fiduciary of the Plan,

charged with all administrative actions under the Plan, appointing members of the

RPAC, reviewing and evaluating the RPAC's performance, and taking any appropriate

corrective action.  ¶¶ 27–28; Ex. 689 at 42–43.

271.    The Board, the IC, and the individuals who served as Board members and IC members during the Class Period are also fiduciaries of the Plan.  ¶¶ 22–25; *see* 29 C.F.R. § 2509.75-8.

272.    The RPAC and each of its members who served during the Class Period are also fiduciaries of the Plan.  ¶¶ 29–30; 29 U.S.C. § 1102(a)(1); *Teets*, 921 F.3d at 1206–07.

## B.      Applicable Law

### 1.      Fiduciary Duties Under ERISA

273.    "ERISA imposes on fiduciaries twin duties of loyalty and prudence." *Troudt v. Oracle Corp.*, 2019 WL 1006019, at *5 (D. Colo. Mar. 1, 2019) ("*Troudt I*"). In enacting ERISA, Congress "invoked the common law of trusts to define the general scope of [trustees and other fiduciaries'] authority and responsibility," and further provided for "strict standards of trustee conduct . . . most prominently, a standard of loyalty and a standard of care." *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570 (1985).

274.    "The burden is on plaintiffs to prove defendants breached their fiduciary duties," and that the breach of fiduciary duty resulted "in losses to the Plan." *Troudt I*, 2019 WL 1006019, at *5.  In other words, causation "is an express element of a claim for breach of fiduciary duty under 29 U.S.C. § 1109(a)," and the burden to prove that causation "falls squarely on the plaintiff asserting a breach." *Pioneer Centres Holding Co. Employee Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1337 (10th Cir. 2017); *Plasterers' Local Union No. 96 Pension Plan v. Pepper*, 663 F.3d 210, 218 (4th Cir. 2011) ("causation of loss is not an axiomatic conclusion that flows from a

breach of that duty"); *Brotherston v. Putnam Investments, LLC*, 907 F.3d 17, 34 (1st Cir. 2018) (causation is an element of an ERISA breach of fiduciary duty claim).

275.    In addition, ERISA prohibits fiduciaries from engaging in specific transactions, or from allowing a plan to engage in certain types of transactions. 29 U.S.C. § 1106; *see Teets*, 921 F.3d at 1207–08.

276.    A fiduciary with respect to a plan who breaches any responsibility, obligation, or duty imposed on it shall be "personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through the use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate."  29 U.S.C. § 1109(a).

277.    A fiduciary is also liable for a breach of fiduciary responsibility of another fiduciary if, among other things, (a) he or she has enabled the other fiduciary to commit a breach, or (b) has knowledge of the breach and fails to make reasonable efforts to remedy it.  29 U.S.C. § 1105(a); *see* 29 U.S.C. § 1105(c).

278.    Plaintiffs allege that the Banner Defendants breached ERISA's duties of prudence and loyalty by (1) failing to monitor the investments available in the Plan's Mutual Fund Window; (2) retaining the Fidelity Freedom Funds as investment options in the Plan after they should have been removed; and (3) failing to monitor and control the asset-based fees paid to the Plan's recordkeeper, Fidelity.  Plaintiffs also allege that Banner Defendants breached their fiduciary duties by allowing the Plan to engage in certain prohibited transactions.

a.    Duty of Prudence

279.    The duty of prudence requires that a fiduciary discharge responsibilities using the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). "The appropriate yardstick of a fiduciary's duty of prudence under ERISA is not that of a prudent lay person, but rather that of a prudent fiduciary with experience dealing with a similar enterprise." *Troudt I*, 2019 WL 1006019, at *5 (internal quotation marks omitted).

280.    Prudence is measured "according to the objective prudent person standard developed in the common law of trusts." *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 63 (2d Cir. 2016) (quoting *Katsaros v. Cody*, 744 F.2d 270, 279 (2d. Cir. 1984)); *Birse v. CenturyLink, Inc.*, 2020 WL 1062902, at *2 (D. Colo. Mar. 5, 2020). "The court's task is to inquire whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Katsaros*, 744 F.2d at 279 (internal quotation marks omitted). As long as the "prudent person" standard is satisfied, "ERISA does not impose a duty to take any particular course of action if another approach seems preferable." *Chao*, 452 F.3d at 182 (internal quotation marks omitted).

281.    The duty of prudence depends on the prevailing circumstances under which the fiduciary acts, and thus "the appropriate inquiry will necessarily be context specific." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).

282.    The duty imposed on a fiduciary by ERISA requires "prudence, not prescience." *Rinehart*, 817 F.3d at 63; *DeBruyne v. Equitable Life Assur. Soc. of U.S.*, 920 F.2d 457, 465 (7th Cir. 1990).  Courts "cannot rely, after the fact, on the magnitude of the decrease in the relevant investment's price; rather, we must consider the extent to which plan fiduciaries at a given point in time reasonably could have predicted the outcome that followed."  *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) (alterations incorporated).  Accordingly, courts should inquire into the "fiduciary's conduct preceding the challenged decision—not the results of that decision."  *Troudt I*, 2019 WL 1006019, at *11 (quoting *Tussey v. ABB, Inc.*, 746 F.3d 327, 335 (8th Cir. 2014) ("*Tussey II*")).  The prudent fiduciary standard is a "test of how the fiduciary acted viewed from the perspective of the time of the challenged decision rather than from the vantage point of hindsight."  *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 918 (8th Cir. 1994) (alterations incorporated; internal quotation marks omitted).

283.    Courts look both at the "merits of a transaction" and "the thoroughness of the investigation into the merits."  *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007) (alterations incorporated).  To determine whether a fiduciary breached the duty of prudence, courts "focus on a fiduciary's conduct in arriving at an investment decision."  *Troudt I*, 2019 WL 1006019, at *11.  "Although the duty of procedural prudence requires more than a pure heart and an empty head, courts have readily determined that fiduciaries who act reasonably—*i.e.*, who appropriately investigate the merits of an investment decision prior to acting—easily clear this bar.  *Tatum v. RJR*

*Pension Inv. Comm.*, 761 F.3d 346, 358 (4th Cir. 2014) (internal citation and quotation marks omitted).

284. A prudent investigation requires a reasoned decision-making process. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 795–96 & n.6 (7th Cir. 2011). A fiduciary's failure "to balance the relevant factors and make a reasoned decision as to the preferred course of action . . . under circumstances in which a prudent fiduciary would have done so is a breach of the prudent man standard of care." *Id.* at 796. Courts evaluate "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *DiFelice*, 497 F.3d at 420 (internal quotation marks omitted; alteration incorporated); *see also Troudt I*, 2019 WL 1006019, at *11.

285. The duty of prudence, under the common law of trusts, imposes both a duty to exercise prudence in selecting investments at the outset, as well as a continuing obligation "to monitor investments and remove imprudent ones." *Tibble v. Edison Int'l*, 575 U.S. 523, 135 S. Ct. 1823, 1828 (2015). In the ERISA context, a fiduciary "must systematically consider all the investments of the trust at regular intervals to ensure that they are appropriate." *Tibble*, 135 S. Ct. at 1828 (internal quotation marks omitted; alterations incorporated); *see also Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016) (recognizing that the duty of prudence requires "choosing wise investments and monitoring investments to remove imprudent ones"); *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 328 (3d Cir. 2019) (duty of prudence requires monitoring of investment and plan expenses).

286.    To carry out their duties, fiduciaries may seek advice from independent advisors.  *DiFelice*, 497 F.3d at 421.  Indeed, seeking independent, expert advice "is evidence of a thorough investigation" by a fiduciary.  *Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1148 (7th Cir. 1998).

287.    While obtaining independent, expert advice is evidence of a thorough investigation, "it is not a complete defense against a charge of imprudence."  *Keach v. U.S. Tr. Co.*, 419 F.3d 626, 637 (7th Cir. 2005); *Troudt I*, 2019 WL 1006019, at *12 n.19.  Engaging an expert or advisor and following their advice, without more, is not "a complete whitewash."  *Donovan I*, 680 F.2d at 272; *Troudt I*, 2019 WL 1006019, at *12 n.19.

288.    Rather, when a fiduciary retains an expert advisor, the fiduciary must "(1) investigate the expert's qualifications, (2) provide the expert with complete and accurate information, and (3) make certain that reliance on the expert's advice is reasonably justified under the circumstances."  *Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1996) (internal citations omitted); *Hightshue*, 135 F.3d at 1148.

289.    A fiduciary "cannot reflexively and uncritically adopt investment recommendations."  *Tibble v. Edison Int'l*, 729 F.3d 1110, 1138 (9th Cir. 2013), *vacated in part on other grounds*, 135 S. Ct. 1823 (2015); *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996) (recognizing that passive acceptance of a recommendation does not satisfy a fiduciary's obligation to conduct some form of independent investigation).  While the fiduciary need not "duplicate the expert's analysis," it must "review that analysis to determine the extent to which any emerging recommendation can be relied upon."  *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 301 (5th Cir. 2000).

The duty of prudence requires a fiduciary "to review the data a consultant gathers, to assess its significance and to supplement it where necessary." *In re Unisys Sav. Plan Litig.*, 74 F.3d at 435.  To fulfill its duty, a fiduciary must "make an honest, objective effort to read the [recommendation], understand it, and question the methods and assumptions that do not make sense. If after a careful review of the [recommendation] and a discussion with the expert, there are still uncertainties, the fiduciary should have a second firm review the [recommendation]." *Howard*, 100 F.3d at 1490.

### b.   Duty of Loyalty

290.   The duty of loyalty requires fiduciaries to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and * * * for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan . . . ."  29 U.S.C. § 1104(a)(1)(A); *see* 29 U.S.C. § 1103(c)(1) (with certain exceptions, "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

291.   Under ERISA, a fiduciary may hold roles as both a fiduciary and corporate office, but must "wear the fiduciary hat when making fiduciary decisions." *Pegram v. Herdrich*, 530 U.S. 211, 225 (2000) (recognizing that a trustee or fiduciary under ERISA may hold multiple, sometimes conflicting roles).  Accordingly, it is not "fatal that a plan fiduciary has 'financial interests adverse to beneficiaries,'" provided that the fiduciary acts in the best interest of plan participants. *DiFelice*, 497 F.3d at 421.

292.   Trustees should, however, "avoid placing themselves in a position where their acts as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan." *Donovan I*, 680 F.2d at 271.

293.   Nonetheless, fiduciaries may take actions which they "reasonably conclude best . . . promote the interests of plan participants and beneficiaries" even where such decision "incidentally benefits the corporation," provided the fiduciaries conduct a "careful and impartial investigation." *Donovan I*, 680 F.2d at 271.  The mere fact that "a plan fiduciary has 'financial interests adverse to beneficiaries'" is not enough to show a breach of the duty of loyalty. *DiFelice*, 497 F.3d at 421 ("There is no per se breach of loyalty. . . .").

294.   Rather, where interests conflict, fiduciaries are obligated to take action to ensure that their duty of loyalty is not compromised.  The form of action depends on the "circumstances of the case and the magnitude of the potential conflict." *Bussian*, 223 F.3d at 299.  In some cases, the duty of loyalty requires an "intensive and scrupulous independent investigation" or a "careful and impartial investigation" of options. *Bussian*, 223 F.3d at 299; *Donovan I*, 680 F.2d at 271.  In other cases, outside counsel or an independent fiduciary may be called upon. *Bussian*, 223 F.3d at 299; *Donovan I*, 680 F.2d at 272.

295.   To prove a breach of the duty of loyalty, Plaintiffs must show that a fiduciary acted "based on anything other than the best interest of the Plan participants," *DiFelice*, 497 F.3d at 422, or that the "the fiduciary's operative motive was to further its own interests," *Brotherston*, 907 F.3d at 40 (internal quotation marks omitted).

## 2.     Burden to Show Economic Loss

296.    An "appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach." *Donovan II*, 754 F.2d at 1056.   ERISA contemplates that a fiduciary "who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary." 29 U.S.C. § 1109(a).

297.    If a plaintiff proves both a breach of a fiduciary duty, as well as loss causation, but fails to present a viable calculation of loss, a prevailing plaintiff may still recover losses to the Plan.   *Tussey I*, 850 F.3d at 960.   In enacting ERISA, "Congress intended to provide the courts with broad remedies for redressing the interests of participants and beneficiaries when they have been adversely affected by breaches of a fiduciary duty." *Donovan II*, 754 F.2d at 1055 (citing *Eaves v. Penn*, 587 F.2d 453, 462 (10th Cir. 1978)).   Recovery under such a circumstance accords with the "principle of long standing in trust law that once the beneficiary has shown a breach of the trustee's duty and a resulting loss, the risk of uncertainty as to the amount of the loss falls on the trustee." *Confederated Tribes of Warm Springs Reservation of Ore. v. United States*, 248 F.3d 1365, 1371 (Fed. Cir. 2001).   "Any doubt or ambiguity" as to the value of damages "should be resolved against [the breaching party]." *Donovan II*, 754 F.2d at 1056.

298.    When a plaintiff prevails on the merits of its claim of breach of fiduciary

duty but fails to present a viable loss calculation, the court must exercise its equitable powers to "fashion the remedy best suited to the harm." *Tussey I*, 850 F.3d at 960 (citing *Martin v. Feilen*, 965 F.2d 660, 670 (8th Cir. 1992)); *see also Donovan II*, 754 F.2d at 1055 ("Since we have rejected the three measures of loss proposed to us, our task is to determine what the measure of the loss in this case ought to be.").  "When precise calculations are impractical, trial courts are permitted significant leeway in calculating a reasonable approximation of the damages suffered." *Cal. Ironworkers Field Pension Tr. v. Loomis Sayles & Co.*, 259 F.3d 1036, 1047 (9th Cir. 2001).

299.    Plan losses include the lost investment opportunity of funds that would have remained in the Plan had the fiduciary performed its duty.  *Donovan II*, 754 F.2d at 1056 ("the district court should presume that the funds would have been treated like other funds being invested during the same period").  Alternatively, the court may use an appropriate prejudgment interest rate to approximate the lost investment opportunity, unless it finds "on substantial evidence, that the equities of that particular case require a different rate." *Blankenship*, 486 F.3d at 628 (awarding prejudgment interest on wrongfully withheld benefits).

### 3.    Statute of Limitations

300.    Generally, ERISA claims must be brought within six years of the date of breach or violation.  29 U.S.C. § 1113(1).  The statute of limitations is shortened to three years if a plaintiff has actual knowledge of the breach or violation.  29 U.S.C. § 1113(2); *see also Wright v. Heyne*, 349 F.3d 321, 327 (6th Cir. 2003) (a "plaintiff with actual knowledge of a non-fraudulent breach of ERISA fiduciary duties must file suit within three years").

301.    Under the Federal Rule of Civil Procedure 8(c), statute of limitations is an affirmative defense.  Fed. R. Civ. P. 8(c); *Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1303 (10th Cir. 2003).

302.    Banner Defendants did not raise any argument about the timeliness of the Plaintiffs' claims at trial, or in their proposed preliminary or final Findings of Fact and Conclusions of Law.  Because Banner Defendants have not earlier raised any argument as to the timeliness of any of Plaintiffs' claims, much less established any facts which support a contention that Plaintiffs' claims are untimely, or that a three-year statute of limitation should apply, the Court finds that ERISA's six-year statute of limitations applies to all Counts.[21]

## C.    Mutual Fund Window (Count II)

### 1.    Duty of Prudence

303.    Plaintiffs contend that the Banner Defendants breached their duty of prudence by failing to monitor the individual investment options offered through the Mutual Fund Window, and by failing to remove imprudently offered investment options. Based on the expert opinion of Dr. Buetow, Plaintiffs claim $23.6 million in resulting losses.

304.    Plaintiffs do not argue that merely *offering* investments through a mutual fund window is alone a breach of the duty of prudence, nor would such an allegation be tenable.  *See Larson v. Allina Health System*, 350 F. Supp. 3d 780, 801–02 (D. Minn.

---

[21] Banner Defendants argued at the class certification stage that Named Plaintiff Mr. Moffitt was not a typical class representative because his claims were time-barred by ERISA's three-year statute of limitations.  ECF No. 296 at 11.  The Court held that the "*potential* time-bar issued raised by Defendants is not enough to defeat class certification, even as to Plaintiff Moffitt individually, much less to defeat certification overall." *Id.* at 13.  The argument has not been further developed by Banner Defendants, and the Court deems it abandoned.

2018) (concluding that plaintiffs failed to state a claim that the defendants breached their fiduciary duty "simply by offering three hundred investment options in its mutual fund window").  Courts have rejected the notion that merely offering a wide variety of investment options is, in and of itself, a breach of fiduciary duty.  *See id.* (collecting cases).

305.    The Court need not decide whether the Banner Defendants were required to monitor the suitability of the specific investments in the Mutual Fund Window, or whether Banner Defendants breached any such duty, because the Court has concluded that Plaintiffs have failed to demonstrate that any such breach caused economic losses to Plan Participants.  "Causation of loss is not an axiomatic conclusion that flows from a breach" of fiduciary duty, *Plasterers' Local*, 663 F.3d at 218, and failure to prove causation is fatal to Plaintiffs' Mutual Fund Window claim, *see Pioneer Centres*, 858 F.3d at 1337.

306.    To demonstrate a causal link between, on one hand, a breach of duty of prudence for failing to monitor and remove imprudent investments and, on the other, losses to the Plan, Plaintiffs must show that "additional monitoring of the Plan's holdings would have averted the injury and caused a change of course" by leading Banner Defendants to remove imprudent investment options.  *See In re SunEdison, Inc. ERISA Litig.*, 331 F. Supp. 3d 101, 113 (S.D.N.Y. 2018).  To demonstrate that a change of course would have occurred with proper monitoring, Plaintiffs must show that "no reasonable fiduciary would have maintained the investment" and thus Banner Defendants would have acted differently had they engaged in proper monitoring.  *Birse*, 2019 WL 1292861, at *4.  Plaintiffs have failed to establish, by a preponderance of the

evidence, that any alleged failure to monitor or earlier remove the funds available to Participants through the Mutual Fund Window caused any economic losses to those Plan Participants.

307.    Plaintiffs' causation theory, articulated through Dr. Buetow's loss calculations, fails to show any losses to the Plan.  The Court credits the opinion of Dr. Turki that Dr. Buetow made a large number of unjustified assumptions and serious calculation errors, and that as a result Dr. Buetow's loss calculations are so unreliable and unsupportable that they cannot form the basis for any finding in favor of Plaintiffs on this Count.  ¶¶ 74–87.

308.    Dr. Buetow failed to show that any particular investment option, when compared to its proper benchmark, was an improper investment option for the Mutual Fund Window.  ¶¶ 91–99.  As explained by Dr. Turki, when properly done, Dr. Buetow's analysis failed to demonstrate that the four funds he actually analyzed—out of the 300 to 400 funds offered through the Mutual Fund Window—meaningfully underperformed their respective benchmarks—and that as result caused losses to the Participants. ¶¶ 94–98.  Dr. Buetow also agreed that there were likely appropriate investment options offered through the Mutual Fund Window, but he made no attempt to reduce his estimate to account for such likely appropriate funds.  ¶ 78.  Dr. Buetow also failed to account for the personal preferences of Plan Participants.  ¶¶ 76–77.  Even were the Court to ignore these overwhelming deficiencies in Plaintiffs' evidence of liability with respect to the causation element of this claim, it remains a fact that Dr. Buetow's estimate of $23.6 million in losses in turn depends on Plaintiffs prevailing on its other

Count II claim, related to the Fidelity Freedom Funds.  ¶ 82.  This they have also failed to do.  ¶ 315.

309.   Based on the foregoing, the Court concludes that Plaintiffs have failed to establish by a preponderance of the evidence: (a) a reasonably precise amount of damages allegedly resulting from Banner Defendants' decisions to offer, and maintain without monitoring, the Mutual Fund Window investment alternatives; and (b) that any breach of the duty of prudence allegedly resulting by the failure to monitor the Mutual Fund Window offerings actually caused any economic losses to any of the Plan Participants.

## 2.   Duty of Loyalty

310.   Plaintiffs also failed to develop the factual basis from which the Court can conclude that Banner Defendants breached their duty of loyalty by retaining the Mutual Fund Window.  Plaintiffs vaguely allege that the Mutual Fund Window options generated over 50% of the recordkeeping and administrative revenue for Fidelity, and that reductions in those fees could result not only in a reduction of the revenue credits paid to Banner, but also in the availability of those funds to pay Banner expenses.  ¶¶ 58, 69; ECF No. 458 at 95–96.  However, the Level 1 funds—to which the funds in the Mutual Fund Window would be mapped when that investment option was terminated—also generated recordkeeping and administrative fees for Fidelity, and therefore the transfer of funds from the Mutual Fund Window to the Freedom target date funds would not necessarily have impacted any fees or corresponding revenue credit.  ¶ 69; ECF No. 483 at 27.  Other than implying potential causation, Plaintiffs have offered no evidence that the Banner Defendants considered this information when analyzing the Mutual

Fund Window.  The significant point here is that, at trial, Plaintiffs failed to sufficiently develop any factual support for this theory of liability.

311.    In addition, Plaintiffs have not shown that the Banner Defendants, in failing to remove the Mutual Fund Window offerings at an earlier date, were motivated by their own interest, rather than the best interest of Plan Participants.  ¶ 69; *see Brotherston*, 907 F.3d at 40.  Especially because Banner paid approximately $71 million on an annual basis in matching contributions to the Participants' individual accounts, *see* ¶ 4, the Court is unable to conclude that Banner Defendants' decision to continue to offer the Mutual Fund Window was motivated by its continued receipt of some amount of revenue credits used to pay Plan expenses.

312.    In sum, for the reasons discussed above, the Court finds that Plaintiffs have failed to establish that retaining the Mutual Fund Window until August 2014, rather than mapping all funds therein to the Level 1 target date funds prior to the start of the Class Period, actually caused economic losses to Plan Participants.  *See Plasterers' Local*, 663 F.3d at 218; *Pioneer Centres*, 858 F.3d at 1337.

313.    Accordingly, the Court concludes that Plaintiffs have failed to establish by a preponderance of the evidence that any breach of the duties of prudence or loyalty with respect to the alleged failure to monitor and remove the Mutual Fund Window investment alternatives caused any economic losses to Plan Participants.  As a result, judgment in favor of Banner Defendants is appropriate on this portion of Count II.

**D.** **Fidelity Freedom Funds (Count II)**

314.    Under ERISA, a fiduciary's duty of prudence includes a duty to monitor investments and remove imprudent investment options.  *Tibble*, 135 S. Ct. at 1828–29.

To determine whether Banner Defendants breached their fiduciary duty of prudence with respect to the Fidelity Freedom Funds, the Court must examine the merits of retaining the Funds until May 2015, and the thoroughness of the RPAC's investigation in that regard.  *See DiFelice*, 497 F.3d at 418.

315.    For the reasons discussed below, the Court determines that Plaintiffs have failed to carry their burden to show that the Fidelity Freedom Funds were imprudent investment options, such that Banner Defendants should have removed these Funds as a Plan investment alternative by the second calendar quarter of 2011.

316.    First, the Court notes that Plaintiffs do not challenge Banner Defendants' retention of the Fidelity Freedom Funds through the second quarter of 2011.  Rather, they challenge the prudence of retaining the Fidelity Freedom Funds from the second quarter of 2011 until May 2015, a period of approximately four years.

317.    A fiduciary does not act imprudently "if a hypothetical prudent fiduciary would have made the same decision."  *Tussey II*, 746 F.3d at 335.  The duty of prudence is measured by what a prudent fiduciary with "like aims" would do in "like circumstances."  29 US.C. § 1104(a)(1)(B).  "The decision of other expert professionals both to invest and not to divest on or near the dates that [the defendant] made those decisions demonstrates the reasonable nature of those decisions."  *Pfeil v. State St. Bank & Tr. Co.*, 806 F.3d 377, 388 (6th Cir. 2015); *Sacerdote v. New York Univ.*, 328 F. Supp. 3d 273, 312 (S.D.N.Y. 2018) ("*Sacerdote I*") (ultimately concluding that a particular investment option was objectively prudent in part because it was "widely accepted as an appropriate and desirable investment by other market participants").

318.    The Fidelity Freedom Funds were popular target date investment options among plans and mega plans in the 2000s and 2010s, and particularly at the beginning of the Class Period.  ¶¶ 101, 106.  At least 30 other mega plans offered the Fidelity Freedom Funds at the time that Dr. Buetow claims that Banner Defendants should have divested from the Funds.  ¶ 106.  Given that the duty of prudence is assessed against the actions and decisions of a hypothetical prudent fiduciary, the Court finds it persuasive that other mega plans also offered the Fidelity Freedom Funds at the same time that Dr. Buetow claimed no prudent fiduciary in Banner Defendants' position would have retained such investments in its plan.

319.    Dr. Wermers testified that the Fidelity Freedom Funds were reasonable investment options, particularly over the longer timeframe, when compared to their peers and respective benchmark indexes.  ¶¶ 109–13.  As discussed above, the Court credits Dr. Wermers' testimony and analysis.  ¶ 109.  Dr. Buetow also admitted that the Fidelity Freedom Funds were average among their peers in terms of market performance.  ¶ 109.  Given that the Fidelity Freedom Funds were a reasonable investment option during the approximately 4-year period in question, Banner Defendants were not required to take "any particular course of action if another approach seems preferable."  *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006) (internal quotation marks omitted).  This is consistent with the view that ERISA does not require that a fiduciary make the best choice among numerous reasonable choices, only that the investment options that a fiduciary selects are prudent.

320.    Dr. Wermers also looked at differences between the performance of the Fidelity Freedom Funds, proposed alternatives, and benchmark indices, and concluded

that any differences among them in terms of market performance were not statistically significant.  ¶¶ 108–10, 112–13.  Plaintiffs argue that statistical significance is irrelevant because a fiduciary would not look to the statistical significance of a fund's performance, and in any event economic significance is the preferred measure of comparison.  ¶ 110.  However, it is not clear what Dr. Buetow meant in his testimony by "economic significance," or how that metric is measured or applied to an investment option.  The Court credits Dr. Wermers' use of statistical significance as a way of determining whether the performance differences among investment alternatives were the result of investment strategy or chance.  *See Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 698 (W.D. Mo. 2019) (crediting expert's testimony that "sound economic practice requires treating any apparent difference in returns that are not statistically significant as nonexistent because it may have resulted from chance").

321.   Dr. Buetow also testified that an August 2010 Slocum report stated that it would not recommend as standalone investments certain constituent mutual funds which comprised the Fidelity Freedom Funds.  ¶ 107.  However, Dr. Wermers explained that it was not necessary to consider the constituent funds on an individual basis, given that some of them were selected for their contrarian investment goals as means of a mutual fund hedging strategy.  ¶ 107.  The Court credits Dr. Wermers' explanation as the better-reasoned of these two competing opinions.  Accordingly, the August 2010 Slocum report was not a sufficiently significant red flag which should have caused reasonably prudent fiduciaries like Banner Defendants to investigate the continued propriety of including the Fidelity Freedom Funds as Plan investment options.

322.    Based on the foregoing, the Court concludes that the Fidelity Freedom Funds were not an imprudent investment option from the second quarter of 2011 until May 2015.  Accordingly, the Court further concludes that the Banner Defendants did not breach their duty of prudence by offering the Fidelity Freedom Funds as the Level 1 target date funds until May 2015.

323.    In the context of this Count, the Court has also considered whether the Banner Defendants were prudent in their continuing evaluation of the Fidelity Freedom Funds.

324.    A prudent investigation requires a reasoned decision-making process. *George*, 641 F.3d at 795–96 & n.6.  To satisfy the duty of prudence, a fiduciary must also balance relevant factors and make a reasoned decision.  *Id.*  To evaluate whether the RPAC breached its fiduciary duty of prudence by retaining the Fidelity Freedom Funds until May 2015, the Court must consider whether the RPAC "employed the appropriate methods to investigate the merits of the investment and to structure the investment." *DiFelice*, 497 F.3d at 420.

325.    From 2009 until 2015, the RPAC worked to balance concerns about the Fidelity Freedom Funds performance with the IPS's charge to look at returns over a market cycle.  ¶¶ 120–21.  The RPAC regularly discussed the performance of the Fidelity Freedom Funds at its quarterly meetings.  ¶ 116.

326.    To help analyze investment options, the RPAC engaged Slocum as an investment advisor, to regularly report on the performance of investments, to analyze reasons for under performance, and to make recommendations.  ¶¶ 115–19, 123–32; *see Hightshue*, 135 F.3d at 1148 (seeking independent expert advice "is evidence of a

thorough investigation").  Slocum and Fidelity provided the RPAC with credible information from experienced investment advisors about Fidelity's changes to the glide path of its target date funds, changes that were intended to improve the performance of the Fidelity Freedom Funds, as compared to their peers and custom benchmarks. ¶ 119.  The RPAC did not uncritically adopt Slocum's recommendations.  Rather, the RPAC engaged with Slocum representatives at the RPAC meetings to understand Slocum's reports, and to make informed decisions about the Fidelity Freedom Funds. ¶¶ 116, 123–32.  The RPAC also tasked Slocum with performing additional work to determine the continuing appropriateness of including the Fidelity Freedom Funds as Level One investment options.  *Id.*

327.    At the point when the longer-term performance of the Fidelity Freedom Funds proved unsatisfactory, and it became increasingly apparent that the changes to the glide path had not resulted in the anticipated improvements, the RPAC, with Slocum's support, engaged in a formal review of its target date fund options, and ultimately moved the Level One target date investment alternatives to the JPMorgan Funds.  ¶¶ 125–32.

328.    The Court finds that the RPAC periodically made reasoned decisions— balancing relevant factors such as historic performance, short-term performance, interests of stability, and anticipated changes to the glide path—to retain the Fidelity Freedom Funds until May 2015.  Accordingly, the Court concludes that the RPAC did not breach its duty of prudence because the RPAC used appropriate methods to investigate and review the merits of retaining the Fidelity Freedom Funds.

329.   In addition, Plaintiffs have failed to establish that the Banner Defendants' decision to retain the Fidelity Freedom Funds until 2015 was motivated by anything other than the best interests of Plan Participants.  ¶ 131; *see Brotherston*, 907 F.3d at 40.  There is no evidence that Banner Defendants considered the impact to the revenue sharing agreement until the eve of the special meeting in February 2015.  ¶ 131.  The inquiries in advance of the special meeting do not show any improper influence of the revenue sharing arrangement, but rather a practical concern for how recordkeeping fees would be paid in the future.  ¶ 131.  Finally on this point, the Court is of the view that any impact to the revenue sharing income or the RCA would have been minimal when compared to Banner's annual matching contributions of around $71 million to Participants' accounts.  ¶ 4.  Accordingly, the Court finds and concludes that the Banner Defendants' decision to retain the Fidelity Freedom Funds until 2015 was motivated by Banner Defendants' consideration of the best interests of Plan Participants, and not by Banner Defendants' own self-interest, or any other improper motivation.

330.   For the reasons discussed above, the Court also finds and concludes that Plaintiffs have failed to establish by a preponderance of the evidence that the Banner Defendants' decision to retain the Fidelity Freedom Funds as an investment option until May 2015 breached Banner Defendants' duties of prudence or loyalty.  The Court will therefore grant judgment in favor of Banner Defendants on this portion of Count II.

E.   **Recordkeeping and Administrative Fees (Count I)**

1.   **Liability**

331.   As discussed above, a fiduciary is obligated to act in the best interest of plan participants and beneficiaries, and to act prudently in the discharge of its

responsibilities under a plan covered by ERISA.  29 U.S.C. § 1104(a)(1)(B).

332.    The Supreme Court has recognized that the value of a participant's

retirement benefits in a defined-contribution plan is "limited to the value of their own

individual investment accounts, which is determined by the market performance of

employee and employer contributions, less expenses."  *Tibble*, 135 S. Ct. at 1825.

"Expenses, such as management or administrative fees, can sometimes significantly

reduce the value of an account in a defined-contribution plan."  *Id.*; *see* Restatement

(Third) of Trusts § 90(c)(3) (2007) (a trustee must "incur only costs that are reasonable

in amount and appropriate to the investment responsibilities of the trusteeship").

Excessive expenses "decrease [an account's] immediate value" and "depriv[es] the

participant of the prospective value of funds that would have continued to grow if not

taken out in fees."  *Sweda*, 923 F.3d at 328.

333.    Accordingly, in addition to prudently selecting investments, "[f]iduciaries

must also understand and monitor plan expenses."  *Sweda*, 923 F.3d at 328.  Failure to

investigate and monitor recordkeeping costs on a continuing basis constitutes a breach

of fiduciary duty.  *Tussey II*, 746 F.3d at 336.  In *Tussey II*, the Eighth Circuit affirmed

the district court's finding that a plan fiduciary breached its duty of prudence where the

fiduciary failed to calculate the amount the plan paid to the recordkeeper through

revenue sharing, to determine whether the recordkeeper's pricing was competitive, to

leverage the plan's size to reduce fees, and to make a good faith effort to prevent the

plan from subsidizing plan sponsor costs.  *Id.*

334.    A prudent fiduciary must, among other things, be vigilant in negotiating the

formula or method by which fees are paid, and by which excessive fees will be credited

back to the plan or participants; determine the exact amounts paid to a recordkeeper for services provided; evaluate whether pricing is competitive; consider a plan's power to obtain favorable investment products and fees; and assure that plan assets are used for the exclusive purpose of providing the benefit to participants and beneficiaries of reasonable plan expenses.  *Sweda*, 923 F.3d at 328; *Tussey II*, 746 F.3d at 336.

335.    Paying fees in a particular manner is not, in and of itself, a breach of the duty of prudence.  *Divane*, 953 F.3d at 985 ("there is nothing wrong, for ERISA purposes, with the fact that the plan participants paid the recordkeeper expenses via expense ratios" (alterations incorporated)).  No matter the method of payment or fee collection, the fiduciary must understand the total amount paid the recordkeeper and per-participant fees, and determine whether pricing is competitive.  *See Tussey II*, 746 F.3d at 336.

336.    A high fee alone does not mandate a conclusion that recordkeeping fees are excessive; rather, fees must be evaluated "relative to the services rendered." *Young v. General Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009). Accordingly, it is incumbent on the fiduciary to engage in a process that results in a strong understanding of the amount of recordkeeping and administrative fees paid, the services provide for that payment, and how that pricing relates to the market.  *Tussey II*, 746 F.3d at 336.

337.    Courts assess fiduciaries' performance by looking at the processes they employ, rather than the subsequent market performance of the investment options they select.  *Sweda*, 923 F.3d at 329.  For example, when a fiduciary has reason to suspect issues with the funding or maintenance of a plan, he or she must conduct an

investigation or inquiry regarding the issues or suspicions; failure to do so is a breach of the duty of prudence. *Barker v. Am. Mobil Power Corp.*, 64 F.3d 1397 (9th Cir. 1995).

338. "Many allegations concerning fiduciary conduct, such as reasonableness of 'compensation for service' are 'inherently factual questions for which neither ERISA nor [DOL] gives specific guidance." *Sweda*, 923 F.3d at 329.

339. Accordingly, the Court examines whether Banner Defendants' process for evaluating recordkeeping and administrative fees paid to Fidelity was prudent. In doing so, the Court finds and concludes that Plaintiffs have carried their burden to show, by a preponderance of the evidence, that Banner Defendants breached their fiduciary duty of prudence with respect to recordkeeping and administrative fees paid to Fidelity, and that this breach resulted in losses to the Plan.

340. It is uncontroverted that from the beginning of the Class Period until after this lawsuit was filed in 2015, the RPAC did not renegotiate with Fidelity the fundamental terms of the Plan's uncapped, asset-based revenue sharing fee structure. ¶¶ 48–49, 137, 149, 155–56. The arrangement with Fidelity was without any date of expiration or required re-negotiation. ¶ 49. During the term of the Trust Agreement with Fidelity, when recordkeeping fees were generally falling because of increasing competition, particularly in the mega plan market, Fidelity continued to collected uncapped, asset-based fees. ¶¶ 152–53. From 2009 until 2015, the RPAC did not engage in any process to consider whether the asset-based revenue sharing fee structure was appropriate, and whether the fees paid under that arrangement were reasonably related to the actual costs of administering the Plan. ¶ 156.

341.   Industry standards suggest that plan sponsors should seriously reevaluate recordkeeping fees every three to seven years, and Banner Defendants acknowledged that doing so is reasonable.  ¶ 155.  However, there is no evidence that the RPAC or other Banner fiduciary ever considered renegotiating the basic fee sharing arrangement with Fidelity, capping fees, limiting the term of the arrangement, or considering a per-participant model.  ¶¶ 155–56.  Failure to even so much as consider a formal process for reviewing fees or entering a limited-term agreement (which would force a periodic review) does not comport with industry standards, and is a violation of the duty of prudence.  *See* ¶¶ 155–56.

342.   The RPAC also ignored red flags that would have motivated a prudent fiduciary to, at a minimum, discuss recordkeeping and administrative fees with Fidelity. For instance, the RPAC did not consider or analyze why Fidelity suggested the RCA, and the concomitant implications for the level of fees for recordkeeping and administrative services.  ¶¶ 165–70.  Similarly, when the RPAC decided to hire Ernst & Young to complete the annual Form 5500, instead of having Fidelity do that work as per the Trust Agreement, the RPAC did not engage with Fidelity to reduce fees based on the reduced scope of services the latter would subsequently provide.  ¶¶ 162–64.

343.   In stark contrast to the robust Fidelity Freedom Funds analysis it employed, the RPAC did not have a thorough process for evaluating the amounts paid to Fidelity for recordkeeping and administrative fees under the revenue sharing agreement.  Slocum provided some limited data, but not fulsome reviews of the uncapped recordkeeping fees, and it was not hired for the purpose of analyzing fees. Therefore, it was incumbent on the RPAC to seriously consider whether the fees paid to

Fidelity were reasonable.  Drinker Biddle and Slocum even warned the RPAC to continually analyze recordkeeping fees under the revenue sharing arrangement, particularly as the market rebounded after the 2008 financial crisis.  However, the RPAC ignored these recommendations until 2015.  ¶¶ 159–61.  The RPAC's procedural imprudence in monitoring the recordkeeping and administrative fees paid to Fidelity under the revenue sharing agreement resulted in excessive fees and losses to the Plan.

344.    Accordingly, the Court concludes that the RPAC and Banner Defendants violated the duty of prudence by failing to regularly assess whether the Plan paid reasonable recordkeeping and administrative fees to Fidelity between November 20, 2009 and December 31, 2016.  In failing to regularly assess whether the fees were reasonable, they did not act in the best interest of Plan Participants.

345.    The Court also concludes that a prudent fiduciary, recognizing the increasing market power of the Plan due to the increasing number of its Participants, growth in assets, as well as the overall market reductions in fees, would not have stood idly by as did the Banner fiduciaries.  ¶¶ 158, 161, 174.  At a minimum, a prudent fiduciary in these circumstances would have ascertained the amount of such fees Fidelity was being paid, meaningfully reviewed the fee arrangement structure, and conducted market research to determine the reasonableness of the recordkeeping and administrative fees.  ¶¶ 176–77.  In the Court's view this in turn would have caused Banner Defendants to recognize their strong negotiating position, and to leverage that position to negotiate reduced fees on a per-participant basis for the Plan, all without any reduction in the level and scope of the recordkeeper services.

346.    Because the Court finds for Plaintiffs on the breach of duty of prudence,
making Plaintiffs the prevailing parties on this portion of Count I, the Court need not
determine whether Banner Defendants' actions also breached their corresponding duty
of loyalty.

## 2.    Damages

347.    "Expert testimony must have a traceable, analytical basis in objective
fact." *Bragdon v. Abbott*, 524 U.S. 624, 653 (1998).  An expert opinion must be derived
from reliable principles or methods, and to determine whether the opinion is so derived,
a court considers (a) the methodology used to reach the opinion, and (b) whether that
methodology is generally deemed reliable in that field.  *Troudt v. Oracle*, 369 F. Supp.
3d 1134, 1139 (D. Colo. 2019) ("*Troudt II*").

348.    Schmidt's calculation of loss resulting from the breach of the duty of
prudence with respect to recordkeeping fees depends almost entirely on his experience.
¶¶ 179–87.  "Yet while experience may qualify an expert[,] credentials alone do not
suffice to establish that the expert's opinion has a reliable basis in fact." *Troudt II*, 369
F.3d at 1139 (internal quotation marks omitted; alterations incorporated).  When an
expert relies solely (or almost solely) on experience, a court cannot assess whether the
expert has relied on sufficient information to make his opinion reliable.  *Id.* at 1140.  And
the "methodology," as it were, of solely relying on experience in an industry is not an
acceptable method of opining on the reasonableness of recordkeeping fees.  *See id.* at
1139.

349.    The Court declines to rely on Schmidt's testimony as to the reasonable
annual ranges of recordkeeping fees because his opinion is based on vague and

insufficient references to his experience in the 401(k) plan industry.  Indeed, Schmidt's explanation was so unhelpful that Dr. Turki was unable to determine the accuracy of his proposed fee levels and damages calculations.  ¶ 186.

350.    In the absence of a coherently explained and replicable methodology, Schmidt's opinion is not reliable.  *See, e.g.*, *Troudt II*, 369 F. Supp. 3d at 1140; *Cunningham v. Cornell Univ.*, 2019 WL 4735876, at *9-10 (S.D.N.Y. Sept. 27, 2019). The Court concludes that the basis for Schmidt's testimony is unreliable and declines to place any weight on his opinion as to the magnitude of the loss.

351.    Nonetheless, as discussed above, it is incumbent on a Court to determine an appropriate remedy for a breach of fiduciary duty resulting in losses.  *See Donovan II*, 754 F.2d at 1056.  An appropriate remedy is one that restores the Plan Participants to the position they would have occupied but for Banner Defendants' breach of the duty of prudence.  *Donovan II*, 754 F.2d at 1056.

352.    The Court has carefully reviewed the record and finds that revenue credits paid to Banner for use on behalf of the Plan are the best approximation of the excessive recordkeeping fees paid to Fidelity.  *Cal. Ironworkers Field Pension Tr.*, 259 F.3d at 1047 ("When precise calculations are impractical, trial courts are permitted significant leeway in calculating a reasonable approximation of the damages suffered.").

353.    Because these amounts were actually paid back to the Plan from 2012 until 2016, the Court concludes that there are no uncompensated losses under Count I for that period.

354.    However, as for the pre-2012 period, for the reasons explained in ¶¶ 209–13, *supra*, the Court finds and concludes that Plaintiffs suffered an economic loss with

respect to violations of law by Banner Defendants as alleged in Count I, and that the best approximation of that loss is $1,661,879.83.  In addition, to compensate for the lost investment opportunity caused by Banner Defendants' breach of fiduciary duty, the Court will permit Plaintiffs to recover prejudgment interest on this amount.  ¶ 213; *see Donovan II*, 754 F.2d at 1056; *Blankenship*, 486 F.3d at 628 (awarding prejudgment interest on wrongfully withheld benefits).

355.    A district court has discretion to determine an appropriate prejudgment interest rate.  *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1287 (10th Cir. 2002); *Weber v. GE Grp. Life Assur. Co.*, 541 F.3d 1002, 1016 (10th Cir. 2008) (affirming the district court's discretion to select an appropriate interest rate in ERISA action).  The Tenth Circuit has made it clear that the district courts may, but are by no means required to, use the postjudgment interest rate under § 1961 to calculate prejudgment interest.  *See Caldwell*, 287 F.3d at 1287 ("Many circuits have held that courts are not required to use section 1961 in calculating prejudgment interest and that the calculation rests firmly within the sound discretion of the trial court.  We now join them.").  Courts within this district have used various prejudgment interest rates including the Colorado statutory interest rate of 8%, the federal postjudgment interest rate under 28 U.S.C. § 1961, and the IRS underpayment rate as defined in 26 U.S.C. § 6621.  *See Barnett v. Bd. of Cnty. Comm'rs of Montrose*, 2015 WL 5315183 (D. Colo. Sept. 11, 2015); *EEOC v. W. Trading Co.*, 291 F.R.D. 615, 621 (D. Colo. 2013); *Fresquez v. BNSF Ry. Co.*, 421 F. Supp. 3d 1099, 1117 (D. Colo. 2019).

356.    The Court finds that the IRS underpayment rate found in 26 U.S.C. § 6621 reasonably approximates the lost earning investment opportunity, and is not punitive to

Banner Defendants. The IRS underpayment rate is generally the Federal short-term rate plus three percent. 28 U.S.C. § 6621. The Federal short-term federal interest rate in May 2020 for amounts compounded monthly is 0.25%, and thus the applicable interest rate under § 6621 is 3.25%. Although the Internal Revenue Code allows for daily compounding of interest, *see* 26 U.S.C. § 6622(a), the Court finds that monthly compounding more accurately reflects Plaintiffs' losses. *Leidel v. Ameripride Servs., Inc.*, 276 F. Supp. 2d 1138, 1147 n.37 (D. Kan. 2003) (finding that annual compounding more accurately reflects the plaintiff's losses than daily compounding of the § 6621 rate).

357. In sum, the Court directs the parties to calculate prejudgment interest on the total amount of losses it will award to Plaintiffs under Count I using a fixed interest rate of 3.25%, with such interest compounded monthly. The Court will order supplemental briefing from the parties to determine the proper amount of prejudgment interest.

## F.    **Prohibited Transactions With Party in Interest (Count IV)**

358. Plaintiffs claim that the payment of unreasonable recordkeeping fees to Fidelity also constitutes a prohibited transaction under ERISA § 406(a), 29 U.S.C. § 1106(a).

359. ERISA § 406(a) states that, unless an exemption applies, a fiduciary

> shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
>> (A) sale or exchange, or leasing, of any property between the plan and a party in interest;

> (B) lending of money or other extension of credit between the plan and a party in interest;
>
> (C) furnishing of goods, services, or facilities between the plan and a party in interest;
>
> (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or
>
> (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

29 U.S.C. § 1106(a)(1).

360.    "What the 'transactions' identified in § 406(a) thus have in common is that they generally involve uses of plan assets that are potentially harmful to the plan." *Lockheed Corp. v. Spink*, 517 U.S. 882, 893 (1996).  "Contracting at arm's length with unrelated service providers plainly does not share that characteristic: it is not a deal struck with 'plan insiders.'"  *Sellers v. Anthem Life Ins. Co.*, 316 F. Supp. 3d 25, 36 (D.D.C. 2018).

361.    The statutory exceptions to § 406 are outlined in § 408(b), and are considered affirmative defenses on which a defendant bears the burden of proof. 29 U.S.C. § 1108(b); *Sacerdote v. New York Univ.*, 2017 WL 3701482, at *13 (S.D.N.Y. Aug. 25, 2017) ("*Sacerdote II*") (noting that the Second, Seventh, and Eighth Circuits have held that the statutory exemptions of § 408(b) are affirmative defenses).

362.    First, Plaintiffs argue that "[w]hen Banner Defendants directed Fidelity to charge Plan participant accounts and then send the collected Plan assets to Banner, they caused Plan assets to be transferred to a party in interest in violation of ERISA § 406(a)(1)(D)."  ECF No. 468 at 159.  If Plaintiffs intend to suggest that Fidelity was the fiduciary for the purposes of this claim, and Banner the party in interest, Plaintiffs have

not alleged, much less shown, that Fidelity was a fiduciary with respect to recordkeeping and administrative fees.  See *Sellers*, 316 F. Supp. 3d at 36–37 (recognizing that "other circuits have concluded that ERISA does not generally impose a duty on plan fiduciaries relating to the settling of their compensation").  Alternatively, Plaintiffs may intend to suggest that Banner (acting through the Banner Defendants) is both the fiduciary and the party in interest.  "The transactions specified in section 406(a) necessarily involve two parties: the fiduciary and the party in interest."  *Reich v. Stangl*, 73 F.3d 1027, 1031 (10th Cir. 1996).  Plaintiffs' Section 406(a)(1)(D) claim fails to the extent that it requires Banner to be both the fiduciary and the party in interest.  Accordingly, Plaintiffs have failed to prove a violation of ERISA § 406(a)(1)(D).

363.    Next, Plaintiffs contend that Fidelity is a party in interest because Banner contracted with Fidelity to provide recordkeeping and administrative services to the Plan, and that because Fidelity was a party in interest, the payment of unreasonable recordkeeping and administrative fees under the uncapped, asset-based contract was a prohibited transaction under ERISA § 406(a)(1)(B).

364.    Fidelity is a "party in interest" under ERISA because it is a "person providing services to [a] plan."  29 U.S.C. § 1002(14)(B); ¶ 48.

365.    However, courts have rejected Plaintiffs' circular reasoning that "transactions were prohibited because [the service provider] was a party in interest, and [the service provider] was a party in interest because it engaged in the prohibited transaction."  *Sellers*, 316 F. Supp. 3d at 34; *Sacerdote II*, 2017 WL 3701482, at *13; *Marshall v. Northrop Grumman Corp.*, 2019 WL 4058583, at *12 (C.D. Cal. Aug. 14, 2019) (finding that defendants did not engage in a prohibited transaction by paying a

party in interest for services rendered); *Divane v. Nw. Univ.*, 2018 WL 2388118, at *10

(N.D. Ill. May 25, 2018) ("[I]t would be nonsensical to let a party state a claim for a

prohibited transaction in violation of ERISA merely by alleging a plan paid a person for a

service."), *aff'd* 953 F.3d 980 (7th Cir. 2020). These courts, rightly in the eyes of this

Court, have found that such litigation would "discourage employers from offering ERISA

plans." *Divane*, 2018 WL 2388118, at *10.

366.   "Rather, the statute only prohibits such service relationships with person

who are 'parties in interest' by virtue of some other relations. . . .  It does not prohibit a

plan from paying an unrelated party, dealt with at arm's length, for services rendered."

*Sellers*, 316 F. Supp. 3d at 34; *see Danza v. Fid. Mgmt. Tr. Co.*, 533 F. App'x 120, 125–

26 (3d Cir. 2013) (finding no prohibited transaction where the service provider was not a

party in interest at the time the service provider contract was signed).  "[A]llegations that

[a plan] paid too much for those services . . . do not, without more, state a claim [for a

prohibited transaction]." *Sacerdote II*, 2017 WL 3701482, at *14; *see Divane*, 2018 WL

2388118, at *10 (to state a prohibited transaction claim, a plaintiff must allege

"something more, such as self-dealing or that the payments were secret").  The Court

finds *Sellers* and *Sacerdote II* persuasive and adopts their reasoning for purposes of the

analysis here.

367.   At trial, Plaintiffs failed to present any evidence that the initial

recordkeeping fee arrangement with Fidelity was not negotiated at arms-length.

Plaintiffs did not put forward any other evidence of impropriety in the course of the

negotiations of recordkeeping and administrative fees as between Banner and Fidelity.

Nor have Plaintiffs offered any evidence that Fidelity was a party in interest when the

initial recordkeeping arrangement was established.  *See Danza*, 533 F. App'x at 125–26.

368.    Plaintiffs also have not shown that the Banner Defendants maintained the recordkeeping arrangement with Fidelity because of their own self-interest.  ¶¶ 58, 131, 310–11, 329; *see Divane*, 2018 WL 2388118, at *10.  Rather, the evidence at trial supports a conclusion that the RPAC simply did not pay attention to the recordkeeping fees or the substantial increase of the total amount of fees under the uncapped, asset-based agreement.  ¶¶ 342–44.  Indeed, multiple RPAC members testified that they were unaware of the level of fees paid to Fidelity, or the origin of the revenue credits that Fidelity offered to pay to Banner.  ¶ 169.

369.    The Court finds that the recordkeeping arrangement with Fidelity did not result in any prohibited transaction.  Because Plaintiffs have failed to show that the recordkeeping arrangement with Fidelity was a prohibited transaction, the Court need not consider whether Banner Defendants had an affirmative defense of reasonableness under § 408(b).  *See* 29 U.S.C. § 1108(b).

370.    Accordingly, the Court concludes that the Banner Defendants are entitled to judgment in their favor on Count IV.

## G.    Prohibited Transactions: Payment of Certain Banner Expenses from Plan Assets (Count V)

371.    Plaintiffs also claim that certain payments from the Plan to Banner were ineligible or otherwise improper expenses constituting prohibited transactions under ERISA § 406(b), 29 U.S.C. § 1106(b).

372.    ERISA § 406(b) prohibits, among other things, a plan fiduciary from dealing with plan assets in its own interest or "receiv[ing] any consideration for his own

personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(1) & (3).

373.   Section 406(b) "protects beneficiaries by prohibiting transactions tainted by a conflict of interest and thus highly susceptible to self-dealing." *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987).   Courts broadly construe the language of this provision, and may impose liability "even where there is not taint of scandal, no hint of self-dealing, no trace of bad faith." *Lowen*, 829 F.3d at 1213 (internal quotation marks omitted); *see Leigh v. Engle*, 727 F.2d 113, 127 (7th Cir. 1984) (broadly construing Section 406 language).

374.   A violation of Section 406(b) is a "per se ERISA violation; even in the absence of bad faith, or in the presence of a fair and reasonable transaction, § 1106(b) establishes a blanket prohibition of certain acts, easily applied, in order to facilitate Congress' remedial interest in protecting employee benefit plans." *Patelco Credit Union v. Sahni*, 262 F.3d 897, 911 (9th Cir. 2001) (*citing Gilliam v. Edwards*, 492 F. Supp. 1255, 1263 (D.N.J. 1980)); *Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield of Mich.*, 722 F.3d 861, 868 (6th Cir. 2013).   The "harshness of this rule is mitigated by [ERISA § 408(a)], which permits [DOL] to grant exemptions." *Patelco*, 262 F.3d at 912. "While ERISA provides that a fiduciary may defray reasonable expenses of administering the plan, it does not allow a fiduciary to set its own administrative fee and directly collect those fees from plan assets." *Borroughs Corp. v. Blue Cross Blue Shield of Michigan*, 2012 WL 3887438, at *11 (E.D. Mich. Sept. 7, 2012).

375.   A breaching fiduciary must restore to the plan "any losses to the plan resulting from each such breach" and "any profits of such fiduciary which have been

made through use of assets." 29 U.S.C. § 1109(a); *Kim v. Fujikawa*, 871 F.2d 1427, 1430 (9th Cir. 1989). When determining the amount of loss to the plan, courts "resolve doubts in favor of the plaintiffs." *Patelco*, 262 F.3d at 912 (*quoting Kim*, 871 F.2d at 1431). Such an approach places "squarely on the breaching fiduciary the burden of demonstrating what portion of his activities benefited the Funds," and "avoid[s] the unfair result of depriving the plaintiffs of any recovery simply because the defendants have made it difficult to disentangle the prohibited transaction." *Patelco*, 262 F.3d at 912 (alterations incorporated); *see also Leigh*, 727 F.2d at 138–39.

### 1. Liability

376. The Plan reimbursed Banner for administrative expenses from at least 2009 until 2017. Pre-2012, payments were drawn from Participants' accounts by Fidelity at Banner's request. ¶¶ 219–20. After 2012, payments were collected from the RCA, a fund established by Fidelity and funded by Plan assets for paying approved expenditures. ¶ 221.

377. During the 2012 to 2017 time period, Banner did not properly account for all of its reimbursements from Plan assets. ¶¶ 223–30. And despite implementing a timekeeping policy in 2012 at the emphatic recommendation of DOL, Banner employees failed to properly allocate and document their time to the Plan and Banner's other plans. ¶¶ 224–25.

378. The DOL letter concluding its 2017 audit of Banner makes clear that Banner Defendants "allowed the Plan to improperly reimburse Banner for expenses" by improperly reimbursing administrative expenses from 2013 to 2017. ¶ 231; Ex. 897.

379.   Indeed, Banner Defendants do not seriously contest that certain payments from 2012 to 2017 were indeed prohibited transactions; rather, Banner Defendants simply argue that there is no loss associated with this portion of the claim because Banner has reimbursed the Plan, and those funds have been allocated to Plan Participants.  ECF No. 459 at 78.

380.   With respect to pre-2012 period, the Court finds Plaintiffs have proved, by a preponderance of the evidence, that the Plan paid Banner expenses not authorized under ERISA.  While O'Connor stated that he did not perceive a reason to review the pre-2012 expenses, there is credible testimony that staff administrative time was not properly charged to the Plan from Weber, who the Plan Administrator during that pre-2012 time period.  ¶¶ 223, 225–26.  In other words, the Court finds it entirely reasonable to infer from the trial evidence that the offending conduct engaged in by Weber and her staff during the 2012–2017 audited time period was also fully in place and a standard operating procedure before that period of time.

381.   The fact that DOL did not require Banner to audit the pre-2012 expenses or salary reimbursements, or impose fees or penalties in 2012, in no way whatsoever requires a contrary result.  The Plan was not the focus of the 2012 DOL audit, and the Court will not presume DOL's reasons for limiting its focus to the other Banner plan in 2012.  *See* ¶ 224.  As for the 2017 audit, as noted in the 2017 audit letter, the resolution of a DOL audit does not prevent others from taking action with respect to those challenged aspects of the Plan.  ¶ 232.  The Court is not "substitut[ing] its judgment" for that of DOL, as Banner Defendants suggest.  ECF No. 459 at 79.  Far from it.  The Court is instead determining the issue in the first instance, based on Plaintiffs' prohibited

action claim corresponding to a period of time not encompassed by the governmental audit.

382.    Inaccurately charging time to the Plan, and being reimbursed for it, is a per se prohibited transaction.  It is true that Banner Defendants did not investigate the exact amount of losses for the pre-2012 period.  ¶ 234.  But as it relates to this prohibited transaction claim asserted by Plaintiffs, that is of no legal moment.  The Court concludes that the reimbursement by the Plan to Banner of unauthorized and undocumented expenses is a per se prohibited transaction, and any such authorized payments to Banner during calendar years 2010 and 2011 caused economic losses to Plan Participants.

### 2.    Damages

383.    For the 2012 to 2017 period, the Court concludes that there are no losses. During that period, Banner Defendants improperly caused the Plan to pay $1,476,072.42 to the Plan.  And as of November 1, 2017, Banner Defendants repaid the improperly used $1,476,072.42 to the Plan.  ¶¶ 232, 237.  Banner subsequently remitted $7,396.09, the interest payment on lost earnings, to the Plan in February 2018. ¶ 237; Ex. 898 at 3–4.  After resolution of the DOL 2017 audit, Banner allocated those amounts back to Participants.  ¶ 237.

384.    As for the interest rate for the 2012 to 2017 period, the Court finds that the applicable RCA interest rate is appropriate, as it represents what the funds would have actually earned.  ¶ 238.  The Court thus denies Plaintiffs' request to file additional briefing to recalculate Plan losses using the S&P 500 rate of return.  ECF No. 458 at 81–82.

385.    As discussed in detail above, the Court finds that Plaintiffs are entitled to recover for losses for the calendar years 2010 and 2011.  Plaintiffs "conservatively seek the return of the amounts paid to Banner for only 2010 and 2011 ($687,589)."  ECF No. 458 at 81; ¶ 236.  Plaintiffs do not seek damages as a result of the prohibited transactions which took place from November 20, 2009 to December 31, 2009, approximately the first 6 weeks of the Class Period.

386.    While the $687,589, consisting of 2010 and 2010 payments, almost certainly includes allowable expenses paid during those years, Defendants have not demonstrated—as is their burden once Plaintiffs have established a breach of fiduciary duty resulting in loss—what portions of these payments, if any, are reasonable and appropriate.  *See Patelco*, 262 F.3d at 912; *see Leigh*, 727 F.2d at 138–39.  Central to the Court's conclusions on this Count is the fact that, under applicable caselaw, Plaintiffs will not be deprived recovery "simply because [Banner Defendants] have made it difficult to disentangle the prohibited transaction."  *Patelco*, 262 F.3d at 912.

387.    Accordingly, and in particular because ERISA is a remedial statute, the Court resolves any doubts in favor of Plaintiffs, and concludes that the best approximation of loss for the pre-2012 time period is the total amount received by Banner from the Plan in 2010 and 2011, or $687,589.  *See Patelco*, 262 F.3d at 912 (*quoting Kim*, 871 F.2d at 1431).

388.    To account for lost earnings in 2010 and 2011, the Court will allow Plaintiffs to recover prejudgment interest on the $687,589, for the reasons discussed above the respect to the recordkeeping fee damages.  ¶¶ 352–55.  Unlike the 2012 to 2017 period, there is no evidence as to what interest rate these funds would have

earned.  Nor would it be appropriate to assume that the RCA interest rates should apply, because the RCA was not established until 2012.  To make Plaintiffs whole, consistent with the statutory purpose of ERISA, they shall receive prejudgment interest on the $687,589, calculated as discussed in ¶¶ 355–57, *supra*.  The Court will order supplemental briefing on the appropriate amount of prejudgment interest for this claim.

## H.   Failure to Monitor Fiduciaries (Count III)

389.   As discussed above, the RPAC and its members breached their fiduciary duty of prudence by failing to adequately monitor the recordkeeping fees paid to Fidelity, and by allowing Fidelity as a consequence to collect excessive recordkeeping and administrative fees.  ¶¶ 331–357.  Plan fiduciaries also failed to monitor and thus allowed the Plan to pay unreimburseable expenses to Banner, thereby permitting the Plan to engage in prohibited transactions under 29 U.S.C. § 1106(b).  ¶¶ 371–88.  The Court therefore must consider Plaintiffs' derivative claim that the Board, Board members, the IC, IC members, the CEO, RPAC, and RPAC members are liable as Plan fiduciaries by their failure to prudently monitor their Plan co-fiduciaries.  29 U.S.C. § 1105(a)(2).

390.   ERISA § 1105(a) imposes liability on a fiduciary for the legal breach of a co-fiduciary if the fiduciary "by his failure to comply with [ERISA § 1104(a)(a)] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach."  29 U.S.C. § 1105(a)(2).

391.   The Plan Document permitted named fiduciaries to "designate[ ] persons other than named fiduciaries to carry out fiduciary responsibilities."  29 U.S.C. § 1105(c)(1); *Stern v. El Paso Corp.*, 2007 WL 1346597, at *2 (D. Colo. May 8, 2007).

Notwithstanding the delegation of these duties, a named fiduciary at all times retains the duty to exercise prudence "in continuing the allocation or designation."  29 U.S.C. § 1105(c)(A).  "At reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan."  29 C.F.R. § 2509.75-8.  Fiduciaries who may appoint other fiduciaries "cannot simply name those fiduciaries and then turn a blind eye to the performance of their appointees."  *Agway, Inc. Employees' 401(k) Thrift Inv. Plan v. Magnuson*, 2006 WL 6903738, at *19 (N.D.N.Y. July 13, 2006).

392.    From the factual summary set forth in ¶¶ 239–49, the Court finds and concludes that the CEO, the IC, and the Board did not follow the Plan Document, nor did they monitor the RPAC or the Plan with respect to the reasonableness of the recordkeeping and administrative fees paid by the Plan to Fidelity.  The Court further concludes that this failure constituted a breach of the duty to monitor, as alleged in Count III.  Finally, the Court finds and concludes that this failure to monitor Plan fiduciaries resulted in losses to the Plan.

393.    From the factual summary set forth in ¶¶ 250–59, the Court finds and concludes that the RPAC, CEO, the IC, and the Board did not follow the Plan Document, nor did they monitor the transactions which resulted in the payment of prohibited Banner expenses from Plan assets.  The Court further finds and concludes that this failure constituted a breach of the duty to monitor, as alleged in Count III.

Finally, the Court finds and concludes that this breach of the duty to monitor Plan fiduciaries resulted in losses to the Plan.

394.    The Court notes that the failures of the Board, IC, and CEO, as relevant to the allegations of Count III, were not in the choices they made or the information they reviewed, but rather they were errors of omission: these fiduciaries persistently failed to monitor the RPAC's performance with respect to whether the recordkeeping and administrative fees paid to Fidelity were reasonable, and they also continually failed to monitor the RPAC with respect to whether non-reimbursable Banner expenses were paid for by the Plan.

395.    The limited monitoring by the CEO, Board, and IC—primarily focused on performance of the Plan's investments and not the recordkeeping and administrative fees paid for services—was not sufficient to discharge their fiduciary obligations under the Plan to monitor their co-fiduciaries.  The buck must stop somewhere, and with regard to these undischarged duties and obligations the Banner Defendants argue that it should stop somewhere else.  But the law will not permit such a wholesale delegation of fiduciary duties.  The failure of the Board and the IC to fully monitor the Plan and the CEO, and of the CEO to monitor the RPAC, and of the RPAC to monitor both the excessive recordkeeping fees paid by the Participants, as well as the Banner expenses improperly reimbursed by the Plan, caused economic losses to the Plan Participants, losses for which all Banner Defendants will be held responsible.

396.    The Court concludes that Defendants' breach of the duty to monitor Plan fiduciaries, as alleged in Count III, resulted in economic losses to the Plan that are equal to and coextensive with the losses to the Plan caused by Defendants' conduct

challenged in Counts I and V.   ¶ 260.   In other words, the Court concludes that there were no economic losses suffered by Plaintiffs which are independent of or in addition to the losses the Court will award to Plaintiffs under Counts I and V.

I.     **Injunctive Relief**

397.    ERISA § 1132(a)(3) of ERISA's civil enforcement provisions allows a plan participant to bring a civil action to, among other things, enjoin any act or practice that violates ERISA's enforcement provisions or the terms of the plan, or to obtain "other appropriate equitable relief (i) to redress . . . violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).   ERISA does not "authorize 'appropriate equitable relief' at large." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 253 (1993).   Rather, per the statute, equitable relief must be for the purpose of redressing violations or enforcing provisions of ERISA or a plan. *Id.*

398.    ERISA § 1132(a)(2) permits a beneficiary to maintain a civil action for appropriate relief under 29 U.S.C. § 1109, which in turn provides that a breaching fiduciary shall be "personally liable to make good . . . any losses to the plan resulting from each such breach . . . and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."   29 U.S.C. § 1109(a).

399.    In egregious cases of breach of fiduciary duties, courts have enjoined individuals from serving in a fiduciary or other capacity to an ERISA plan. *Beck v. Levering*, 947 F.2d 639, 641 (2d Cir. 1991) (holding that a permanent injunction is available as a remedy "where individuals participate in the kind of egregious self-dealing proved" before the district court); *Acosta v. Finishing Professionals, LLC*, 2018 WL

6603641, at *8 (D. Colo. Nov. 20, 2018) (enjoining an individual from serving in a fiduciary capacity to a particular plan, but not all ERISA plans); *Solis v. Sonora Envtl., L.L.C.*, 2012 WL 5269211, at *7 (D. Ariz. Oct. 24, 2012) (removing fiduciary for failure to timely remit employee contributions to the plan and comingling of assets); *Acosta v. WH Administrators, Inc.*, 2020 WL 1479580, at *10 (D. Md. Mar. 26, 2020) (removing fiduciaries for "serious misconduct").

400.   Because Plaintiffs have prevailed on Counts I, III, IV, the Court must consider whether equitable relief is warranted.  As discussed above in Parts II.E, G, and H, the Banner Defendants breached their duty of prudence with respect to recordkeeping fees resulting in Plan losses, allowed prohibited transactions involving misuse of Plan assets, and failed to adequately monitor other Plan fiduciaries.

401.   Nonetheless, Plaintiffs have failed to make any showing that injunctive or equitable relief is appropriate in the circumstances of this case.  This is so primarily because the record evidence is entirely bereft of any proof or even a suggestion that Banner Defendants will likely in the future violate ERISA in the same manner as was adjudicated in this action.  Necessarily, therefore, Plaintiffs have also failed to make any showing that injunctive relief is necessary in order to restrain the Defendants in the future, or to redress any hypothetical future violations.

402.   On January 1, 2017, Banner switched to a per-participant recordkeeping fee, ending the previous uncapped, asset-based recordkeeping fee arrangement.  ¶ 150.  Plaintiffs themselves acknowledge that a per-participant fee is an appropriate fee structure or model, and they did not challenge the appropriateness the recordkeeping fees paid to Fidelity after January 1, 2017.  Under these circumstances, and given the

categorical fee structure change effected by the Banner Defendants over three years ago, there is simply no evidence from which the Court can reasonably conclude that Banner Defendants will at some future point in time resume a policy or practice of violating their duty of prudence with respect to recordkeeping fees.  Accordingly, the Court will not enter injunctive or equitable relief with respect to the recordingkeeping count.

403.    Similarly, Plaintiffs have failed to present any evidence, or indeed they have not even alleged, that Banner has engaged in prohibited transactions of the type alleged in Count IV after December 30, 2017.  In this regard the Court notes that Banner Defendants have for nearly two-and-a-half years used a robust "allocation process" before charging staff administrative time to the Plan.  ¶¶ 226, 233.  From this the Court similarly concludes that Plaintiffs have failed to make the requisite showing for the imposition of injunctive or equitable relief as it pertains to this prohibited transactions count.

404.    Finally, with respect to injunctive relief, Plaintiffs have also failed to present any evidence from which the Court can reasonably conclude that equitable relief to restrain the Banner Defendants from engaging in any ongoing or future breach of the duty to monitor other fiduciaries is necessary or appropriate.

405.    Since Plaintiffs brought this lawsuit, Banner has renegotiated how it pays Fidelity for its recordkeeping and administrative services to the Plan, and ceased any improper payments to itself from Plan assets.  Under these circumstances, the Court finds that there is no basis to find that the breach of fiduciary duty and prohibited transactions are ongoing, or will likely reoccur in the future.  Accordingly, equitable relief

is not warranted or appropriate to redress a possible future violation of ERISA, or to enforce provisions of the Act or the Plan.

406.    Plaintiffs have also failed to show that any particular fiduciary acted in such an egregious manner so as to merit barring any individual from service in the future as a fiduciary to the Plan or other ERISA plans.   *See Beck*, 947 F.2d at 641. Accordingly, the Court concludes that the facts and circumstances of this case do not warrant enjoining any of the individual Banner Defendants in this manner.

407.    Finally, Plaintiffs request equitable relief in the form of an order that "Banner will cease paying itself from the Plan, from Plan related revenue sharing, or any other source related to Plan investments or service providers" and that "Banner shall operate the Plan for the exclusive benefit of the participants."   ECF No. 458 at 180–81. Such an injunction would "constitute an impermissibly vague obey-the-law injunction, and therefore is impermissible under Rule 65."   *Acosta v. Finishing Professionals, LLC*, 2018 WL 6603641, at *8 (D. Colo. Nov. 20, 2018) (citing *Keyes v. Sch. Dist. No. 1, Denver, Colo.*, 895 F.2d 659, 668 (10th Cir. 1990)).   Such an injunction "would be both duplicative and vague, and the court does not believe issuing such an injunction comports with judicial economy or the requirements of Rule 65."   *Id.*   Accordingly, the Court denies Plaintiffs' request to enter such an obey-the-law injunction.

## III. RULE 52(C) MOTION

Rule 52(c) provides that "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party."   Fed. R. Civ. P. 52(c).   Judgment under Rule 52(c) must be supported by findings of fact and conclusions of law as required by Rule 52(a).   *Id.*

At the conclusion of Plaintiffs' case, Defendants orally moved for a judgment on partial findings under Rule 52(c), and renewed that motion at the close of evidence. Tr. 1339:11–14; Tr. 1784:12–13.  The Court took the motion, as renewd, under advisement at the conclusion of the trial.

The Court now rules on these motions: The Defendants' original Rule 52(c) motion, and as renewed, is granted in part and denied in part consistent with the foregoing findings of fact and conclusions of law entered after a full trial on the merits to the Court.

## IV. CONCLUSION

Given the factual findings and legal conclusions set forth above, the Court finds and concludes that Plaintiffs are entitled to judgment in their favor on Counts I, III, and V, and that Defendants are entitled to judgment in their favor on Counts II and IV. Excluding prejudgment interest, Plaintiffs are entitled to losses in the amount of $1,661,879.83 on Count I and $687,589 on Count V.  As discussed previously, prejudgment interest at fixed interest rate of 3.25%, with interest compounded monthly, is appropriate on these amounts, but has not yet been calculated.  Therefore, the precise dollar amount to be awarded to Plaintiffs for their losses remains under advisement, and judgment will not enter until the amount of prejudgment interest has been calculated.

To determine the amount of prejudgment interest to be awarded to Plaintiffs, the Court will order the parties to confer and submit a notice regarding the appropriate amount of prejudgment interest.  If the parties cannot agree on this amount, the parties shall file supplemental, simultaneous briefs addressing the amount of prejudgment

interest owed, in accordance with the Court's rulings above.  The Court emphasizes that the supplemental briefs are **NOT** an opportunity to reargue the facts and conclusions set forth in this Order.  Any attempt to do so **will be stricken and ignored**.

The COURT therefore ORDERS as follows:

1.  The Court FINDS and CONCLUDES that the Named Plaintiffs, on behalf of themselves and a class of those similarly situated defined as "All participants and beneficiaries of the Banner Health Employees 401(k) Plan from November 20, 2009 through the date of judgment, excluding the Defendants," are entitled to judgment in their favor on Counts I, III, and V, and that Defendants are entitled to judgment in their favor on Counts II and IV, as set forth above;

2.  Plaintiffs and Defendants are ordered to submit a joint notice, or in the alternative simultaneous supplemental briefs, no later than **May 27, 2020**, on the question of the appropriate amount of prejudgment interest on the total amount of losses awarded to Plaintiffs, calculated in a manner entirely consistent with the Court's findings and conclusions in this Order.  Because the amount of prejudgment interest will depend on the precise day that judgment is entered, the parties are instructed to calculate prejudgment interest as of the following three dates: **June 3, June 4, and June 5, 2020.**  These briefs shall not to exceed **5 pages** in length, exclusive of attorney signature blocks, certificate of service, and supporting declaration(s) and/or affidavits(s), if any;

3.  The Court GRANTS IN PART and DENIES IN PART Defendants' Rule 52(c) for Judgment on Partial Findings, consistent with the findings of facts and conclusions of law set for above;

4.   The Court ORDERS that any party seeking an award of attorneys' fees and/or costs under 29 U.S.C. § 1132(g) file an opening brief, along with full supporting documentation, no later than **June 19, 2020**.  The opening brief should address two issues: (1) whether the party should be awarded attorneys' fees and costs under 29 U.S.C. § 1132(g); and (2) if so, in what amount.  Any response in opposition to such a brief and supporting documentation shall be filed no later than **July 10, 2020**.  Any reply in support of such a brief and supporting documentation shall be filed no later than **July 24, 2020**.  As it pertains to costs, in these submissions the parties shall distinguish between costs allegedly recoverable under 29 U.S.C. § 1132(g), and costs recoverable under Federal Rule of Civil Procedure 54(d)(1) and D.C.COLO.LCivR 54.1—and as to the latter, the party seeking such costs shall file a bill of costs per D.C.COLO.LCivR 54.1; and

5.   The Court's Revised Practice Standard III.C.1 limiting the length of written filings will not apply to the briefs ordered in the paragraph directly above.

Dated this 20th day of May, 2020.

BY THE COURT:

William J. Martinez
United States District Judge